Paul Leeds, Esq, (Bar No. 214309)
pleeds@fsl.law
Meredith King, Esq. (Bar No. 280043)
mking@fsl.law
FRANKLIN SOTO LEEDS LLP
444 West C Street, Suite 300
San Diego, California 92101
Tel:  619.872.2520
Fax: 619.566.0221

*Attorneys for River Falls, LLC,
Private Mortgage Lending, Inc., and
The Armbrust Living Trust*

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No: 25-04245-JBM11 |
| VILLA CHARDONNAY HORSES WITH WINGS, INC. | Chapter 11 |
| | **NOTICE OF _EMERGENCY_ MOTION AND _EMERGENCY_ MOTION TO APPOINT CHAPTER 11 TRUSTEE** |
| Debtor. | (11 U.S.C. § 1104) |
| | Case Filed:   October 14, 2025 |
| | **Status Conference** |
| | Date:         January 27, 2026 |
| | Time:         2:00 p.m. |
| | Dept:         2 |
| | Judge:        Hon. J. Barrett Marum |

///
///
///
///
///

**TO: THE HONORABLE UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; AND ANY OTHER PARTIES IN INTEREST:**

Counsel for the Office of the United States Trustee ("UST") and the Office of the California State Attorney General ("OAG") appeared before the Court in the above-captioned bankruptcy on January 22, 2026 and confirmed it was their understanding that Debtor and Debtor-in-Possession Villa Chardonnay Horses With Wings, Inc. ("Debtor") could neither operate for a charitable purpose nor distribute or expend charitable assets under California law because Debtor's status with the California Registry of Charitable Trusts ("Registry") was suspended. Debtor's counsel, in turn, advised that, without the ability to operate as a non-profit or use donated funds, Debtor would run out of food to feed animals within its care within 24 hours. This, and Debtor's other gross mismanagement, has created an urgent and extraordinary circumstance that threatens irreparable harm to the estate, its creditors, Debtor's animals, and donors. Rather than dismissal, however, Secured Creditors River Falls, LLC, Private Mortgage Lending, Inc., and Larry D. Armbrust and Carol A. Armbrust, as trustees of the Armbrust Living Trust (together "Secured Creditors") believe appointment of a neutral trustee would in the best interests of creditors and the estate, including because a trustee would be best positioned to work with the OAG to obtain the necessary authorization to use donated funds, or, in the alternative, would be best positioned to find alternative financing to wind down Debtor's affairs in compliance with applicable law.

**PLEASE THEREFORE TAKE NOTICE** that Secured Creditors move the court on an emergency basis to enter an order under 11 U.S.C. § 1104(a)(1) and (a)(2),[1] Fed. R. Bankr. P. 2007.1, and Local Rules 9013-9 appointing a chapter 11 trustee. This

---

[1] All statutory references herein are to Title 11 of the United States Code unless otherwise stated.

emergency motion (the "Motion" or the "Emergency Motion") is supported by the memorandum set forth below and the declarations of Meredith King ("King Decl."), Carl Armburst ("Armbrust Decl."), and DeAnn S. Cary ("Cary Decl.") filed herewith as well as all other documents on file in this case and (1) all documents on file in the individual Chapter 7 bankruptcy proceeding of Monika Kerber Perez pending as United States Bankruptcy Court for the Southern District of California Case No. 25-04318-CL7 (Ms. Perez's "Individual Bankruptcy") and (2) all documents on file in Debtor's prior bankruptcy filed as United States Bankruptcy Court of the Southern District of California Case No. 25-0369-JBM11 (Debtor's "First Bankruptcy").

**PLEASE TAKE FURTHER NOTICE** that Secured Creditors are requesting the Court schedule an emergency hearing on the Emergency Motion before the Honorable J. Barrett Marum, United States Bankruptcy Judge, in Department 2, Courtroom 118, located at United States Bankruptcy Court for the Southern District of California, U.S. Courthouse, 325 West "F" Street, San Diego, California 92101 as soon as is convenient for the Court and prepared to provide notice of such hearing in a manner reasonably calculated to provide prompt notice to all interested parties in accordance with Local Bankruptcy Rule 9013-9(d).

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-9(g) any party that opposes the Emergency Motion must immediately notify the judge's law clerk by telephone of intent to oppose. Written opposition is not required to be filed to the emergency motion, unless the Court otherwise directs.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-9(h) the Court reserves discretion to grant or deny the Emergency Motion without further hearing.

-3-

CASE NO. 25-04245-JBM11
NOTICE OF *EM*. MOT. APP. TRUSTEE

| | |
|---|---|
| Dated: January 23, 2026 | Respectfully Submitted,<br>FRANKLIN SOTO LEEDS LLP |
| | By:   */s/ Meredith King*<br>Meredith King, Esq.<br>Dylan A. Noceda, Esq. |
| | *Attorneys for River Falls, LLC,*<br>*Private Mortgage Lending, Inc., and*<br>*The Armbrust Living Trust* |

# MEMORANDUM

## I. Background

### A. Debtor

Debtor is a nonprofit Public Benefit Corporation organized under Nonprofit Public Benefit Corporation Law for public and charitable purposes. Debtor filed Articles of Incorporation with the State of California on May 14, 2009. Debtor's purpose as stated in its articles of incorporation is to "rescue horses and other animals that have been neglected or abused, providing safe shelter, food, kindness, medical care and farrier care, if needed to nurture the rescued animals back to health." Debtor's Bylaws require it to be operated by a President, Secretary, and Chief Financial Officer designated by a Treasurer. Among other duties, the Bylaws require the Treasurer to "[k]eep and maintain accurate accounts of the corporation's prosperities and business transactions, including accounts of its assets, liabilities, receipts, disbursements, gains and losses." [*See* King Decl., ¶ 11, Ex. 5.]

In its schedules, Debtor identifies itself as a "Horse Sanctuary" housing approximately 300 sick and elderly horses, 300 cats in similar condition, 3 pigs, 2 alpacas, 8 elderly geese, 30 elderly chickens, 1 blind bull, 4 elderly peacocks, 5 elderly turkeys, 3 turtles, 9 elderly donkeys, 10 elderly goats, and 1 elderly lamb. [Sch. A/B, Doc 37, pgs. 10 and 12.] At an initial meeting of creditors ("Initial Creditors' Meeting") held on November 19, 2025, Debtor's principal, Ms. Monika Kerber Perez, appeared and testified that as a sanctuary, Debtor strived to provide animals a "forever home" and to take animals that nobody else wanted. [King Decl., ¶ 12, Ex. 6, pgs. 19-20.] Ms. Perez testified Debtor's only limitation with respect to the number of animals it could rescue was "finances." [King Decl., ¶ 12, Ex. 6, pg. 22.]

Debtor is located at and operates at the real property located at 4554 Boulder Creek Road, Julian CA 92036 ("4554 Boulder Creek") and 4430 Boulder Creek Road, Julian CA 92036 ("4430 Boulder Creek" and, together with 4554 Boulder Creek,

"Boulder Creek"). Boulder Creek consists of three parcels and includes a detached garage, outbuildings, pond, barn, pool and spa, horse stables, a covered arena, and a 1,200-square-foot guest house. [Decl. D. Huntley Supp. Joinder Mot. Dismiss, Debtor's First Bankruptcy, Doc. 36-1("Huntley Decl."), at ¶ 7.] Debtor valued Boulder Creek at $3,250,000 in its Sch. A/B. [Sch. A/B, Doc 37, pg. --.]

### B. Secured Creditor's Loan

In March 2020, Secured Creditors jointly extended a secured loan ("Loan") to Debtor in the principal amount of $1,600,000. [*See* Claim No. 7, Dec. 23, 2025 (Secured Creditors' "Claim"); *see also* Huntly Decl., ¶¶ 7-14.] The Loan is evidenced by a Note Secured By Deed of Trust dated March 11, 2020 ("Note") and Short Form Deed of Trust and Assignment of Rents. [Claim, Exs. 1-3; Huntley Decl., at ¶¶ 9 and 10 and Exs. 1 and 2.] The Note required interest-only, monthly payments of $10,666.67 until the April 1, 2025 maturity, when the entire loan balance came due. Interest is accruing on the Loan under the Note at a rate of 8% per annum, and it is secured by a priority interest in Boulder Creek. [Claim, Exs. 2 and 3.] The last regular, monthly payment Secured Creditors received on the Note was made in March 2025. [Huntley Decl., ¶ 13.]

### C. Debtor's Default

Debtor failed to pay Secured Creditors loan on maturity. [Huntley Decl., at ¶ 13.] Secured Creditors thereafter agreed to extend the maturity date to April 18, 2025 in exchange for the payment of a $100,000 forbearance fee; however, Debtor paid only $20,000 of the agreed upon fee and foreclosure proceedings commenced. [*Id.*, at ¶ 14.] Between April and July of 2025, Secured Creditor's foreclosure trustee negotiated with Ms. Kerber in good faith, delaying foreclosure based on representations that Secured Creditors would be paid in full from a multi-million dollar inheritance, however these funds never materialized. A foreclosure sale was subsequently noticed for September 3, 2025. [*See id.* at ¶¶ 26-32.]

### D. Debtor's First Bankruptcy

Debtor filed its first Chapter 11 bankruptcy case on September 1, 2025, two days before the scheduled foreclosure. The case was dismissed 17-days later, on October 17, 2025 as the Court found cause existed to dismiss the bankruptcy under § 1112(b)(4)(C) because Debor failed to obtain appropriate insurance that posed a risk to the estate and the public. [*See* Or. Dismissing Case, First Bankruptcy, Doc 45, pgs. 2-3.]

### E. Debtor's Second Bankruptcy

The day before a continued foreclosure sale was scheduled (*see* Cary Decl., ¶ 10), on October 14, 2025, Debtor filed a second voluntary Chapter 11 petition initiating the above captioned bankruptcy proceeding. Secured Creditors thereafter timely filed their secured Claim in the amount of $1,745,578.10.

### F. Debtor's Operating Reports

During its Second Bankruptcy, Debtor has filed operating reports for the months of October, November, and December 2025. [*See* 2d Am. Oct. 2025 MOR, Doc 53 ("October MOR"); Am. Nov. 2025 MOR, Doc 56 ("November MOR"); Dec. 2025 MOR, Doc 57 ("December MOR").] In its October MOR, Debor reported it made disbursements of $35,812 for the reporting period beginning on October 14, 2025 and ending October 31, 2025 of which $33,000 was reported as having been disbursements made by a third party on behalf of the estate. [October MOR, pg. 2.] In its November MOR, Debtor reported having made disbursements of $56,685, of which Debtor reported $54,022 were disbursements made by a third party on behalf of the estate. [November MOR, pg. 2.] Finally, in its December MOR, Debtor reported making disbursements of $40,684, of which $31,247 were disbursements made by a third party on behalf of the estate. [December MOR, pg. 2.] While all three of Debtor's operating reports stated on page 1 that they were filed with a "[b]alance sheet containing the summary and detail of the assets, liabilities and equity (net worth) or deficient," no balance sheet is attached. Instead, filed with each operating report are pages of what

appear to be scanned receipts. [October MOR, pgs. 10-49; November MOR, pgs. 15-41; December MOR, pgs. 14-30.]

G.     **Suspended Status and Creditors' Meetings**

As set forth above, on November 19, 2025, Debtor's principal, Ms. Perez, appeared and provided testimony on behalf of Debtor at an Initial Creditors' Meeting. At that time, Ms. Perez testified that Debtor had received between $30,000 to $40,000 in donations in October 2025 from donors and $70,000 in cash from Ms. Perez's parents. The UST then requested Debtor provide a "detailed listing of all donors and donated amounts by year for 2023, 2024, and 2025." [King Decl., ¶ 12, Ex. 6, pgs. 27-29.]

After the Initial Creditors' Meeting, on or around November 21, 2025, counsel for Secured Creditors became aware that Debtor's registration with the Registry had been suspended. [Cary Decl., ¶ 11.] On December 9, 2025, in response to having received notice that Debtor's 341(a) meeting of creditors was being continued for personal reasons, counsel for Secured Creditors advised the UST that Secured Creditors objected to the continuance, including because there were a number of compliance issues which remained outstanding, such as and including that Debtor's registration status with the Registry was listed as suspended. [King. Decl., ¶ 13, Ex. 7.]

A continued meeting of creditors was held on January 7, 2026 ("Continued Creditors' Meeting"). At the Continued Creditors' Meeting, counsel for Debtor appeared and represented that he did not have a list of donations that Debtor had received for 2023, 2024, and 2025 and that it was his understanding Debtor had never maintained such a list. [King Decl., ¶ 14.] Ms. Perez also confirmed she was aware Debtor was not in good standing with the Registry. She advised that she understood this to mean Debtor could not solicit donations but confirmed that members of the public could donate to Debtor through its website and that Debtor had not solicited any donations in the past year. [King Dec., ¶ 16.]

**H.    Insurance Issues**

As is set forth above, Debtors First Bankruptcy was dismissed on October 17, 2025 because Debor failed to obtain appropriate insurance, which posed a risk to the estate and the public. At the time Debtor filed bankruptcy this time, Debtor provided Secured Creditors the following evidence of insurance: (1) a document entitled "Evidence of Property Insurance" along with declarations showing that Alta Vista Insurance Agency had placed a California Fair Plan policy for 4554 Boulder Creek with Debtor; and (2) a "Confirmation of Binding" and a "Certificate of Liability Insurance" confirming that Slade Brown had arranged an "Equestrian General Liability" policy from Kinsale Insurance Company for Debtor. [Armbrust Decl., ¶¶ 7-8 and Ex. 4.]

On October 28, 2025, counsel for Secured Creditors emailed counsel for Debtor and requested copies of all insurance policies covering Debtor's operations, all insurance applications, statements, or submissions used to acquire such policies, and endorsements or mortgagees' clauses identifying Secured Creditors as loss payees, mortgagees, or additional insured. Counsel requested this be provided by October 31, 2025. [King Decl., ¶ 5.] Counsel reiterated its request for Debtor's insurance policies, related applications, and endorsements on December 3, 2025. [King Decl., ¶ 6.] Debtor's counsel provided some, but not all of the records requested on December 3, 2025. In particular, on or around December 10, 2025, Secured Creditors received confirmation that they had been named as mortgagees on Debtor's California Fair Plan. However, the plan incorrectly identified Mr. and Mrs. Armbrust individually rather than through their trust, and the plan did not cover 4430 Boulder Creek or other structures on Debtor's property. [King Decl., ¶ 7.]

On December 12, December 22, and December 30, 2025, counsel for Secured Creditors reiterated their requests for confirmation that 4430 Boulder Creek had been added to Debtor's insurance policy and their requests for copies of all insurance

applications, statements, and other submissions. [King Decl., ¶ 8.] On January 22, 2026, a representative of Secured Creditors spoke with Tandy Owens, who Secured Creditors understand is Debtor's insurance agent assisting with the administration of its California Fair Plan, and confirmed that the Fair Plan does not cover 4430 Boulder Creek, including because Debtor has not provided information needed to properly value the structures. Secured Creditors further confirmed that they are still not properly listed on Debtor's Kinsdale liability policy. [Armbrust Decl., ¶ 9.] Finally, as of the date this Motion, Secured Creditors' have not received any documents Debtor used to obtain coverage, despite repeated requests. [King Decl., ¶ 9.]

I.      **January 22, 2026 Status Conference**

A continued status conference was held in Debtor's Second Bankruptcy on January 22, 2026. [*See* Min. Or., Doc 62.] At the status conference, counsel for the UST appeared and confirmed that it was their understanding that Debtor's status with the Registry had been suspended since January 2024. The UST further represented that it understood that 11 CCR § 312 required Debtor maintain good standing with the Registry "to operate or solicit for charitable purposes in California" and 11 CCR § 345(b) prohibited Debtor from "distribut[ing] or expend[ing] any charitable assets or assets subject to a charitable trust without the written approval of the Attorney General" while in suspended status. Because Debtor could not legally operate while in suspended status and § 1112(c) prevented it from being converted to a Chapter 7 proceeding, the UST advised the Court it was taking the position that the case likely should be dismissed. [King Decl., ¶ 19.]

Attorney David Eldan appeared at the status conference on behalf of the OAG and confirmed that it was his understanding Debtor's status with the Registry was suspended, and that this meant Debtor could not operate for charitable purposes or distribute or expend charitable assets. [King Decl., ¶ 20.] Counsel for Debtor represented that it was his understanding that without the ability to receive and spend

-6-

CASE NO. 25-04245-JBM11
MEM. SUPP. *EM.* MOT. APP. TRUSTEE

donated funds, Debtor would run out of food for the animals within its care in the next 24 hours. [King Decl., ¶ 21.] As a result of these representations, the Court required Debtor to, no later than 3:00 p.m. today, either: (1) submit an order dismissing the case; (2) file a stipulation with the OAG confirming Debtor has authorization to disburse funds necessary disbursements to feed and care for Debtor's animals; or (3) file a declaration regarding the terms of an agreement with the OAG that would permit Debtor to care for its animals. [*See* Min. Or., Doc 62.]

## II. The Court Should Appoint a Chapter 11 Trustee

Section 1104( a) requires courts appoint of a chapter 11 trustee if the Court: (1) finds "cause," including "fraud, dishonesty, incompetence, or gross mismanagement" or "(2) if such appointment is in the interests of creditors." While there is a strong presumption in favor of keeping a debtor in possession of the estate, the standard for appointing a Chapter 11 Trustee is a preponderance of the evidence. *Keeley & Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Lan P'ship)*, 455 B.R. 153, 162-63 (B.A.P. 8th Cir. 2011) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)); *also see In re Veblen W. Dairy LLP*, 434 B.R. 550, 555 (Bankr. D.S.D. 2010). In this case, cause exists for the Court to appoint a chapter 11 trustee either under § 1104(a)(l) or (a)(2).

### A. Debtor Has Grossly Mismanaged Debtor's Affairs

In determining whether a debtor has grossly mismanaged its affairs, courts typically look at how the debtor has managed its assets or business during the bankruptcy, including how they have reported and handled the income and expenses derived from the assets. *See, e.g.*, *Kingsway Capital Partners, LLC v. Sosa*, 549 B.R. 897, 905 (N.D. Cal. 2016) (paying personal expenses, ineffective business management, and problematic financial disclosures all constituted gross mismanagement); *In re Prods. Int'l Co.*, 395 B.R. 101, 111 (Bankr. D. Ariz. 2008) (debtor's failure to maintain an effective corporate management team constituted gross

mismanagement); *Matter of Anchorage Boat Sales, Inc.*, 4 B.R. 635, 645 (Bankr. E.D.N.Y. 1980) (failure to supervise bookkeeper resulting in sales "out of trust," misapplication of proceeds and general confusion of accounting system constituted cause for trustee appointment). Courts also consider a debtor's pre-petition conduct, although mere mismanagement is insufficient. *Anchorage Boat Sales*, 4 B.R. at 645 ("Since one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11, the Court must find something more aggravated than simple mismanagement in order to appoint a trustee.").

In this case the undisputed facts on the record demonstrate Debtor has grossly mismanaged its affairs, including that:

1. Debtor's registration with the Registry was suspended in January 2024 and Debtor's operating reports and representations at creditors' meetings make clear that it nonetheless continued to operate for charitable purposes in violation of 11 CCR § 345(b) and distribute charitable assets in violation of 11 CCR § 345(b).

2. Debtor's Bylaws require Debtor's Treasurer to "[k]eep and maintain accurate accounts of the corporation's prosperities and business transactions, including accounts of its assets, liabilities, receipts, disbursements, gains and losses." However, Debtor's counsel has represented Debtor has never maintained a list of donations and since filing Debtor's bankruptcy over 100 days ago, Debtor has failed to provide the UST a list of donations received, despite repeated requests. Debtor's operating reports further fail to attach financial statements, and it appears Debtor has failed to maintain any, let alone, adequate financial records as required by its Bylaws.

3. Despite repeated and numerous requests over the past 100 days (*see supra* Section I.H), Debtor has failed to provide Secured Creditors documentation that Boulder Creek is fully insured under a policy that appropriately names Secured Creditors as mortgagees. Instead, it appears Debtor continues to remain underinsured. This is consistent with Debtor's pre-petition gross mismanagement, in which Debtor repeatedly failed to ensure Boulder Creek was adequately insured. [*See* Huntly Decl., ¶¶ 15-18.]

4.  Debtor has not made a payment on the priority lien secured by its real property since March 2025. Instead, in the past five months it has filed two bankruptcy petitions on the eve of foreclosure.

5.  Debtor's counsel appeared in Court on January 22, 2026 and represented that Debtor had only enough food on hand to feed the animals in Debtor's care for the next 24 hours. This is an insufficient reserve. If Debtor only has enough food on hand to feed its animals for the next 24 hours, any unexpected supply chain, natural disaster, or financial setback would compromise Debtor's ability maintain the nutritional needs of animals in its care. Debtor owes a responsibility to its donors, regulators, and the public to maintain adequate food reserves and its failure to do so constitutes further gross mismanagement.

It remains to be seen whether representations Debtor made to potential donors regarding Debtor's operations during its period of suspension with the Registry constitute fraud or dishonesty. However, at a minimum, Debtor's continued operation during this time and failure to maintain adequate books and records constitute gross mismanagement of the estate. Cause therefore exists to appoint a Chapter 11 trustee under § 1104(a)(1).

### B. Appointment of a Trustee Is in the Interests of Creditors

In determining whether appointment of a trustee is in the best interest of creditors, courts look at the realities and necessities of a case, including whether appointment of a neutral trustee would reduce estate expenses, maximize the value of estate assets, or enable the formulation of a confirmable of plan. *See, e.g, In re Corona Care Convalescent Corp.*, 527 B.R. 379, 385 (Bankr. C.D. Cal. 2015) (appointment of a trustee in the best interests of creditors where a sale of the debtor's business offered "some prospect of payment of creditors" because assets could "monetized for the payment of claims of creditors").

Debtor, the Court, and all creditors share an interest in ensuring Debtor's animals receive proper care and Debtor's obligations to donors who provided Debtor charitable contributions are satisfied. Secured Creditors had hoped to find a buyer at foreclosure who would be willing to acquire title to the property and take on the responsibility of

caring for Debtor's animals. [Cary Decl., ¶ 14.] However, the pervasive nature of Debtor's mismanagement of its affairs, the vast number of animals on the property, and their current condition, and information that Ms. Perez has been the defendant in at least one unlawful detainer proceeding in Riverside County have led Secured Creditors to conclude that a neutral third party is necessary to work with Debtor, creditors, the California Attorney General, and other stakeholders to ensure the rights of Debtor's donors and animals are protected while Debtor's assets are monetized for the benefit of creditors. [Cary Decl., ¶ 15.] Secured Creditors understand the Attorney General remains ready and able to authorize the use of donated funds as needed for Debtor to accomplish its charitable purchase, and Secured Creditors believe a neutral third party is in the best position to facilitate this process. [*See* King Decl., ¶ 21; Cary Decl., ¶ 16.] Finally, in the event the trustee is unable to find donations needed to operate and/or is unable to coordinate with the Attorney General to receive authorization to use such funds, Secured Creditors believe a trustee is best situated to secure third-party debtor-in-possession or other financing needed to operate while Debtor's operations are wound-down in accordance with California law. Indeed, Secured Creditors are unwilling to provide Debtor any advances or additional financing while Debtor remains in possession but would be willing to discuss the terms of a potential debtor-in-possession financing facility with a Chapter 11 Trustee. [Cary Decl., ¶ 17.] Based on the above, Secured Creditors request the Court find appointment of a trustee is in the best interests of creditors and the estate.

### III. Grounds Exist to Grant the Relief Requested on an Emergency Basis

Section 1104 permits courts to appoint a trustee only "after notice and a hearing." However, "[b]ankruptcy courts have traditionally limited hearings to what was necessary in the circumstances to decide disputed questions relating to appointment of a trustee." *In re Bibo, Inc.*, 76 F.3d 256, 259 (9th Cir. 1996). Debtor's counsel appeared at a status conference on January 22, 2026 and admitted on the record that Debtor was

unsure whether it would be able both operate within the constraints of California law and feeds its animals within the next 24 hours. The Court accordingly ordered Debtor upload a dismissal order or provide evidence that it could operate under California law and feed its animals by January 22, 2026.

The imminent dismissal of Debtor's case creates an urgent situation that threatens both the welfare of Debtor's animals and the interests of creditors and donors. As is set forth above, Secured Creditors have been forced to conclude that if this case is dismissed it is possible, if not likely, that Debtor will continue to fail to maintain a sufficient food reserve for its animals, that the maintenance and care of Debtor's charitable assets and donors interests will be put at risk, and that creditors will lose the opportunity to recover value through an orderly process. Because these circumstances involve immediate harm to vulnerable animals and potential violations of California law, the urgent nature of the case justifies consideration of appointment of a trustee on an emergency basis.

### IV. Conclusion

For all the reasons set forth above, the imminent dismissal of this case creates an urgent and extraordinary circumstance that threatens irreparable harm to the estate, its creditors, and the animals under Debtor's care. Debtor has represented that it may be unable to feed its animals within the next 24 hours and cannot legally operate under California law due to its suspended status. Appointment of a Chapter 11 trustee—not dismissal—is the only viable path to protect the rights of creditors, donors, and the welfare of the animals, while ensuring compliance with applicable law. Accordingly, Secured Creditors respectfully request that the Court grant this Motion on an ***emergency*** basis and enter an order appointing a trustee under § 1104(a).

Dated: January 23, 2026

Respectfully Submitted,
FRANKLIN SOTO LEEDS LLP

By:    */s/ Meredith King*
Meredith King, Esq.
Dylan A. Noceda, Esq.

*Attorneys for River Falls, LLC,*
*Private Mortgage Lending, Inc., and*
*The Armbrust Living Trust*