1  Paul Leeds, Esq, (Bar No. 214309)
   pleeds@fsl.law
2  Meredith King, Esq. (Bar No. 280043)
3  mking@fsl.law
   FRANKLIN SOTO LEEDS LLP
4  444 West C Street, Suite 300
5  San Diego, California 92101
   Tel:  619.872.2520
6  Fax: 619.566.0221

7
8  *Attorneys for River Falls, LLC,*
   *Private Mortgage Lending, Inc., and*
9  *The Armbrust Living Trust*

10            **UNITED STATES BANKRUPTCY COURT**

11            **SOUTHERN DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| In re: | Case No: 25-04245-JBM11 |
| | Chapter 11 |
| VILLA CHARDONNAY HORSES WITH WINGS, INC. | **DECLARATION OF MEREDITH KING IN SUPPORT OF _EMERGENCY_ MOTION TO APPOINT CHAPTER 11 TRUSTEE; AND DECLARATION RE: TELEPHONIC NOTICE** |
| Debtor. | (11 U.S.C. § 1104) |
| | Case Filed:   October 14, 2025 |
| | **Status Conference** |
| | Date:        January 27, 2026 |
| | Time:        2:00 p.m. |
| | Dept:        2 |
| | Judge:       Hon. J. Barrett Marum |

26  I, Meredith King, declare as follows:

27         1.     I am, and at all relevant times herein mentioned have been, an attorney

28

duly licensed to practice law in the State of California in all state and federal courts. I am an attorney at the law firm of Franklin Soto Leeds LLP , attorneys for Secured Creditors River Falls, LLC ("River Falls"), Private Mortgage Lending, Inc. ("PMI"), and Larry D. Armbrust and Carol A. Armbrust, as trustees of the Armbrust Living Trust (the "Armbrust Trust," and together "Secured Creditors").

2.     This declaration is based on my own personal knowledge and, to the extent it is not, it is based on my familiarity with FSL's business records in the course of my employment. FSL's business records are routinely made to record acts, events, and conditions relating to FSL's business operations by those with firsthand knowledge and contemporaneous to the information recorded. If called upon as a witness I could, and would, testify competently to the contents of this declaration.

3.     This declaration is filed in support of Secured Creditors' concurrently filed emergency motion ("Motion") seeking appointment of a Chapter 11 trustee in this case.

**A.     Debtor's Insurance Coverage**

4.     On October 14, 2025, I received an email from counsel for Debtor in the above captioned proceeding, Mr. Michael Totaro, forwarding documents which Mr. Totaro indicated evidenced Debtor's insurance coverage. I provided insurance documents attached to this email to Carol Armbrust, trustee of the Armbrust Living Trust and I understand they are attached as Exhibit 4 to the concurrently filed declaration from Ms. Armbrust.

5.     On October 28, 2025, I emailed counsel for Debtor and requested copies of all insurance policies covering Debtor's operations, all insurance applications, statements, or submissions used to acquire such policies, and endorsements or mortgagees' clauses identifying Secured Creditors as loss payees, mortgagees, or additional insured by October 31, 2025.

6.      On December 3, 2025, I emailed Debtor's counsel reiterating my request for Debtor's insurance policies, related applications, and endorsements, to which some,

but not all of the records were provided.

7.     On or around December 10, 2025, I received confirmation that Secured Creditors had been named as mortgagees on Debtor's California Fair Plan. However, I understand they were incorrectly identified. Specifically, Mr. and Mrs. Armbrust were named individually rather than through their trust, and the plan did not cover 4430 Boulder Creek or other structures on Debtor's property.

8.     On December 12, December 22, and December 30, 2025, I emailed Debtor's counsel reiterating requests for confirmation that 4430 Boulder Creek had been added to Debtor's insurance policy and their requests for copies of all insurance applications, statements, and other submissions.

9.     As of the date of this declaration, I understand that all structures on Boulder Creek have not been added to Debtor's insurance policy and that Secured Creditors still have not be correctly named on Debtor's California Fair Plan.  My office also still has not received copies of Debtor's applications and submissions used to obtain insurance coverage.

**B.     Debtor's Corporate Records**

10.     On January 7, 2026, I emailed Mr. Totaro and requested he provided copies of Debtor's corporate records and all amendments thereto, including its articles of incorporation and bylaws, minutes, of all board of directors and shareholder meetings, and current and historical lists of officers, directors, and shareholders.

11.     On  January 20, 2026, I received a response from Mr. Totaro providing what he represented were all of the corporate records "we have." A true and correct copy of Mr. Totaro's email to me along with all accompanying exhibits are attached hereto as **Exhibit 5.**

**C.     Debtor's Initial Meeting of Creditors**

12.     I attended the creditors' meeting ("Initial Creditors' Meeting") held on November 19, 2025 in connection with the above captioned bankruptcy proceeding. Debtor appeared at the meeting by and through its representative—Monika Kerber

Perez.  Attached hereto as **Exhibit 6** is a true and correct copy of the transcript of this meeting of creditors.

13.    On December 9, 2025, I received notice that Debtor's continued meeting of creditors was being continued for personal reasons. At that time, I advised the UST that Secured Creditors objected to the continuance, including because there were a number of compliance issues which remained outstanding, such as and including that Debtor's registration status with the Registry was listed as suspended. A true and correct copy of my email to Ms. Hong is attached hereto as **Exhibit 7**.

14.    I attended Debtor's continued creditors' meeting ("Second Creditors' Meeting") held in connection with this bankruptcy on January 7, 2026. Debtor again appeared at the meeting by and through its representative, Ms. Perez.

15.    Notes from my attendance at Debtor's Second Creditors' Meeting indicate that Mr. Totaro appeared at the meeting for Debtor and represented that he did not have a list of donations that Debtor had received for 2023, 2024, and 2025 and that it was his understanding Debtor had never maintained such a list.

16.    My notes from Villa Chardonnay's Second Creditors' Meeting further indicate that at the meeting Ms. Perez also provided testimony indicating:

    a.  She understood Debtor's status with the California Registry of Charitable Trusts ("Registry") was suspended.

    b.  She understood Debtor's suspension meant Debtor could not solicit donations.

    c.  It was her understanding that members of the public could make donations on Debtor's website.

17.    Debtor's 341(a) meeting was concluded on January 7, 2026; however, it was noted on the record that several document requests remained outstanding including, among others, banking and financial records.

**D.    January 22, 2026 Status Conference**

18.    I attended a status conference held in connection with the above captioned

bankruptcy on January 22, 2026.

19.    My notes from the status conference indicate that at hearing counsel for Office of the United States Trustee ("UST") represented that the UST understood that 11 CCR § 312 required Debtor maintain good standing with the Registry "to operate or solicit for charitable purposes in California" and 11 CCR § 345(b) prohibited Debtor from "distribut[ing] or expend[ing] any charitable assets or assets subject to a charitable trust without the written approval of the Attorney General" while in suspended status. Because Debtor could not legally operate while in suspended status and § 1112(c) prevented it from being converted to a Chapter 7 proceeding, the UST advised the Court it was taking the position that the case likely should be dismissed.

20.    My notes from the status conference indicate that at the status conference counsel for Office of the California State Attorney General ("OAG") appeared and confirmed that it was his understanding Debtor's status with the Registry was suspended, and that this meant Debtor could not operate for charitable purposes or distribute or expend charitable assets without the consent of the Attorney General.

21.    My notes from the status conference indicate that at the status conference indicate that at the hearing Mr. Totaro appeared at the hearing and represented that it was his understanding that without the ability to receive and spend donated funds, Debtor would run out of food for the animals within its care in the next 24 hours. As is set forth more fully below, on January 23, 2026, I spoke with counsel for the OAG. At that time, he confirmed that he was working with counsel for Debtor to provide Debtor limited authorization to use donated funds to meet Debtor's operating expenses.

### E.    Telephonic Notice of Emergency Motion

22.    As is set forth below, prior to filing Debtor's Motion, my office provided telephonic notice of the motion to Debtor's counsel, the UST, and the OAG as well as all other parties whom we understand made an appearance at yesterday's status conference or Debtors' creditors meetings.  We were not able to connect with the UST, however, based on these conversions we did have, we understand that while Debtor

1    may oppose appointment of a trustee, no other party has currently expressed opposition
2    to the relief requested.

3        23.    Where Secured Creditors were not able to speak with a representative
4    about the Motion or when a parties' representative advised that they may need more
5    time to consider the relief requested,  my office attempted to confirm to the best method
6    to deliver Secured Creditors' Motion papers and requested the parties' representative
7    call the Court as soon as possible if they determined opposition to the Motion was
8    appropriate.

9        24.    Additional details on the telephonic notice provided are below and my
10    offices stands ready to provide any additional notice the Court determines is warranted
11    under the circumstances.

12        25.    On January 23, 2026 at 10:36 a.m., I emailed Mr. Totaro and advised him
13    that Secured Creditors' intended to file an emergency motion today requesting
14    appointment of a Chapter 11 trustee in this bankruptcy. My office attempted to provide
15    telephonic notice to Mr. Totaro at 888-425-2889 how we received a message indicating
16    that the phone number was not receiving calls. We were therefore unable to leave a
17    message.

18        26.    At 10:44 a.m. today and 11:32 a.m. Mr. Totaro sent emails to my office
19    requesting Secured Creditors "hold off" on filing their Emergency Motion and
20    requesting additional time to work with the OAG.

21        27.    My office sent a follow up email to Mr. Totaro today at 1:09 p.m. advising
22    that Secured Creditors would be moving forward with the Emergency Motion and
23    would notify the Court of Debtor's intent to oppose.

24        28.    On January 23, 2026, I am aware that Paul Leeds, Esq., from my office
25    left a message with Haeji Hong, Esq. with the UST advising Ms. Hong that Secured
26    Creditors intended to file their Motion. My office has not been able to connect with
27    Ms. Hong to determine whether the UST intends to oppose the relief requested.

28        29.    On January 23, 2026 at approximately 12:25 p.m., I spoke with Grace

CASE NO. 25-04245-JBM11
DECL. M. KING SUPP. *EM.* MOT. APP. TRUSTEE

Wainscot, counsel for Interested Party Humane Farming Association and informed her that Secured Creditors intended to file a motion requesting emergency appointment of a trustee. At that time, Ms. Wainscot advised that while the Human Farming Association had not yet asserted a claim in Debor's case they remained an interested party available to assist with the care of Debtor's animals as needed. Ms. Wainscot advised that she did not as the time of our conversation oppose appointment of a trustee. I requested that she call the Court immediately if this position changed.

30.    On January 23, 2026 at approximately 1:01 p.m. I spoke with counsel for OAG Mr. David Eldan and Ms. Nicole Kennedy and advised them that Secured Creditors' intended an emergency motion seeking appointment of a trustee. At that time, I confirmed the email address to which Secured Creditors' Motion could be sent and Mr. Eldan informed that the OAG did not intend to oppose appointment of a trustee in this case. I requested that Mr. Eldan immediately contact the Court by telephone after service of the Motion if this position changed.

31.    On January 23, 2026 at 1:15 p.m. I spoke with counsel for Celine Myers and the Ark Watch Foundation and advised him that Secured Creditors' intended an emergency motion seeking appointment of a trustee. At that time, I confirmed Mr. Folley would accept service of the motion via email. Mr. Folley advised that he did not necessarily intend to oppose appointment of a trustee in this case based on the information currently available to him. I requested that Mr. Folley immediately contact the Court by telephone after service of the Motion if he determined it was appropriate for his clients to oppose the relief requested.

32.    Based on the above and the telephonic notice, I understand Secured Creditors have fully complied with LBR 9013-9(e) requiring telephonic notice of the Motion be provided to all interested parties.  I further understand a proof of service is being concurrently filed herewith reflecting service of the Emergency Motion Package in accordance with the terms above.

CASE NO. 25-04245-JBM11
DECL. M. KING SUPP. *Em.* MOT. APP. TRUSTEE

1    I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct.

3

4    Executed this 23rd day of January, 2026.

5                    By:   _/s/ Meredith King_____

6                          MEREDITH KING

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "5"

**Friday, January 23, 2026 at 1:43:56 PM Pacific Standard Time**

| | |
|---|---|
| **Subject:** | Re: Villa Chardonnay - Corporate Books and Records |
| **Date:** | Tuesday, January 20, 2026 at 7:08:06 PM Pacific Standard Time |
| **From:** | Totaro & Shanahan, LLP |
| **To:** | mking@fsl.law |
| **Attachments:** | Corporate Authorization.pdf, corporate.pdf |

(1) corporate records and all amendments thereto, including its articles of incorporation and bylaws;

Attached is all we have

(2) minutes of all board of directors and shareholder meetings; and

Corporate authorization attached if that is what you want

(3) current and historical lists of officers, directors, and shareholders.

These are listed on SOFA

I am hopeful these corporate records will be on hand to the extent that they have been provided to the Office of the United States Trustee and ask that, if possible, they be provided tomorrow.

Michael R. Totaro J.D., LL.M.
Totaro & Shanahan
P.O. Box 789
Pacific Palisades, CA 90272
310 804 2157

www.TotaroandShanahan.com

Deuteronomy 15:1-2
At the end of every seven years you shall grant a release. And this is the manner of the release: every creditor shall release what he has lent to his neighbor. He shall not exact it of his neighbor, his brother, because the Lord's release has been proclaimed.

In its infinite wisdom, the Legislature has extended this to 8 years!!

The parties expressly do not provide, AOL, Google, Microsoft or any other ISP permission  to read this email and view its contents. All ISP, including AOL and Google, Microsoft are expressly prohibited from using any means including creating a hash value for the contents of the email, to view the contents of this email.
In a message dated 1/7/2026 6:08:52 PM Pacific Standard Time, mking@fsl.law writes:

(1) corporate records and all amendments thereto, including its articles of incorporation and bylaws;
(2) minutes of all board of directors and shareholder meetings; and
(3) current and historical lists of officers, directors, and shareholders.

I am hopeful these corporate records will be on hand to the extent that they have been provided to the Office of the United States Trustee and ask that, if possible, they be provided tomorrow.

**United States Bankruptcy**
**Southerin District of California**

In Re: Villa Chardonnay Horses with Wings, Inc          Case No: 25-04245

Chapter: 11

### STATEMENT REGARDING AUTHORITY TO SIGN AND FILE PETITION

     I, Monika Kerber Perez, declare under penalty of perjury that I am the President of Villa Chardonnay Horses with Wings, Inc a California Corporation and that on October 13, 2025 the following resolution was duly adopted by the Board of this Corporation:

     "Whereas, it is in the best interest of this Corporation to file a voluntary petition in the United States Bankruptcy Court pursuant to Chapter 11 of Title 11 of the United States Code:

     Be it Therefore Resolved, that Monika Kerber Perez, President of this Corporation, is authorized and directed to execute and deliver all documents necessary to perfect the filing of a Chapter 11 voluntary bankruptcy case on behalf of the [Corporation or LLC]: and

     Be it Further Resolved, that Monika Kerber Perez, President of this Corporation, is authorized and directed to appear in all bankruptcy proceedings on behalf of the [Corporation or LLC], and to otherwise do and perform all acts and deeds and to execute and deliver all necessary documents on behalf of the Corporation in connection with such bankruptcy case; and

     Be it Further Resolved that Monika Kerber Perez, President of this Corporation, is authorized and directed to employ the law firm of Totaro & Shanahan, LLP and its attorneys, to represent the Corporation in such bankruptcy case."

Executed on: October 13, 2025          Signed: _____

                                     Monika Kerber Perez
                                     President

W

3119436



## State of California
Secretary of State

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That the attached transcript of _____ page(s) has been compared with the record on file in this office, of which it purports to be a copy, and that it is full, true and correct.



**IN WITNESS WHEREOF,** I execute this certificate and affix the Great Seal of the State of California this day of

MAY 1 4 2009

*Debra Bowen*

DEBRA BOWEN
Secretary of State

Sec/State Form CE-107 (REV 1/2007)

OSP 08 111441

3119436

## Public Benefit Corporation, State of California
## Articles of Incorporation

**ENDORSED - FILED**
in the office of the Secretary of State
of the State of California

MAY 1 1 2009

I.

The name of the corporation is Villa Chardonnay—Horses With Wings.

II.

A.  This corporation is a nonprofit Public Benefit Corporation and is not organized for the private gain of any person. It is organized under the Nonprofit Public Benefit Corporation Law for public and charitable purposes.

B.  The purposes of this corporation shall be to rescue horses and other animals that have been neglected or abused, providing safe shelter, food, kindness, medical care and farrier care, if needed to nurture the rescued animals back to health. We are committed to placing the rescued horses with quality adoptive family units or foster parents, retaining the rights to the horses in case of mistreatment or neglect discovered during regular monitoring and inspections. We plan to raise funds to care for the needs of the rescued horses and animals through individual, community, and corporate donations.

III.

The name and address in the State of California of this corporation's initial agent for service of process is:

Name: Monika Kerber
Address: 42200 Calle Barbona
City:  Temecula            State: CALIFORNIA            Zip Code: 92592

IV.

A. This corporation is organized and operated exclusively for charitable purposes within the meaning of Internal Revenue Code section 501(c)(3).

B. No substantial part of the activities of this corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of any candidate for public office.

V.

The property of this corporation is irrevocably dedicated to charitable purposes and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes and which has established its tax exempt status under Internal Revenue Code section 501(c)(3).

Monika Kerber, Incorporator

BYLAWS
OF
VILLA CHARDONNAY—HORSES WITH WINGS, INC.

ARTICLE 1
OFFICES

**SECTION 1. PRINCIPAL OFFICE**

The principal office of the corporation for the transaction of its business is located at 42200 Calle Barbona, Temecula, CA 92592.

**SECTION 2. CHANGE OF ADDRESS**

The county of the corporation's principal office can be changed only by amendment of these Bylaws and not otherwise. The Board of Directors may, however, change the principal office from one location to another within the named county by noting the changed address and effective date below, and such changes of address shall not be deemed an amendment of these Bylaws:

_____   Dated: _____

_____   Dated: _____

**SECTION 3. OTHER OFFICES**

The corporation may also have offices or facilities, within or outside the State of California, where it is qualified to do business, as its business may require and as the Board of Directors may, from time to time, designate.

ARTICLE 2
PURPOSES

**SECTION 1. OBJECTIVES AND PURPOSES**

The primary objectives and purposes of this corporation shall be: To provide a wide range of educational programs and services for individuals and groups of all ages and socioeconomic backgrounds in each community it serves. The organization will not discriminate based on race, religion, gender, sexual orientation or any other factor in accordance with state and federal law. These activities include, but are not limited to, classroom and on-line instruction, tutoring, specialized camp experiences, community learning events and educational outreaches.

1

## ARTICLE 3
## DIRECTORS

### SECTION 1. NUMBER

The corporation shall have three directors and collectively they shall be known as the Board of Directors. The number of directors may be changed at any time but by amendment of this Bylaw by a majority of the Board of Directors.

### SECTION 2. POWERS

Subject to the provisions of the California Nonprofit Public Benefit Corporation law and any limitations in the Articles of Incorporation and Bylaws, the activities and affairs of this corporation shall be conducted and all corporate powers shall be exercised by or under the direction of the Board of Directors.

### SECTION 3. DUTIES

It shall be the duty of the directors to:

(a)  Perform any and all duties imposed on them collectively or individually by law, by the Articles of Incorporation of this corporation, or by these Bylaws;

(b)  Appoint and remove, employ and discharge, and, except as otherwise provided in these Bylaws, prescribe the duties and fix the compensation, if any, of all officers, agents and employees of the corporation;

(c)  Supervise all officers, agents and employees of the corporation to assure that their duties are performed properly;

(d)  Meet at such times and places as required by these Bylaws;

(e)  Register their addresses with the Secretary of the corporation to ensure timely notices of meetings are mailed or e-mailed to them at such addresses.

### SECTION 4. TERMS OF OFFICE

(a)  Board of Directors shall serve renewable two-year terms, or until their successors are elected, whichever is shorter.

(b)  Any new Directors shall be nominated and approved by the Board in consultation with other parties within the organization.

(c)  The term of office for Directors shall be from to January 1 to December 31 for the two-year period of service.

2

## SECTION 5. COMPENSATION

Directors shall serve without compensation. In addition, they shall be allowed reasonable advancement or reimbursement of expenses incurred in the performance of their regular duties as specified in Section 3 of this Article. Directors may not be compensated for rendering services to the corporation in any capacity other than director unless such other compensation is reasonable and is allowable under the provisions of Section 6 of this Article.

## SECTION 6. RESTRICTION REGARDING INTERESTED DIRECTORS

Notwithstanding any other provision of these Bylaws, not more than forty-nine percent (49%) of the persons serving on the board may be interested persons. For purposes of this Section, "interested persons" means:

(a)  Any person currently being compensated by the corporation for services rendered it within the previous twelve (12) months, whether as a full- or part-time officer or other employee, independent contractor, or otherwise, excluding any reasonable compensation paid to a director as director.

## SECTION 7. PLACE OF MEETINGS

Meetings shall be held at the principal office of the corporation unless otherwise provided by the Board or at such place within or without the State of California. A valid meeting of the Board of Directors would occur with a majority of Directors present.

Any meeting, regular or special, may be held by conference telephone, electronic video screen communication, or other communications equipment. Participation in a meeting through use of conference telephone would be considered the same as the Director's physical presence at that meeting so long as all directors participating in the meeting agree.

## SECTION 8. REGULAR AND ANNUAL MEETINGS

Regular meetings of Directors shall be held at least semi-annually at locations and times determined by the Board of Directors given the issues to be addressed.

## SECTION 9. SPECIAL MEETINGS

Special meetings of the Board of Directors may be called by the Chairperson of the Board, the President, the Vice President, the Secretary, or by any two directors, and such meetings shall be held at the place, designated by the person or persons calling the meeting.

### SECTION 10. NOTICE OF MEETINGS

Regular meetings of the board may be held without notice. Special meetings of the board shall be held upon three (3) days' notice by first-class mail, e-mail or personal telephone call. Such notices shall be addressed to each director at his or her address as shown on the books of the corporation.

### SECTION 11. CONTENTS OF NOTICE

Notice of meetings not herein dispensed with shall specify the place, day and hour of the meeting. The purpose of any board meeting need not be specified in the notice.

### SECTION 12. WAIVER OF NOTICE AND CONSENT TO HOLDING MEETINGS

The transactions of any meeting of the board, however called and noticed or wherever held, are as valid as though the meeting had been duly held after proper call and notice, provided a quorum, as hereinafter defined, is present and provided that either before or after the meeting each director not present signs a waiver of notice, a consent to holding the meeting, or an approval of the minutes thereof. All such waivers, consents, or approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

### SECTION 13. QUORUM FOR MEETINGS

A quorum shall consist of a majority of authorized Directors.

Except as otherwise provided in these Bylaws or in the Articles of Incorporation of this corporation, or by law, no business shall be considered by the board at any meeting at which a quorum, as hereinafter defined, is not present, and the only motion which the Chair shall entertain at such meeting is a motion to adjourn. However, a majority of the directors present at such meeting may adjourn until the time fixed for the next regular meeting of the board.

When a meeting is adjourned for lack of a quorum, it shall not be necessary to give any notice of the time and place of the adjourned meeting or of the business to be transacted at such meeting, other than by announcement at the meeting at which the adjournment is taken, except as provided in Section 10 of this Article.

The Directors present at a duly called and held meeting at which a quorum is initially present may continue to do business notwithstanding the loss of a quorum at the meeting due to a withdrawal of directors from the meeting, provided that any action thereafter taken must be approved by at least a majority of the required quorum for such meeting or such greater percentage as may be required by law, or the Articles of Incorporation or Bylaws of this corporation.

### SECTION 14. MAJORITY ACTION AS BOARD ACTION

4

Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present is the act of the Board of Directors, unless the Articles of Incorporation or Bylaws of this corporation, or provisions of the California Nonprofit Public Benefit Corporation Law, particularly those provisions relating to appointment of committees (Section 5212), approval of contracts or transactions in which a director has a material financial interest (Section 5233) and indemnification of directors (Section 5238e), require a greater percentage or different voting rules for approval of a matter by the board.

## SECTION 15. CONDUCT OF MEETINGS

Meetings of the Board of Directors shall be presided over by the Chairperson of the Board, or, if no such person has been so designated or, in his or her absence, the President of the corporation or, in his or her absence, by the Vice President of the corporation or, in the absence of each of these persons, by a Chairperson chosen by a majority of the directors present at the meeting. The Secretary of the corporation shall act as secretary of all meetings of the board, provided that, in his or her absence, the presiding officer shall appoint another person to act as Secretary of the Meeting.

Meetings shall be governed by Robert's Rules of Order as deemed necessary. Such rules may be revised from time to time, insofar as such rules are not inconsistent with or in conflict with these Bylaws, with the Articles of Incorporation of this corporation, or with provisions of law.

## SECTION 16. ACTION BY UNANIMOUS WRITTEN CONSENT WITHOUT MEETING

Any action required or permitted to be taken by the Board of Directors under any provision of law may be taken without a meeting, if all members of the board shall individually or collectively consent in writing to such action. For the purposes of this Section only, "all members of the board" shall not include any "interested director" as defined in Section 5233 of the California Nonprofit Public Benefit Corporation Law. Such written consent or consents shall be filed with the minutes of the proceedings of the board. Such action by written consent shall have the same force and effect as the unanimous vote of the directors. Any certificate or other document filed under any provision of law which relates to action so taken shall state that the action was taken by unanimous written consent of the Board of Directors without a meeting and that the Bylaws of this corporation authorize the directors to so act, and such statement shall be prima facie evidence of such authority.

## SECTION 17. VACANCIES

Vacancies on the Board of Directors shall exist (1) on the death, resignation or removal of any director, and (2) whenever the number of authorized directors is increased.

The Board of Directors may declare vacant the office of a director who has been declared of unsound mind by a final order of court, or convicted of a felony, or been found by a final order or judgment of any court to have breached any duty under Section 5230 and following of the California Nonprofit Public Benefit Corporation Law.

If this corporation has no members, directors may be removed without cause by a majority of the directors then in office.

5

Any director may resign effective upon giving written notice to the Chairperson of the Board, the President, the Secretary, or the Board of Directors, unless the notice specifies a later time for the effectiveness of such resignation. No director may resign if the corporation would then be left without a duly elected director or directors in charge of its affairs, except upon notice to the Attorney General.

Vacancies on the board may be filled by approval of the board or, if the number of directors then in office is less than a quorum, by (1) the unanimous written consent of the directors then in office, (2) the affirmative vote of a majority of the directors then in office at a meeting held pursuant to notice or waivers of notice complying with this Article of these Bylaws, or (3) a sole remaining director.

A person elected to fill a vacancy as provided by this Section shall hold office until the next annual selection of the Board of Directors or until his or her death, resignation or removal from office.

### SECTION 18. NON-LIABILITY OF DIRECTORS

The directors shall not be personally liable for the debts, liabilities, or other obligations of the corporation.

### SECTION 19. INDEMNIFICATION BY CORPORATION OF DIRECTORS, OFFICERS, EMPLOYEES AND OTHER AGENTS

To the extent that a person who is, or was, a director, officer, employee or other agent of this corporation has been successful on the merits in defense of any civil, criminal, administrative or investigative proceeding brought to procure a judgment against such person by reason of the fact that he or she is, or was, an agent of the corporation, or has been successful in defense of any claim, issue or matter, therein, such person shall be indemnified against expenses actually and reasonably incurred by the person in connection with such proceeding.

If such person either settles any such claim or sustains a judgment against him or her, then indemnification against expenses, judgments, fines, settlements and other amounts reasonably incurred in connection with such proceedings shall be provided by this corporation but only to the extent allowed by, and in accordance with the requirements of, Section 5238 of the California Nonprofit Public Benefit Corporation Law.

### SECTION 20. INSURANCE FOR CORPORATE AGENTS

The Board of Directors may adopt a resolution authorizing the purchase and maintenance of insurance on behalf of any agent of the corporation (including a director, officer, employee or other agent of the corporation) against any liability other than for violating provisions of law relating to self-dealing (Section 5233 of the California Nonprofit Public Benefit Corporation Law) asserted against or incurred by the agent in such capacity or arising out of the agent's status as such, whether or not the corporation would have the power to indemnify the agent against such liability under the provisions of Section 5238 of the California Nonprofit Public Benefit Corporation Law.

6

## ARTICLE 4
## MEMBERSHIP

### SECTION 1.  NO DESIGNATED MEMBERS

The corporation exists to serve the community, and would refer to this group as clients, participants or benefactors of the organization instead of members. This aforementioned group, while consulted regularly for its input regarding the health and services of the organization, does not have voting privileges and therefore are not designated as members.

## ARTICLE 5
## OFFICERS

### SECTION 1. NUMBER OF OFFICERS

The officers of the corporation shall be a President, a Secretary, and a Chief Financial Officer who shall be designated the Treasurer. The corporation may also have, as determined by the Board of Directors, a Chairperson of the Board, one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers, or other officers. Any number of offices may be held by the same person except that neither the Secretary nor the Treasurer may serve as the President or Chairperson of the Board.

### SECTION 2. QUALIFICATION, ELECTION, AND TERM OF OFFICE

Any person may serve as officer of this corporation. Officers shall be elected by the Board of Directors, at any time, and each officer shall hold office until he or she resigns or is removed or is otherwise disqualified to serve, or until his or her successor shall be elected and qualified, whichever occurs first.

### SECTION 3. SUBORDINATE OFFICERS

The Board of Directors may appoint such other officers or agents as it may deem desirable, and such officers shall serve such terms, have such authority, and perform such duties as may be prescribed from time to time by the Board of Directors.

### SECTION 4. REMOVAL AND RESIGNATION

Any officer may be removed, either with or without cause, by the Board of Directors, at any time. Any officer may resign at any time by giving written notice to the Board of Directors or to the President or Secretary of the corporation. Any such resignation shall take effect at the date of receipt of such notice or at any later date specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The above provisions of this Section shall be superseded by any conflicting terms of a contract which has been approved or ratified by the Board of Directors relating to the employment of any officer of the corporation.

7

## SECTION 5. VACANCIES

Any vacancy caused by the death, resignation, removal, disqualification, or otherwise, of any officer shall be filled by the Board of Directors. In the event of a vacancy in any office other than that of President, such vacancy may be filled temporarily by appointment by the President until such time as the Board shall fill the vacancy. Vacancies occurring in offices of officers appointed at the discretion of the board may or may not be filled as the board shall determine.

## SECTION 6. CONFLICT OF INTEREST

The purpose of this conflict of interest policy is to protect this tax-exempt organization's interest when it is discussing, contemplating and making decisions about a transaction or arrangement that might benefit the private interest of a director, officer, or employee of the organization. This policy only supplements and does not replace any applicable state and federal laws governing conflict of interest related to nonprofit and charitable organizations.

(a) If a director, officer or employee has a financial interest in a decision, whether directly or indirectly, and the governing board determines that it is a conflict of interest, the person or board must disclose the potential conflict and be removed from any portion of the meeting where this issue is being discussed.

(b) If there is a dispute, the conflict of interest will be settled by a majority vote of the board.

(c) The directors, officers and employees will do everything in their power to avoid all conflicts of interest. In certain cases a transaction is in the organization's best interest that also presents a conflict of interest, the directors will provide oversight and accountability to limit, if not eliminate, all appearances or actions related to conflicts of interest.

(d) In the event of an impasse, the board retains the right to seek outside mediation or legal counsel to ensure the organization's integrity in all conflict of interest matters.

## SECTION 7. DUTIES OF PRESIDENT

The President shall be the chief executive officer of the corporation and shall, subject to the control of the Board of Directors, supervise and control the affairs of the corporation and the activities of the officers. He or she shall perform all duties incident to his or her office and such other duties as may be required by law, by the Articles of Incorporation of this corporation, or by these Bylaws, or which may be prescribed from time to time by the Board of Directors. Unless another person is specifically appointed as Chairperson of the Board of Directors, he or she shall preside at all meetings of the Board of Directors. Except as otherwise expressly provided by law, by the Articles of Incorporation, or by these Bylaws, he or she shall, in the name of the corporation, execute such deeds, mortgages, bonds, contracts, checks, or other instruments which may from time to time be authorized by the Board of Directors.

## SECTION 8. DUTIES OF SECRETARY

The Secretary shall:

(a) Certify and keep at the principal office of the corporation the original or a copy of these Bylaws as amended or otherwise altered to date.

(b) Keep at the principal office of the corporation or at such other place as the board may determine, a book of minutes of all meetings of the directors, and, if applicable, meetings of committees of directors and of members, recording therein the time and place of the meeting, whether regular or special, how called, how notice thereof was given, the names of those present or represented at the meeting, and the proceedings thereof.

(c) See that all notices are duly given in accordance with the provisions of these Bylaws or as required by law.

(d) Be custodian of the records and of the seal of the corporation and see that the seal is affixed to all duly executed documents, the execution of which on behalf of the corporation under its seal is authorized by law or these Bylaws.

(e) Exhibit the Bylaws, meeting minutes, or other documents executed by the Board of Directors to any director of the corporation, or to his or her agent or attorney, within 72 hours of the request.

(f) In general, perform all duties of the office of Secretary and such other duties as may be required by law, by the Articles of Incorporation of this corporation, or by these Bylaws, or which may be assigned to him or her from time to time by the Board of Directors.

## SECTION 9. DUTIES OF TREASURER

Subject to the provisions of these Bylaws relating to the "Execution of Instruments, Deposits and Funds," the Treasurer shall:

(a) Have direct charge and custody of, and be responsible for, all funds and securities of the corporation, and deposit all such funds in the name of the corporation in such banks, trust companies, or other depositories as shall be selected by the Board of Directors, or will oversee and monitor the activities of any Board-designated or approved bookkeeper or financial team working on behalf of the corporation.

(b) Receive, and give receipt for, monies due and payable to the corporation from any source whatsoever.

(c) Disburse, or cause to be disbursed, the funds of the corporation as may be directed by the Board of Directors, taking proper vouchers for such disbursements.

(d) Keep and maintain accurate accounts of the corporation's properties and business transactions, including accounts of its assets, liabilities, receipts, disbursements, gains and losses.

(c) Exhibit the books of accounts and financial records to any director of the corporation, or to his or her agent or attorney, with 72 hours upon request.

9

(d) Render to the President and Directors, whenever requested, an account of any or all of his or her transactions as Treasurer and of the financial condition of the corporation.

(e) Prepare, or cause to be prepared, and certify, or cause to be certified, the financial statements to be included in any required reports.

(f) In general, perform all duties incident to the office of Treasurer and such other duties as may be required by law, by the Articles of Incorporation of the corporation, or by these Bylaws, or which may be assigned to him or her from time to time by the Board of Directors.

## SECTION 10. COMPENSATION

The salaries of the officers, if any, shall be fixed from time to time by resolution of the Board of Directors, and no officer shall be prevented from receiving such salary by reason of the fact that he or she is also a director of the corporation, provided, however, that such compensation paid a director for serving as an officer of this corporation shall only be allowed if permitted under the provisions of Article 3, Section 6 of these Bylaws. In all cases, any salaries received by officers of this corporation shall be reasonable and given in return for services actually rendered for the corporation which relate to the performance of the charitable or public purposes of this corporation.

## ARTICLE 6
## COMMITTEES

## SECTION 1. NATURE OF COMMITTEES

Upon approval of the Board of Directors, committees for specified purposes may be formed in an advisory capacity or if certain activities warrant the formation of a committee for a period of time as determined by the Directors.

## SECTION 2. MEETINGS AND ACTION OF COMMITTEES

Meetings and action of committees shall be governed by and conducted in accordance with the provisions of these Bylaws concerning meetings of the Board of Directors. The Board of Directors may also adopt rules and regulations pertaining to the conduct of meetings of committees to the extent that such rules and regulations are not inconsistent with the provisions of these Bylaws.

## ARTICLE 7
## EXECUTION OF INSTRUMENTS, DEPOSITS AND FUNDS

## SECTION 1. EXECUTION OF INSTRUMENTS

The Board of Directors, except as otherwise provided in these Bylaws, may by resolution authorize any officer or agent of the corporation to enter into any contract or execute and deliver any instrument in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances. Unless so authorized, no officer, agent, or employee

shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable monetarily for any purpose or in any amount.

## SECTION 2. CHECKS AND NOTES

Except as otherwise specifically determined by resolution of the Board of Directors, or as otherwise required by law, checks, drafts, promissory notes, orders for the payment of money, and other evidence of indebtedness of the corporation shall be signed by the Treasurer and countersigned by the President of the corporation.

## SECTION 3. DEPOSITS

All funds of the corporation shall be deposited from time to time to the credit of the corporation in such banks, trust companies, or other depositories as the Board of Directors may select.

## SECTION 4. GIFTS

The Board of Directors may accept on behalf of the corporation any contribution, gift, bequest, or devise for the charitable or public purposes of this corporation.

## ARTICLE 8
## CORPORATE RECORDS, REPORTS AND SEAL

## SECTION 1. MAINTENANCE OF CORPORATE RECORDS

The corporation shall keep at its principal office in the State of California:

(a)  Minutes of all meetings of directors and committees of the board, indicating the time and place of holding such meetings, whether regular or special, how called, the notice given, and the names of those present and the proceedings thereof;

(b)  Adequate and accurate books and records of account, including accounts of its properties and business transactions and accounts of its assets, liabilities, receipts, disbursements, gains and losses;

(c)  A copy of the corporation's Articles of Incorporation and Bylaws as amended to date, which shall be open to inspection by the members, if any, of the corporation at all reasonable times during office hours.

## SECTION 2. CORPORATE SEAL

The Board of Directors may adopt, use, and at will alter, a corporate seal. Such seal shall be kept at the principal office of the corporation. Failure to affix the seal to corporate instruments, however, shall not affect the validity of any such instrument.

### SECTION 3. DIRECTORS' INSPECTION RIGHTS

Every director shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of the corporation.

### SECTION 4. RIGHT TO COPY AND MAKE EXTRACTS

Any inspection under the provisions of this Article may be made in person or by agent or attorney and the right to inspection includes the right to copy and make extracts.

### SECTION 5. ANNUAL REPORT

The board shall execute an annual report to be furnished not later than one hundred and twenty (120) days after the close of the corporation's fiscal year to all directors of the corporation. The report shall contain the following information in appropriate detail:

(a) The assets and liabilities, including the trust funds, of the corporation as of the end of the fiscal year;

(b) The principal changes in assets and liabilities, including trust funds, during the fiscal year;

(c) The revenue or receipts of the corporation, both unrestricted and restricted to particular purposes, for the fiscal year;

(d) The expenses or disbursements of the corporation, for both general and restricted purposes, during the fiscal year;

(e) Any information required by Section 7 of this Article.

The annual report shall be accompanied by any report from independent accountants and/or an auditor as deemed appropriate by the Board of Directors.

### ARTICLE 9
### FISCAL YEAR

### SECTION 1. FISCAL YEAR OF THE CORPORATION

The fiscal year of the corporation shall begin on the January 1 and end on December 31 of each year.

12

### ARTICLE 10
### AMENDMENT OF BYLAWS

**SECTION 1. AMENDMENT**

Subject to any provision of law applicable to the amendment of Bylaws of public benefit nonprofit corporations, these Bylaws, or any of them, may be altered, amended, or repealed and new Bylaws adopted upon approval of a majority of the Board of Directors.

### ARTICLE 11
### AMENDMENT OF ARTICLES OF INCORPORATION

**SECTION 3. AMENDMENT LIMITS**

This corporation shall not amend its Articles of Incorporation to alter any statement which appears in the original Articles of Incorporation of the names and addresses of the first directors of this corporation, nor the name and address of its initial agent, except to correct an error in such statement or to delete such statement after the corporation has filed a "Statement by a Domestic Non-Profit Corporation" pursuant to Section 6210 of the California Nonprofit Corporation Law.

### ARTICLE 12
### PROHIBITION AGAINST SHARING CORPORATE PROFITS AND ASSETS

**SECTION 1. PROHIBITION AGAINST SHARING CORPORATE PROFITS AND ASSETS**

No director, officer, employee, or other person connected with this corporation, or any private individual, shall receive at any time any of the net earnings or pecuniary profit from the operations of the corporation, provided, however, that this provision shall not prevent payment to any such person of reasonable compensation for services performed for the corporation in effecting any of its public or charitable purposes, provided that such compensation is otherwise permitted by these Bylaws and is fixed by resolution of the Board of Directors; and no such person or persons shall be entitled to share in the distribution of, and shall not receive, any of the corporate assets on dissolution of the corporation. Upon the dissolution of the corporation, after all debts have been satisfied, funds and properties shall be distributed to other charitable organizations as required by the Articles of Incorporation of this corporation and not otherwise.

**WRITTEN CONSENT OF DIRECTORS ADOPTING BYLAWS**

We, the undersigned, are the persons named as directors of Villa Chardonnay—Horses With Wings, a California nonprofit corporation, and, pursuant to the authority granted to the directors by these Bylaws to take action by unanimous written consent without a meeting, consent to, and hereby do, adopt the foregoing Bylaws as the Bylaws of this corporation.

Dated: FEB. 23, 2009

_____ Director
Monika Kerber

_____ Director
Louise Gardner


**CERTIFICATE**

This is to certify that the foregoing is a true and correct copy of the Bylaws of the corporation named in the title thereto and that such Bylaws were duly adopted by the Board of Directors of said corporation on the date set forth below.

Dated: FEB 23, 2009

_____ Secretary
Louise Gardner

14

X



# California Secretary of State

**Business Programs Division**
1500 11th Street, Sacramento, CA 95814

VILLA CHARDONNAY-HORSES WITH WINGS
PO BOX 1000
JULIAN, CA  92036

## Business Amendment Filing Approved

April 2, 2025

**Entity Name:** VILLA CHARDONNAY-HORSES WITH WINGS
**Entity Type:** Nonprofit Corporation - CA - Public Benefit
**Entity No.:** 3119436
**Document Type:** Statement of Information
**Document No.:** BA20250698449
**File Date:** 04/02/2025

The above referenced document has been approved and filed with the California Secretary of State. To access free copies of filed documents, go to **biz**fileOnline.sos.ca.gov and enter the entity name or entity number in the Search module.

### What's Next?

The most up to date records may be obtained by searching for the Entity Name or Entity Number in the Search module at **biz**fileOnline.sos.ca.gov.

For further assistance, contact us at (916) 657-5448 or visit **biz**fileOnline.sos.ca.gov.



Thank you for using **biz**file California, the California Secretary of State's business portal for online filings, searches, business records, and additional resources.

  

BA20250698449



## STATE OF CALIFORNIA
*Office of the Secretary of State*
## STATEMENT OF INFORMATION
## CA NONPROFIT CORPORATION

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

For Office Use Only

**-FILED-**

File No.: BA20250698449

Date Filed: 4/2/2025

---

**Entity Details**

| | |
|---|---|
| Corporation Name | VILLA CHARDONNAY-HORSES WITH WINGS |
| Entity No. | 3119436 |
| Formed In | CALIFORNIA |

Street Address of California Principal Office of Corporation

| | |
|---|---|
| Street Address of California Office | 4554 BOULDER CREEK ROAD<br>JULIAN, CA 92036 |

Mailing Address of Corporation

| | |
|---|---|
| Mailing Address | PO BOX 1000<br>JULIAN, CA 92036 |
| Attention | |

**Officers**

| Officer Name | Officer Address | Position(s) |
|---|---|---|
| MERCEDES FLORES | PO BOX 1000<br>JULIAN, CA 92036 | Secretary |
| MONIKA KERBER | PO BOX 1000<br>JULIAN, CA 92036 | Chief Executive Officer |
| ➕ Lauro Magno De La Garza | PO BOX 1000<br>4554 BOULDER CREEK RD<br>JULIAN, CA 92036 | Chief Financial Officer |

☒ The entity's bylaws allow the CEO (President) to be the Secretary or CFO (Treasurer).

---

**Additional Officers**

| Officer Name | Officer Address | Position | Stated Position |
|---|---|---|---|
| None Entered | | | |

---

**Agent for Service of Process**

| | |
|---|---|
| Agent Name | MERCEDES FLORES |
| Agent Address | 4554 BOULDER CREEK RD<br>JULIAN, CA 92036 |

**Email Notifications**

| | |
|---|---|
| Opt-in Email Notifications | Yes, I opt-in to receive entity notifications via email. |

**Electronic Signature**

☒ By signing, I affirm that the information herein is true and correct and that I am authorized by California law to sign.

*MERCEDES FLORES, Secretary*
_____
Signature

*04/02/2025*
_____
Date

Y

United States Bankruptcy Court

Southern District of California

In Re:   Villa Chardonnay Horses with Wings, Inc

Case No:   3:25-bk-03692-JBM11

Chapter: 11

## STATEMENT REGARDING CORPORATE RESOLUTION

I, Monika Kerber-Perez, declare under penalty of perjury that I am the President of this Corporation
a California Corporation and that on  August 30, 2025   the following resolution was
duly adopted by the Board of this Corporation:

"Whereas, it is in the best interest of this Corporation to file a voluntary petition in the United States
Bankruptcy Court pursuant to Chapter 11 of Title 11 of the United States Code;

Be it Therefore Resolved, that  Monika Kerber-Perez, the President        of this Corporation, is authorized
and directed to execute and deliver all documents necessary to perfect the filing of a Chapter 11 voluntary
bankruptcy case on behalf of the Corporation; and

Be it Further Resolved, that  Monika Kerber-Perez, the President of       / this Corporation, is authorized
and directed to appear in all bankruptcy proceedings on behalf of the Corporation, and to otherwise do and
perform all acts and deeds and to execute and deliver all necessary documents on behalf of the Corporation
in connection with such bankruptcy case; and

Be it Further Resolved that Monika Kerber-Perez, the President of        , this Corporation, is authorized and
directed to employ Michael R Totaro and to represent the Cor            in such bankruptcy case."

Executed on:  8/30/2025                                    Signed: _____
                                                                   Monika Kerber-Perez

# EXHIBIT "6"

Audio Transcription:

In Re: Villa Chardonnay Horses with Wings, Inc.

November 19, 2025



---------------------------------------------------


*** AUDIO TRANSCRIPTION ***

25-04245-JBM11 Villa Chardonnay Horses with Wins,

Inc._341a_2025.11.19

In Re: Villa Chardonnay Horses with Wings, Inc.


* * *


---------------------------------------------------


Transcribed

By:  Mary Karanja

Job No.: 135577

1      MS. HONG:  Good morning.  My name is

2  Haeji Hong.  I am an attorney employed by the

3  Office of the United States Trustee for the

4  Southern District of California assigned to

5  the Chapter 11 bankruptcy case of Villa

6  Chardonnay Horses with Wings, Inc, case number

7  25-04245-JBM11, which was filed on October 14,

8  2025.  Today is November 19, 2025.  It is 9:03

9  a.m.  This is the first meeting of creditors

10  held pursuant to 11 USC Section 341(a).

11      The purpose of this meeting is to provide

12  a forum for creditors and other parties in

13  interest to ask questions of the debtor.

14  Questions may relate to debtor's acts,

15  conduct, property, liabilities, financial

16  condition, or any other matter which may

17  affect the administration of the debtor's

18  estate.  No decisions are made here.  All

19  decisions are made at the bankruptcy court.

20  This meeting is being recorded.

21      Therefore, please identify yourself when

22  speaking and speak clearly and loudly.

23  Anybody wishing to obtain a copy of the

24  recording can go to our website which has

25  instructions on how to obtain a copy of the

 1   recording.  This is telephonic meeting of

 2   creditors.

 3       If for some reason you drop off after you

 4   have made your appearance, please dial back in

 5   until the meeting ends.  If you need to leave

 6   this meeting after you have appeared, please

 7   unmute yourself and speak up that you're about

 8   to leave.  Ms. Meredith King, are you present?

 9       MS. KING:  Yes, I am.

10       MS. HONG:  Could you state your name and

11   indicate who you're representing?

12       MS. KING:  Yes.  My name is Meredith

13   King.  I'm appearing from the law firm

14   Franklin Soto Leeds on behalf of secured

15   creditors; Richard Falls LLC, The Armbrust

16   Living Trust, and Private Mortgage

17   Incorporated.

18       MS. HONG:  Ms. Grace Wainscot, are you

19   present?

20       MS. WAINSCOT:  Yes, I am present.

21       MS. HONG:  Could you state your name and

22   who you're representing or who you're

23   appearing on behalf --

24       MS. WAINSCOT:  Grace --

25       MS. HONG:  -- of?

```
 1        MS. WAINSCOT:  Grace Wainscot on behalf
 2   of the Humane Farming Association.
 3        MS. HONG:  Are there any other creditors
 4   or parties in interest who have not checked in
 5   with me online?  Okay.  Hearing none, Mr. --
 6        MR. FARLEY:  Yeah.
 7        MS. HONG:  -- Totaro --
 8        MR. FARLEY:  This is --
 9        MS. HONG:  Oh, sorry.  Go ahead.
10        MR. FARLEY:  I am representing -- sorry.
11   This is Connor Farley.  Manatt, Phelps &
12   Phillips on behalf of Arc Watch Foundation and
13   Celine Myers.
14        MS. HONG:  I'm sorry.  Could you spell
15   your last name please?
16        MR. FARLEY:  F-A-R-L-E-Y.
17        MS. HONG:  And you're representing who?
18        MR. FARLEY:  Arc Watch Foundation and
19   Celine Myers, judgment creditors.
20        MS. HONG:  Okay.  Thank you.  Is there
21   anybody else online who have not checked in
22   with me?
23        MS. MYERS:  Yes.  Celine Myers.
24        MS. HONG:  Okay.  Thank you.  Is there
25   anybody else online who have not checked in
```

1   with me?  Okay.  Hearing none, Mr. Michael

2   Totaro, could you state your name and make

3   your appearance for the debtor as debtor's

4   counsel?

5        MR. TOTARO:  Yeah.  Michael Totaro for

6   the debtor in possession.  It is possible that

7   at some points it might drop off because there

8   are -- I'm up in the Palisades and we don't

9   have really good reception on anything.  I'm

10  trying a new device today to see if that's

11  better.  But if I disappear, I will dial right

12  back in again.

13       MS. HONG:  Okay.  I will periodically

14  check to make sure you're online because I

15  will not be questioning the debtor.  And no

16  one will be allowed to question the debtor

17  without your presence.  All right.  Ms. Perez,

18  could you state your name and make your

19  appearance, please?

20       MS. KERBER:  Yeah.  My name is Monika

21  Kerber Perez.

22       MS. HONG:  And you are the president for

23  the debtor?

24       MS. KERBER:  Correct, for Villa

25  Chardonnay Horses with Wings.

1      MS. HONG:  All right.  Could you raise

2  your right hand?  And please let me know once

3  you have done so.

4      MS. KERBER:  Its done.

5      MS. HONG:  Do you swear to tell the

6  truth, the whole truth, and nothing but the

7  truth?

8      MS. KERBER:  I do.

9      MS. HONG:  You understand that you're

10  testifying under oath today under penalty of

11  perjury?

12      MS. KERBER:  I do.

13      MS. HONG:  And the penalty of perjury may

14  include a fine or imprisonment or both.  Do

15  you understand that?

16      MS. KERBER:  Yes, I do.

17      MS. HONG:  Okay.  You can lower your

18  hand.  So you were just sworn in as the person

19  who can answer my questions today.  The

20  questions are directed to you, not to your

21  counsel.  So you must answer them to the best

22  of your abilities without help from anybody

23  else.  Do you understand that?

24      MS. KERBER:  Yes, I do.

25      MS. HONG:  All right.  Is there anybody

1   in the room with you or is it just you in the

2   room by yourself?  Ms. Kerber, Ms. Perez?

3        MS. KERBER:  Yes, ma'am.

4        MS. HONG:  Did you hear my question?

5   Hello?

6        MS. KERBER:  Yes.  Ms. Hong, could you

7   repeat the question again, please?

8        MS. HONG:  I asked if anybody else was in

9   the room with you or if you're by yourself.

10        MS. KERBER:  No.  I'm just by myself.

11        MS. HONG:  Okay.  And should I address

12   you as Ms. Kerber or Ms. Perez?  How would you

13   like to be addressed?

14        MS. KERBER:  My, my, my last name is

15   Kerber.  Please call me -- thank you.

16        MS. HONG:  Okay.

17        MS. KERBER:  Right.

18        MS. HONG:  And for everybody on the line,

19   please do not record this proceeding.  All

20   recordings are done officially by the U.S.

21   trustee's office.  Please make sure any

22   recording devices, Siri, Alexa, whatever are

23   all turned off.  It is not to be recorded by

24   any AI devices either.

25        Okay.  As I stated, the first half of the

 1   341 -- before I started the 341, I indicated,

 2   usually the U.S. trustee asks questions of the

 3   debtor.  And then I open it up to creditors.

 4   And so, I have a number of questions prepared.

 5   And this meeting may be continued because we

 6   do have some outstanding issues.  But let me

 7   get started.  First, let me go through what

 8   compliance documents we still need from the

 9   debtor.

10        We received a lot of documents during the

11   shutdown and right after the government has

12   reopened.  And as people may be aware, during

13   the government shutdown, our office was also

14   shut down.  And so, we were not staffed at

15   full level.  Having said all of that, it looks

16   like the debtor provided some documents

17   yesterday as well, but we're still missing

18   some records.

19        I understand the insurance that would

20   cover volunteers or contractors, that's still

21   outstanding.  And so, it sounded like, from

22   the counsel's representation, that will be

23   forthcoming shortly.  So I wanted to make sure

24   that is the final liability insurance from the

25   debtor that could be provided, listing UST as

 1  additionally notice party for that piece of

 2  insurance as well.

 3      We did receive proof of the closing of

 4  the pre-petition account number 3870

 5  documented as a web payout showing that the

 6  balance is 0.  But usually, when an account is

 7  closed, there's a closing statement that the

 8  bank issues.  And so, the proof of the closing

 9  of the pre-petition account or any other

10  account should be that closing statement.

11  That's what we're looking for.

12      So I don't know if, Ms. Kerber, there's

13  any other documentation that you receive from

14  the bank that shows a closing statement, but

15  that's what needs to be provided to our

16  office.  There's also, I understand, another

17  bank account ending in number 9030 that should

18  be closed out.  And so, that also needs to be

19  provided as well.  We received proof of

20  opening of a bank account.

21      And I understand, from debtor's counsel's

22  representation, that that is supposed to be

23  designated as a general debtor-in-possession

24  bank account.  The U.S. trustee will wait for

25  that confirmation that the bank will be

1   providing to you.  So that will still remain

2   outstanding because what was provided seems to

3   just show opening of a general operating

4   account for business, which is not accurate.

5        But I understand the bank indicated to

6   the counsel that they will be providing

7   confirmation it's a DIP account.  So that is

8   still outstanding.  I believe at the IDI, Ms.

9   Doherty indicated the 2022 tax return that our

10  office received does not appear to match what

11  was on the website of the IRS.  And so, we

12  requested an explanation and a copy of the

13  return that was actually filed with the IRS.

14       And it looked like we had received

15  certain tax returns last night as well.  So we

16  will review the tax returns that were provided

17  last night.  And if they seem to be missing

18  anything, I will let the debtor and the

19  debtor's counsel know.

20       For financial records, the U.S. trustee

21  requested the projected 90 days cash receipts

22  and disbursement.  There was some kind of

23  projection of expenses for a two-month period.

24  That's not what the U.S. trustee is looking

25  for and I don't think that's what the court is

```
 1   looking for.  I believe --

 2        MR. TOTARO:  Ms. Hong.

 3        MS. HONG:  Yes.

 4        MR. TOTARO:  Excuse me.  But would you --

 5   would you go back a couple steps because I did

 6   drop off for about 30 seconds?  So the last

 7   thing I heard was the 2022 tax returns which

 8   we did provide again, but that's where we left

 9   off.  Sorry about that.

10        MS. HONG:  Okay.  So tax returns -- I

11   said 2022 tax return, I understand -- and it

12   did not appear to match, what was provided to

13   our office, with what's been filed with the

14   IRS based on the -- what we could see from the

15   IRS website.  And so, we asked for an

16   explanation of that discrepancy and to make

17   sure that what's ultimately filed with the IRS

18   is what's provided to our office.

19        And I also indicated that we received

20   other tax returns last night.  We haven't had

21   a chance to review.  So we'll review it and

22   let you know if we have any questions.  And

23   then I moved on to financial records.  The

24   projected 90-day cash receipts and

25   disbursement, that's still outstanding.  It
```

1    can't be some combined two-month period that

2    doesn't have breakdown of cash receipts and,

3    and disbursements.

4        It needs to be monthly and it needs to be

5    very detailed and particular about cash

6    receipts, as in what's coming in and cash

7    disbursement.  So -- and I, I could be wrong,

8    but I think in this case the court actually

9    wants that, based on the order that's entered.

10       The U.S. trustee also requested balance

11   sheet, income statement, and statement of cash

12   flows as of the petition date and as of

13   December 31, 2024, copies of any financial

14   statements issued to any third-parties in the

15   year preceding the petition date, copies of

16   all pre-petition bank account statements for

17   all accounts open at any time from 2023

18   through year to date of 2025.

19       There were also discussions at the IDI to

20   amend the schedules to include all of the

21   assets of the debtor as of the petition date,

22   such as cameras, office furniture, equipment,

23   computers, laboratory, or veterinary

24   equipment, medication supplements, food for

25   animals, or other supplies and inventories

1   that are not listed.

2        Amend the schedules to list judgment the

3   debtor has against Ronald Allen and any other

4   judgment the debtor has against other parties.

5   Amend the schedules to reflect any property

6   taxes owed by the debtor as of the petition

7   date.  Amend the Statement of Financial

8   Affairs to list accurate 2025 income year to

9   date.

10        I note that -- I don't know -- I guess,

11   about an hour ago there was a Statement of

12   Financial Affairs that was filed in this case

13   that actually signed it, but I'm not sure it

14   addressed the accuracy of the year-to-date

15   income information.

16        MR. TOTARO:  It did.

17        MS. HONG:  Well, okay.  And Mr. Totaro,

18   my -- this is to the debtor.  And I will be

19   questioning the debtor, as she's the only one

20   sworn in.  And I will ask whether or not

21   that's actually accurate.

22        And then we also requested any current or

23   historical sale listing of the property,

24   detailed listing of all donors and donated

25   amounts by year for 2023, 2024, and 2025, year

1   to date, detailed listing of all grants

2   applied for, grants denied, grants approved,

3   and grant funds received by year for 2023,

4   2024 and 2025, year to date, name of the

5   company that approached Ms. Kerber regarding

6   ERC rebates, and provide any related

7   documentation and communications.

8        And, and I think that's it.  And Ms.

9   Kerber, I know there were some communications

10  regarding hesitancy of providing information

11  to our office.  I would just like to let you

12  know that what's provided to our office by the

13  debtor is not given to third-parties.  Any

14  third-parties wishing to obtain information

15  from the debtor should ask directly from the

16  debtor.  We do not release that information.

17  So the information that we're requesting needs

18  to be provided so that we can review this

19  case.  Okay.

20        MS. KERBER:  Thank you, Ms. Hong.

21        MS. HONG:  All right.  So that's my

22  laundry list of what's still outstanding as of

23  today.  Let me start with the petition and

24  schedules.  Ms. Kerber, do you have the

25  petition in front of you?

1      MS. KERBER:  Yes, I do now.

2      MS. HONG:  All right.  Is the debtor's

3  name correct on the petition?

4      MS. KERBER:  Yes, it is.

5      MS. HONG:  Did you sign the petition

6  schedules and Statement of Financial Affairs

7  that are filed with the bankruptcy court?

8      MS. KERBER:  Yes, I did.

9      MS. HONG:  Including the one that was

10  just filed this morning?

11      MS. KERBER:  Yes, I, I did sign.

12      MS. HONG:  Okay.  Who provided the

13  information that are contained in the petition

14  schedules and Statement of Financial Affairs?

15      MS. KERBER:  Mr. Totaro.

16      MS. HONG:  You didn't provide the

17  information that are contained in the petition

18  schedules and Statement of Financial Affairs?

19      MS. KERBER:  I did.

20      MS. HONG:  Is there anybody else who

21  provided the information that are contained in

22  the petition schedules and Statement of

23  Financial Affairs?

24      MS. KERBER:  No.

25      MS. HONG:  Okay.  As of this morning, are

1  you aware of any changes or corrections to

2  make to the petition schedules or Statement of

3  Financial Affairs?

4      MS. KERBER:  Not as, as of this morning.

5      MS. HONG:  Okay.  And you thoroughly

6  reviewed the petition schedules and Statement

7  of Financial Affairs before they were filed

8  with the court?

9      MS. KERBER:  Yes, I did.

10      MS. HONG:  All right.  Could you.  And,

11  and I understand this may sound repetitive

12  from the IDI, but this is a sworn recorded

13  proceeding.  So if you could describe what

14  this debtor actually does and why this case

15  was filed in this case as a bankruptcy case, I

16  would appreciate it.

17      MS. KERBER:  Ms, Hong, could you repeat

18  again?

19      MR. TOTARO:  Ms. Hong?

20      MS. HONG:  Yes.

21      MR. TOTARO:  Hello?  Ms, Hong, let me

22  interrupt again.  They just shut off all the

23  electricity in the Palisades.  So, I mean, I

24  should be able to hear everything, but there

25  might be a problem.  But they just shut down

1   the whole area.

2        MS. HONG:  Are you calling from a phone

3   that's tied to the electricity grid?

4        MR. TOTARO:  No, no.  I just transferred

5   to my cell phone that -- I'm standing outside

6   because we have no service anywhere else here.

7   But you can go ahead.  I just wanted to warn

8   you that, that we just -- everything just shut

9   down --

10       MS. HONG:  Okay.

11       MR. TOTARO:  -- instantly.

12       MS. HONG:  All right.  Well, thank you.

13   And I'm sorry that you have to deal with that

14   kind of burden.  Ms. Kerber, could you

15   describe --

16       MR. TOTARO:  Thank you.

17       MS. HONG: -- what this debtor does and

18   why you filed for bankruptcy?

19       MS. KERBER:  Yes.  Ms. Hong, as I

20   explained to you before, there's been several

21   issues to people that -- they have threatened

22   for five years to bring down myself and the

23   foundation.

24        So they -- the reason that we didn't want

25   to disclose some of the information -- but

1    thank you, you already told me will stay with

2    you guys -- is because these people have done

3    -- and you have an email testified from high-

4    end people that all they've done is lie to

5    foundations, lie to donors, even when they

6    have reviews.  They call people and they have

7    lied bluntly to say that the animals were in

8    bad shape.

9         Everything, everything absolutely was

10    lied.  And I have the emails and the proof

11    that shows that these two women, since the

12    beginning, they said they were going to be a

13    thorn on my side and that they were going to

14    bring me down, you know. It started with --

15         MS. HONG:  Ms. Kerber --

16         MS. KERBER:  They said that they were

17    sick.  That's why --

18         MS. HONG:  Ms. Kerber, I'm going to

19    interrupt you.  So my question was, what does

20    this debtor do?  So it's a chance for you to

21    explain what the debtor's business is.  I

22    understand it's a nonprofit organization, but

23    I would like you to explain what the debtor's

24    operation actually is.  What does it do?

25         MS. KERBER:  I don't know what exactly

 1  you mean, Ms. Hong.  If you can be a little

 2  bit more specific, please --

 3       MS. HONG:  Okay.

 4       MS. KERBER:  -- when you ask, what do I

 5  do?

 6       MS. HONG:  No.  I am asking what Villa

 7  Chardonnay Horses with Wings, Inc., the

 8  debtor, does.  What is its operation?

 9       MS. KERBER:  Okay.  We are an equine and

10  animal factory for 23 years, then we got our

11  501(c)(3) nonprofit status in 2009.  And since

12  then, we've been caring substantially for all

13  the unwanted animals.

14       MS. HONG:  Okay.  So when you say --

15       MS. KERBER:  So we, we --

16       MS. HONG:  -- that --

17       MS. KERBER:  -- watch -- we give them a

18  home for -- a forever home to all of them.

19       MS. HONG:  All right.  So when you say

20  the debtor is an animal sanctuary, what does

21  that mean?  Why is it a sanctuary?

22       MS. KERBER:  Okay.  The difference

23  between a rescue and a sanctuary, Ms. Hong, a

24  rescue, they rescue the animals.  They

25  gradually take them and they find them a home.

1  The difference with the sanctuary is -- like,

2  all the animals, they come to our sanctuary --

3  they're assured that they have a forever home.

4  So they call Villa Chardonnay their last hope.

5      So whenever they went to several places

6  and nobody wanted to take these animals

7  because they're old or they're sick, we are

8  the ones who take them.  So essentially, it

9  means that all the animals stay with us until

10 they die.

11     MS. HONG:  Okay.  So are -- all the

12 animals that the debtor take in, are they all

13 ill, old?  Do they -- are there any healthy

14 animals?

15     MS. KERBER:  Ms. Hon, you, you cut off a

16 little bit.

17     MS. HONG:  Oh.  So I, I was asking what

18 kind of animals the debtor takes in.  Are they

19 all old?  Are they all ill?  Are they -- does

20 the debtor actually take in any healthy

21 animals?

22     MS. KERBER:  Well, we -- it depends.  We

23 have different cases, mostly controlled.

24 They're -- they came with a illness.  They're

25 sick.  Some people, people cannot longer

1   afford to have them, so they, they look for --

2   they, they don't want to give them to a

3   shelter because they know that they will put

4   them down.

5        And they look for, for a sanctuary so

6   they can stay there for the rest of their

7   lives.  So it depends -- it depends.  It's

8   case to case.

9        MS. HONG:  Okay.  What is the capacity

10  limit for this debtor to accept animals?  As

11  in, is there a maximum, based on the

12  facilities that are -- that's on the premise,

13  that would limit how many animals the debtor

14  can take?

15       MS. KERBER:  Well, as you know, we are

16  located in 42 acres, so there's several areas

17  of the sanctuary, the property, that we don't

18  even have any animals.  So we, we still have

19  the capacity.  Yes, we do.  For example, with

20  the cats -- because there's so much meat every

21  day, you know, we, we put them down on the

22  shelter.  So whenever they come to us, we've

23  been expanding.  So since we started, we, we

24  have expand the area for the -- for the cats.

25       MS. HONG:  So that didn't quite answer my

1  question of whether or not there's -- you are

2  aware, the debtor is aware what the max limit

3  of animals could be.  Does the debtor have a

4  max limit?  Do you know?

5      MS. KERBER:  Well, the max capacity will

6  be pretty much related to finances, if you can

7  take care of them and give them the property

8  that they need.  So right now, that hasn't

9  happened.  They, they receive proper care

10 every single day.

11     So, no, I mean, it's not that we're going

12 to bring 1,000 animals if we cannot take care

13 of them.  But the ones we have, the capacity

14 we have -- and, and, you know, some of the

15 ones, they, they pass.  So it leads from -- to

16 others.

17     MS. HONG:  Okay.  So as of the petition

18 date, the debtor listed certain amount of

19 animals in the schedules.  And the petition

20 was filed -- the bankruptcy case was filed

21 October 14, 2025.  Today is November 19, 2025.

22 It's been a little bit more than a month.

23 Since the petition date, has the debtor

24 accepted any other animals?

25     MS. KERBER:  We, we have taken a couple

1   of cats from a shelter, like, three or four

2   and -- that's, that's it.

3       MS. HONG:  Okay.  Since the petition

4   date, has there been any animal that passed

5   away?

6       MS. KERBER:  Yes.  We have two very old,

7   old cats that -- they passed away.  Probably

8   they were in their -- like, 18, 19 years old,

9   two of the cats that we had for probably

10  around, I would say, 10 years, say, 12 years.

11      MS. HONG:  Okay.  And does the debtor

12  actually euthanize any animals?

13      MS. KERBER:  Excuse me, Ms. Hong?

14      MS. HONG:  I asked if the debtor actually

15  euthanizes any animals.

16      MS. KERBER:  Personally, ourselves, no.

17  When it's needed, yeah.  We take them to a vet

18  when it's a small animal, like a cat.  And

19  when it's needed with a horse, yes.  We, we,

20  we call our vet and they take care of that.

21  We, we have never taken care of -- euthanize

22  any animals.

23      MS. HONG:  Okay.  So how many people

24  actually work on the premise, either as a

25  volunteer --

1    MS. KERBER:  We --

2    MS. HONG:  Go ahead.

3    MS. KERBER:  We, we, we have five people,

4  Ms. Hong.  And I'm here up here, 365, 24/7,

5  daily.

6    MS. HONG:  Are you included in that five

7  people who are working?

8    MS. KERBER:  I will be the sixth person.

9    MS. HONG:  Okay.  And are, are they all

10  volunteers?

11    MS. KERBER:  Yes, they are.

12    MS. HONG:  Are there any paid employees

13  of the debtor?

14    MS. KERBER:  Not at the moment.

15    MS. HONG:  Is the, the debtor expecting

16  to hire any paid employees?

17    MS. KERBER:  Starting January, yes.

18    MS. HONG:  Okay.  What kind of employee

19  is the debtor expecting to hire starting

20  January 2026?

21    MS. KERBER:  Hopefully, we are looking to

22  get a staff of maybe eight people.

23    MS. HONG:  And how much are you -- is the

24  debtor expecting to pay them?

25    MS. KERBER:  We haven't discussed that

1  with the court.

2       MS. HONG:  I'm sorry.  It was a little

3  fuzzy, what you said.  Could you repeat what

4  you just stated?

5       MS. KERBER:  Oh, yes.  Yeah.  We, we

6  haven't discussed what the factors -- that you

7  have to meet.

8       MS. HONG:  Did you -- I'm sorry.  You cut

9  out a little bit again.  Could you restate?

10  Ms. Kerber?  Ms. Kerber, are you online?  Mr.

11  Totaro, are you online?

12       MR. TOTARO:  I am online.  I suspect

13  she's had to call back in just occasionally

14  because of her area being generally distant

15  with --

16       MS. HONG:  Okay.

17       MR. TOTARO:  That happens when she --

18  when she, she would call right back in.  Yeah.

19  They're, unfortunately, an area --

20       MS. HONG:  Yeah.

21       MR. TOTARO:  -- not really conducive to

22  technology.

23       MS. HONG:  Well, can always meet in

24  person.

25       MR. TOTARO:  Yeah.

1     MS. HONG:  I think our office actually

2  still has a conference room, if technology

3  becomes too much of an issue.  Ms. Kerber, are

4  you --

5     MR. TOTARO:  I think that that would be a

6  -- that would actually be a better idea in

7  that case (indiscernible).

8     MS. HONG:  Yeah.

9     MS. KERBER:  I actually (indiscernible).

10     MS. HONG:  Yes.  I kind of figured.  I'm,

11  I'm sorry.  So with respect to 8 people the

12  debtor is expecting to hire in January 2026,

13  did you say that you don't have a salary

14  expectation yet?

15     MS. KERBER:  No.  It's going to depend on

16  the skills of the people that we're going to

17  hire.

18     MS. HONG:  Okay.  So how does the debtor

19  make any money?  As in, this is a bankruptcy

20  case.  So I would like to know the revenue

21  side.  How does the debtor take in any

22  revenue?

23     MS. KERBER:  Donation.  My parents help

24  me also a lot --

25     MS. HONG:  So --

1      MS. KERBER:  -- people in general.  And a

2  board member that we have, she's helping.

3      MS. HONG:  Okay.  When you reference a

4  board member, who is that?

5      MS. KERBER:  Hello?

6      MS. HONG:  Which, which board member,

7  please?

8      MS. KERBER:  Ms. Hong, I'm so sorry.

9  You're, you're cutting off.

10      MS. HONG:  I asked, what -- which board

11  member are you referencing with respect to

12  donation?

13      MS. KERBER:  I, I, I won't disclose it

14  on, on the call right now.  I can disclose it

15  to you -- to you later but not on the call.

16      MS. HONG:  All right.  So then with

17  respect to the donations, how much does the

18  debtor take in per month in donation?

19      MS. KERBER:  Well, as any nonprofit, not

20  that you have a, a number, I mean, we set.

21      MS. HONG:  Okay.  For the month of

22  October, how much donations did the debtor

23  take in?

24      MS. KERBER:  From the side, let me tell

25  you.  October.  I would say probably --

1    October maybe -- I don't know.  Donations, I

2    would say maybe 30, 30 to 40,000.

3         MS. HONG:  Okay.  For the month of

4    October, did the debtor take in any other

5    money that could be considered revenue?

6         MS. KERBER:  So from my parents, yes.

7         MS. HONG:  Okay.  So -- I'm sorry.  What

8    did you say, the other part?  What kind of

9    revenue?

10        MS. KERBER:  Yeah.  This is from my

11   parents, Ms. Hong.

12        MS. HONG:  Your, your what?

13        MS. KERBER:  My, my father --

14        MS. HONG:  Your, your --

15        MS. KERBER:  -- and my mother.

16        MS. HONG:  I'm sorry.  Okay.  So your

17   family, as in your personal family --

18        MS. KERBER:  Correct.

19        MS. HONG:  -- members?  Okay.  So --

20        MS. KERBER:  That's correct.

21        MS. HONG:  So from your family members,

22   for the month of October, how much did they

23   donate?

24        MS. KERBER:  Around 70,000.

25        MS. HONG:  Is there any other source of

1   revenue for the month of October that the

2   debtor took in?

3        MS. KERBER:  No, no.

4        MS. HONG:  So for the month of October,

5   between the donations and your family, your

6   personal family members, the debtor took in

7   about $100,000?

8        MS. KERBER:  Yes, around 100.

9        MS. HONG:  Is that typical amount for the

10  debtor?

11       MS. KERBER:  Yeah.  It could be more.

12  Sometimes it's a little bit less, but yeah.

13       MS. HONG:  Okay.  So for Schedule AB, if

14  you look at line 55 -- do you have schedules

15  and front of you?

16       MS. KERBER:  Yes, ma'am.

17       MS. HONG:  Okay.  So if you have a filed

18  copy, it was filed as docket number 1.  It's

19  on PDF page 14 and it's line 55, which asks

20  for any building, real estate, land that the

21  debtor owns or that the debtor has an

22  interest.

23       MS. KERBER:  Do you mean apart from the

24  property that we're in with the country?

25       MS. HONG:  Well, well, I want you to look

```
 1   at the schedule if you have that in front of
 2   you so that I could ask the question.
 3        MS. KERBER:  I don't -- I think I have
 4   the paper. No.  I don't think I have that one,
 5   Ms. Hong.
 6        MS. HONG:  Okay.  Well, docket number 1,
 7   Schedule AB, line 55 as -- line 55.1, the
 8   debtor disclosed horse sanctuary-4554 Boulder
 9   Creek Road, Julian, California 92036 as
10   description and location of property with a
11   valuation of $3,625,000.  I was wondering, is
12   that the only real property that the debtor
13   has interest or are there any other real
14   property with different addresses that the
15   debtor also has interest?
16        MS. KERBER:  No, not at all.
17        MS. HONG:  There's no other addresses
18   that's associated with this debtor?
19        MS. KERBER:  Well, just on the same
20   property.  It's the same.  You just divide it
21   in three parcels.  So it's 4430, but it's in
22   the same property.
23        MS. HONG:  Okay.  So the address 4554
24   Boulder Creek, that was one address.  But the
25   reason why I'm asking is, I believe, we got
```

1   copy of the grant deed that shows 4554 and

2   4430 Boulder Creek Road, Julian, California

3   being transferred to Villa Chardonnay Horses

4   with Wings.  Is that also an address that

5   should be associated with this debtor?

6       MS. KERBER:  Yeah.  It's the one that I

7   just mentioned to you.  It's the same

8   property, but it's divided in three parcels,

9   so yes.

10      MS. HONG:  Okay.  So I think there should

11  be an amendment to Schedule AB so that all of

12  them are listed, not just one address.  And

13  clearly explain how many parcels are

14  associated, whether it's by address or APN

15  because right now it's only showing one and

16  that's incomplete.

17      So I'm going to request an amendment to

18  Schedule AB.  Do you have the real property

19  questionnaire that you filled out and

20  forwarded to the U.S. trustee's office?

21      MS. KERBER:  No.  I don't have it with

22  me.

23      MS. HONG:  Mr. Totaro, are you online?

24  Mr. Totaro?

25      MR. TOTARO:  Yes, I'm here.  Can you hear

```
 1   me?
 2        MS. HONG:  Yes, I can -- yes, I can.
 3        MR. TOTARO:  Can you hear me?
 4        MS. HONG:  Yes.  Mr. Totaro --
 5        MR. TOTARO:  Okay.  (indiscernible).
 6        MS. HONG:  You're breaking up a little
 7   bit, Mr. Totaro, but let me see.
 8        MR. TOTARO:  Okay.
 9        MS. HONG:  I was going to ask if --
10        MR. TOTARO:  All right.
11        MS. HONG:  -- you could email Ms. Kerber
12   with the real property questionnaire if she --
13        MR. TOTARO:  Well, she has -- she has --
14   she, she has everything.  She doesn't know
15   what she's looking at.  And I can't email her
16   because the electricity is down, so our
17   internet is down.
18        MS. HONG:  Okay.
19        MR. TOTARO:  So  I'm, I'm really thinking
20   this really would be better in person.  I
21   mean, we keep trying to do this, but it's --
22   you know.  I mean, I know she has all the
23   documents because I've sent them a number of
24   times and we've actually gone through them.
25   She just doesn't know what she's looking at.
```

```
 1        MS. HONG:  Okay.  Ms. Kerber, do you
 2   think you can locate the debtor and possession
 3   real property questionnaire?
 4        MS. KERBER:  No, no, Ms. Hong.
 5        MR. TOTARO:  Monika, it's the compliance
 6   packet that I sent you.  Okay?  There are
 7   three files labeled compliance in the -- in
 8   the packet that you've been -- signed at the
 9   beginning.
10        MS. HONG:  And I don't know if it's named
11   the same way, but the PDF name that I received
12   is realprop.PDF.
13        MS. KERBER:  Michael, Michael?
14        MS. HONG:  Mr. Totaro, are you online?
15        MR. TOTARO:  Hello?  I'm here.  Hello?
16   You're saying?  Hello?
17        MS. KERBER:  We can barely hear you,
18   Michael.
19        MR. TOTARO:  I'll, I'll disconnect and
20   dial back in.  Let me go to a different place
21   so that I can hear you.
22        MS. HONG:  All right.  While Mr. Totaro
23   is dialing back in, I am going to pause my
24   question.  For those who have checked in with
25   me earlier today, while we're paused in
```

```
 1   questioning, let me ask each of you if you
 2   have time --
 3        MR. TOTARO:  Can you hear me now?
 4        MS. HONG:  Yes.  Mr. Totaro --
 5        MS. KERBER:  Yes, I can.
 6        MS. HONG:  -- can you -- can you hang on
 7   just a second?
 8        MR. TOTARO:  Okay.
 9        MS. HONG:  Let -- I, I was going to ask
10   if people have time limitations.  Ms. Meredith
11   King, do you have any time limitation this
12   morning?
13        MS. KING:  Yes.  I have until 11:00 a.m.
14        MS. HONG:  Okay.  Ms. Wainscot, do you
15   have any time limitations?
16        MS. WAINSCOT:  No, we do not.
17        MS. HONG:  Mr. Farley, do you have any
18   time limitations?
19        MS. FARLEY:  No time limitation.
20        MS. HONG:  Okay.  Ms. Myers, do you have
21   any time limitations?
22        MS. MYERS:  No time limitations.
23        MS. HONG:  Okay.  Since it is 9:45, I am
24   going to continue questioning, but I will keep
25   Ms. King's time limitation in mind.  And I may
```

1    pause to allow her to question at some point.

2    Okay.  Mr. Totaro?

3         MR. TOTARO:  Yes.

4         MS. HONG:  Go ahead.  I think Ms. Kerber

5    had a question for you and she said she

6    couldn't hear you.  So I will let her speak.

7         MR. TOTARO:  Okay, okay.  What was the

8    question, Monika?

9         MS. KERBER:  Yes.  Michael, I was asking

10   if you could please resend to me the, the

11   package, the one that you said -- the three

12   house with it.

13        MR. TOTARO:  I, I don't know what your

14   question is.

15        MS. KERBER:  Resend the packet, please.

16   If you could please resend to me the packet

17   that you were referring to, please.

18        MR. TOTARO:  I can't.  Monika, I can't

19   because I have no electricity.  So therefore,

20   I have no internet.

21        MS. KERBER:  Okay.  Ms. Hong, would you

22   be able to -- I'll be excused for five minutes

23   so I can check in the computer, please?

24        MS. HONG:  Yes.

25        MS. KERBER:  Thank you.

 1        MR. TOTARO:  Ms, Hong, I'm going to try

 2   and send them to her from my phone.

 3        MS. HONG:  Okay.

 4        MR. TOTARO:  Which one -- which ones do

 5   you want right now?

 6        MS. HONG:  I wanted to ask her about the

 7   real property questionnaire.  That's a four-

 8   page real property questionnaire.

 9        MR. TOTARO:  Okay.  I'll see if I can

10   send it because it's in the middle of the

11   compliance packet and I think I can do it.

12   See what happens.  I'm sorry for this, but

13   this has just been complete mess since

14   January.  Let's see.

15        MS. HONG:  Did we lose Ms. Kerber?

16        MR. TOTARO:  I don't know.  I'm trying to

17   send this out.  I'm going to copy you on it so

18   you'll know if it comes through, the, the

19   compliance packet A.  It's it's uploading very

20   slowly because it's not on the internet, so --

21   it won't upload.

22        MS. HONG:  Okay.

23        MR. TOTARO:  There's, there's not --

24   there's not enough connection here to upload.

25        MS. HONG:  That's all right.  I don't

```
 1   know where Ms. Kerber went.  It doesn't sound

 2   like she's near the telephone.

 3        MR. TOTARO:  Let me see what I can --

 4        MS. HONG:  Okay.

 5        MR. TOTARO:  See if I can call her phone,

 6   phone.

 7        MS. HONG:  Thank you.

 8        MS. KING:  Ms. Hong?

 9        MS. KERBER:  Yes.

10        MS. KING:  This is Meredith King.  I just

11   wanted to let you know that I, I spoke with

12   someone in my office and I, I rearranged my

13   schedule, so I do not have a limitation today.

14        MS. HONG:  Okay.

15        MR. TOTARO:  All right.  I guess, she was

16   on the call and she's calling back in, but she

17   can't -- she can't find anything.  She doesn't

18   know what she's looking for.

19        MS. HONG:  Okay.

20        MR. TOTARO:  I mean, I've helped her,

21   indicated her with documents, so -- I mean,

22   maybe you can email her what you want her to

23   see.

24        MS. HONG:  Well, since the debtor is

25   represented, I prefer not to do that.
```

1    MR. TOTARO:  Well, at this --

2    MS. HONG:  I --

3    MR. TOTARO:  -- time, the, the

4  (indiscernible).

5    MS. HONG:  Yes.  That's for strictly

6  technical questions.

7    MS. KERBER:  Ms. Hong, I'm here on the

8  call.

9    MS. HONG:  Yes.  Oh, good, Ms. Kerber.

10  Okay.  I understand that maybe you can't

11  exactly find the document I wanted you to look

12  at.  So I'm just going to question you what I

13  can.

14    MS. KERBER:  Thank you so much, Ms. Hong.

15  And I apologize.  There are so many emails and

16  so documents.

17    MS. HONG:  Yeah.  Well, it would be ideal

18  if the counsel is with you, but I understand

19  it's hard.  So let me ask -- so the real

20  property questionnaire the U.S. trustee

21  received is four pages.  And it was signed by

22  you on October 21, 2025.  It asks various

23  questions, but one of the questions -- the

24  answer to which was regarding the monthly

25  expenses of the property, excluding debt

 1    service.

 2         And according to the listing of various

 3    expenses, the U.S. trustee calculated a total

 4    $143,000 per month of expenses.  That would

 5    include some utilities, feed, etc. that you

 6    listed in this questionnaire.  Is that

 7    accurate?

 8         MS. KERBER:  Yes.  It started from month

 9    to month.

10         MS. HONG:  Okay.  And that excludes any

11    debt service, meaning any mortgage payments,

12    right?

13         MS. KERBER:  Correct.

14         MS. HONG:  On the same page, the U.S.

15    trustee's real property questionnaire asks for

16    names of lenders and the installment payments,

17    outstanding principal payments, and delinquent

18    payments.  And there's only one listed.  And

19    then it says, "Too many to list.  See

20    preliminary."  How many mortgages are actually

21    on the property?

22         MS. KERBER:  Only one.

23         MS. HONG:  Okay.  So there's no second,

24    third?  There's just one mortgage?  So I, I

25    wasn't sure why there was the verbiage "too

November 19, 2025

1    many to list.  See prem."  So if there's only

2    one and what you listed is accurate, then

3    that's fine.  What you listed, what the debtor

4    listed as private lending, 1,650,000 as the

5    principal amount and the installment payment

6    of $10,666.67.  Is that the only mortgage

7    payment that the debtor actually has?

8         MS. KERBER:  Yes, Ms. Hong.

9         MS. HONG:  Okay.  Is the debtor current

10   post-petition on the mortgage payment?  Do you

11   understand what I'm asking?  I'm asking, after

12   the filing of the bankruptcy, has the debtor

13   been making the mortgage payment?  Ms Kerber?

14        MR. TOTARO:  Monika, can you hear me?

15        MS. KERBER:  Yes.  Ms. Hong, yes, I'm

16   here.

17        MR. TOTARO:  Monika can you --

18        MS. KERBER:  You were cutting off.

19        MR. TOTARO:  Okay.

20        MS. HONG:  Oh, I asked whether or not the

21   debtor has made post-petition mortgage

22   payment, meaning after the bankruptcy was

23   filed, did the debtor pay mortgage payment?

24        MR. TOTARO:  Monika, what don't you

25   understand about that question?

```
 1        MS. HONG:  I asked whether or not the
 2   debtor has been current post --
 3        MS. KERBER:  Ms. Hong, I'm sorry.  It's
 4   dropping the call, but I did hear your
 5   question --
 6        MS. HONG:  Okay.
 7        MS. KERBER:  -- and I was trying to, to
 8   answer to you.  So I apologize.  Wherever we
 9   are -- the connection sometimes is not really
10   good here in Julian.
11        MS. HONG:  Yes.  I didn't get an answer
12   on whether or not the debtor has been current
13   post-petition on the mortgage payment.
14        MS. KERBER:  The mortgage payments have
15   been made.  We are just talking about the loan
16   payment, but all the monthly payments were
17   made.
18        MS. HONG:  Okay.  Are there any property
19   taxes due?
20        MS. KERBER:  Yes, they are.
21        MS. HONG:  So are the property taxes
22   paid?
23        MS. KERBER:  For this year, no.  They're
24   going to be paid in December.  They're
25   assessing because of the nonprofit, the
```

 1   501(c)(3).  So they have to assess what's

 2   going to be paid because there's some that

 3   even though -- as a nonprofit, we have to pay

 4   and some other ones, we don't.

 5        MS. HONG:  Okay.

 6        MS. KERBER:  So that I'm seeing with the

 7   office of Joel Anderson in San Diego.

 8        MS. HONG:  All right.  And are you the

 9   only person residing on this property of the

10   debtor?

11        MS. KERBER:  No.  There's a second

12   person, my partner.

13        MS. HONG:  Okay.  Do, do you or your

14   partner pay rent to the debtor?

15        MS. KERBER:  No, we don't.  But we don't

16   receive a salary.

17        MS. HONG:  So Mr. Totaro, if the -- if

18   there are any -- especially because Ms. Kerber

19   is the owner and president, if she is living

20   there without paying rent, it appears to be a

21   form of insider compensation.  So the debtor

22   will need to file a motion for insider comp

23   and get an order from the court that she can

24   continue to do so.  So that will be on the

25   compliance list as well.  Has the debtor --

Audio Transcription                                    November 19, 2025

1        MS. KERBER:  Michael?

2        MS. HONG:  Mr. Totaro?

3        MR. TOTARO:  No.  I understand.

4        MS. HONG:  Okay, okay.  Great.  Has the

5    debtor ever tried to sell the property?

6        MS. KERBER:  Repeat again, Ms. Hong.

7        MS. HONG:  Has the debtor ever tried to

8    sell the property?

9        MS. KERBER:  No, not at all.

10       MS. HONG:  Okay.  Has the debtor ever

11   rented out the property?

12       MS. KERBER:  Not at all.

13       MS. HONG:  So the U.S. trustee also

14   received an appraisal report that's effective

15   as of October 6, 2025, showing that the

16   appraisal of the property is $3,625,000.  And

17   it appears that the insurance that the debtor

18   currently has is only up to 2.5 million.  And

19   so, if this is accurate appraisal, then it

20   appears that the insurance may not be

21   sufficient.  It's short by about a million, so

22   that needs to go up.

23       MR. TOTARO:  They don't insure vacant

24   land, Ms. Hong.  That's the -- that's the

25   insurance for the structures.

```
 1        MS. HONG:  I see.  Okay.  All right.  Let
 2   me -- let me see if I can slice and dice that
 3   appraisal report a little bit more because I
 4   was looking at it very quickly.  Okay.  Does
 5   the debtor have any special events or does --
 6   do anything to bring in any special type of
 7   revenues at any different seasons of the year?
 8        MS. KERBER:  No.  Never.
 9        MS. HONG:  Okay.  I understand that at
10   the IDI, there were discussions that other
11   people may have paid for the debtor, for
12   example, to get the insurance in place, etc.
13   And Ms. Doherty had already advised you that
14   the debtor needs to reflect any payments made
15   by third-party in the monthly operating
16   report.
17        And going forward, the debtor should
18   hopefully be paying everything for its own
19   expenses so that it can be accurately
20   reflected in the monthly operating report.  So
21   I just wanted to remind you that if there are
22   any third-parties, whether it's coming in
23   forms of gifts, donations, but they're paying
24   directly, but it's on behalf of the debtor,
25   that needs to be reflected in the monthly
```

1   operating report.  And based --

2        MS. KERBER:  Okay.

3        MS. HONG:  -- on the date, the monthly

4   operating report for the first one is due by

5   end of this week.  So I expect to see, you

6   know, the third-party payments accurately

7   reflected in the monthly operating reports.

8        MS. KERBER:  Okay, Ms. Hong.

9        MS. HONG:  Okay.

10       MR. TOTARO:  But, Ms. Hong, that, that

11  donation and the payments are made by the

12  debtor.

13       MS. HONG:  Yes.  I think that would be

14  much better if the debtor is the one making

15  its own payments and it accurately reflects

16  all the donations received from all sources of

17  parties.  Okay?

18       MS. KERBER:  Sure, Ms. Hong.

19       MS. HONG:  Okay.  Great.  All right.  So

20  how is the debtor hoping to get out of this

21  bankruptcy case?

22       MS. KERBER:  Well, like I mentioned to

23  Christina, we're going to try to use different

24  marketing strategies.  My family is -- keep

25  helping.  Like I mentioned, I'm, I'm going to

 1   inherit a good amount of money.  So keep doing

 2   what we're doing with donations and, and

 3   family money.

 4        MS. HONG:  You said marketing strategies.

 5   What kind of marketing strategies are you

 6   talking about?

 7        MS. KERBER:  Well, we're going to have

 8   different things.  We've been talking to some

 9   people that -- they offer to do it pro bono.

10   We have a marketing agency.  So that's what

11   we're discussing to see what's going to be the

12   best avenue.  Like I said, majorly, it will be

13   from my family as well.

14        MR. TOTARO:  Ms. Hong, would you like an

15   elaboration on that?

16        MS. HONG:  No.  Thank you.

17        MR. TOTARO:  She doesn't --

18        MS. HONG:  I, I --

19        MR. TOTARO:  She doesn't know what I'm

20   doing.

21        MS. HONG:  Right.  I, I  understand.

22   But, but --

23        MR. TOTARO:  Okay.

24        MS. HONG:  But, as I --

25        MR. TOTARO:  That's fine.

1       MS. HONG:  Yes.  As I said, I -- this is

2   testimony of the debtor who's sworn in, so she

3   is the one who needs to answer my questions as

4   -- to her best ability.  So thank you for the

5   offer, but no.

6       MR. TOTARO:  Okay.  I was just making

7   wrong statements, so -- whatever.  Okay.

8       MS. HONG:  Ms. Kerber, I understand you

9   have an MBA.  Is that right?

10      MS. KERBER:  That is correct.

11      MS. HONG:  And do you plan to somehow use

12  your MBA to some use for this debtor?

13      MS. KERBER:  Well, I have been using it

14  for these 23 years that I -- that I founded

15  Villa Chardonnay.  I have been, yes, and I

16  will continue.

17      MS. HONG:  Does the debtor need any

18  license in order to operate as an animal

19  sanctuary?

20      MS. KERBER:  No, Ms. Hong.

21      MS. HONG:  Does it need any other -- any

22  kind of permits in order to operate as a

23  sanctuary?

24      MS. KERBER:  No.

25      MS. HONG:  Are there any regulatory

1    agencies that oversees this debtor as a

2    sanctuary?

3         MS. KERBER:  Not if you are affiliated

4    and we were.  We were part of the Animal

5    Sanctuary Association.  And thanks to these

6    women, we lost it.

7         MS. HONG:  Okay.  So my question was, if

8    there's any --

9         MS. KERBER:  So, no.  The answer is no.

10        MS. HONG:  And so, there is no local,

11   state, federal agencies that periodically come

12   out to check, inspect the premises as of this

13   debtor because it's an animal sanctuary?

14        MS. KERBER:  Not for being an animal

15   sanctuary, just the regular animal control, so

16   no.

17        MS. HONG:  Okay.  So for animal control,

18   what does that mean?

19        MS. KERBER:  You're asking if there's an

20   agency that has to come and check if you're a

21   sanctuary?  Not per se, no.

22        MS. HONG:  Okay.  So aside of the fact

23   that it's a sanctuary, are there any other

24   agencies that come out to inspect this debtor

25   for any other reason?

```
 1        MS. KERBER:  The Animal Control.

 2        MS. HONG:  Okay.  Is that -- what kind of

 3   an agency is that?

 4        MS. KERBER:  Is -- it is -- if somebody

 5   calls them, whether it is true or not, they

 6   come and check on the animal.  And it's Animal

 7   Control.

 8        MS. HONG:  Is that the local state?

 9        MS. KERBER:  Yes, they are, depending on,

10   on the county.

11        MS. HONG:  Does Animal Control come out

12   at any other time, regardless of complaints?

13        MS. KERBER:  No, but they be here

14   several, several times.  Everything is fine.

15   There's never been a, a problem.

16        MS. HONG:  Okay.  How many times has

17   Animal Control been out this year, 2025?

18        MS. KERBER:  This -- oh this year,

19   probably just, just twice.  And there was no

20   need for more because there's nothing.  And

21   we've been in contact with them via email and

22   phone calls.  They call us whenever somebody

23   calls with lies.  So we have a really close

24   relationship with them.

25        MS. HONG:  Okay.  When did they come out
```

1    this year?

2        MS. KERBER:  I think that was maybe about

3    three months ago, I believe.

4        MS. HONG:  Okay.  So it's November.  So

5    did they come out twice three months ago or is

6    that the first or the second of the two times

7    that they came out this year?

8        MS. KERBER:  No.  This year, I think

9    they've been here, like, twice, twice or three

10   times.

11       MS. HONG:  Okay.  Why did they come out?

12       MS. KERBER:  Well, because somebody

13   called them with lies to say that the horses

14   were emaciated and there was no food, which is

15   a lie.

16       MS. HONG:  Okay.  So somebody actually

17   came out to check out the horses?

18       MS. KERBER:  Yes.

19       MS. HONG:  Okay.  What happened after

20   that?

21       MS. KERBER:  Nothing.  There was not even

22   a follow-up because there was nothing.

23   Whenever they came, there is no such a thing.

24       MS. HONG:  Okay.  So after the visit,

25   does the Animal Control issue any kind of

 1   documents or statements?

 2       MS. KERBER:  No.  I'm pretty sure they

 3   have because that's public domain.  And I

 4   think I shared with you guys an email that

 5   Animal Control sent to us.

 6       MS. HONG:  Okay.  So I think, going back,

 7   my initial question that I didn't go back to

 8   ask was why this bankruptcy case was filed.

 9   Is there some exigent reason why the debtor

10   decided to file for the Chapter 11 bankruptcy

11   case?

12       MS. KERBER:  Yeah.  We lost several of

13   our, our foundations because of the lies of

14   these people.  So it's been -- it's been

15   challenging to come up again with the -- with

16   the revenue that we were having.

17       MS. HONG:  Was there any pending

18   foreclosure?

19       MS. KERBER:  Yes, there is.

20       MS. HONG:  Could that be -- was that a

21   reason why the bankruptcy case was filed?

22       MS. KERBER:  Yes, so we can readjust our

23   finances.

24       MS. HONG:  Okay.  The pending foreclosure

25   was initiated by whom?

1        MS. KERBER:  The lender.

2        MS. HONG:  Which was?

3        MS. KERBER:  There's three different

4   ones.  It's just one, but we, we have three

5   different ones, The Carol Armbrust Trust.

6        MS. HONG:  Okay.

7        MS. KERBER:  It was four.  And I don't

8   bring them the other way, just to pay the

9   three different people --

10       MS. HONG:  Okay.

11       MS. KERBER:  -- but it's the same one.

12       MS. HONG:  All right.  Does this debtor

13  have any other operations other than what we

14  discussed today?

15       MS. KERBER:  No.

16       MS. HONG:  This is a California nonprofit

17  corporation.  Is that right?

18       MS. KERBER:  That's correct.

19       MS. HONG:  And it's in good standing?

20       MS. KERBER:  Yes.

21       MS. HONG:  The debtor has nonprofit

22  status from the IRS as well?

23       MS. KERBER:  Yes, we do.

24       MS. HONG:  Are you intending to take any

25  salary during the pendency of this bankruptcy

1   case?

2        MS. KERBER:  No, no.

3        MS. HON:  Who's going to be preparing and

4   filing the monthly operating reports?

5        MS. KERBER:  Ms. Penny Stock has been

6   presented by Mr. Totaro.

7        MS. HONG:  Okay.  Is that a CPA?

8        MS. KERBER:  Yes.

9        MS. HONG:  Okay.  If it's a CPA, she

10  would need to be employed by the estate.

11       MS. KERBER:  Okay.

12       MS. HONG:  Okay.  So besides the insider

13  compensation motion, add -- to employ CPA is

14  going on the list.  Ms. Kerber, did you

15  personally guarantee the debtor's debts?

16       MS. KERBER:  No.  I don't know what you

17  mean exactly.  No.

18       MS. HONG:  When the debtor takes out a

19  loan, did you sign on as a personal guarantor

20  of any of the debts?

21       MS. KERBER:  No.

22       MS. HONG:  And the reason I'm asking that

23  is because debtor's Schedule H filed in this

24  case shows that you are a co-debtor to a

25  number of debts that are listed on Schedule D

1   and EF.  So you did not personally guarantee

2   any of the debtor's loans, the loans that the

3   debtor got?

4       MS. KERBER:  No.  I was named on the

5   judgment, but no.

6       MS. HONG:  Okay.  Was there a judgment

7   from Small Business Association?

8       MS. KERBER:  Yes.

9       MS. HONG:  So SBA filed the lawsuit and

10  then they sued both you personally and the

11  debtor?

12      MS. KERBER:  No.

13      MS. HONG:  Okay.  The -- so Small

14  Business Association, which is listed on

15  Schedule D as a secure claim, is listed as the

16  first one on Schedule H, where you are the co-

17  debtor.  And what I'm asking is --

18      MS. KERBER:  I might be, like, listed as

19  a precaution.

20      MS. HONG:  Okay.  How many bank accounts

21  is -- does the debtor have open as of today?

22      MS. KERBER:  The one for Villa Chardonnay

23  or personal?

24      MS. HONG:  For the debtor.

25      MS. KERBER:  One.

1        MS. HONG:  One?  Okay.  And that's the

2    debtor-in-position account.

3        MS. KERBER:  Correct.

4        MS. HONG:  If the debtor employs any

5    staff members in January of 2026, the debtor

6    will need to open a couple of other bank

7    accounts, not just general debtor-in-

8    possession account.  And you need to alert our

9    office that's going to be happening.  For now,

10   since the debtor does not have any employees,

11   one general debtor-in-possession account is

12   okay.  But if and when the debtor actually

13   does hire paid employees, we will need to see

14   --

15       MS. KERBER:  Okay, Ms. Hong.

16       MS. HONG:  -- the payroll debtor-in-

17   possession bank account as well.

18       MS. KERBER:  Okay.  No problem.

19       MS. HONG:  Okay.  How much money does the

20   debtor have in the bank as of today or last

21   time you checked?

22       MS. KERBER:  Probably -- I mean, I

23   haven't checked yesterday and today, I don't

24   know.  Maybe 5,000, 10,000.

25       MS. HONG:  Okay.  And Ms. Kerber, you

1   filed for personal bankruptcy.  Correct?

2       MS. KERBER:  Yes.

3       MS. HONG:  And this debtor had filed for

4   bankruptcy that was dismissed earlier this

5   year, right?

6       MS. KERBER:  Correct.

7       MS. HONG:  Your personal bankruptcy case

8   that you filed, Ms. Kerber, that's a Chapter

9   7.  Is that right?

10      MS. KERBER:  Yes, Ms. Hong.

11      MS. HONG:  Okay.  Does the debtor have

12  cameras?

13      MS. KERBER:  Yes, we do.

14      MS. HONG:  Okay.  So the debtor has

15  certain personal properties, like computers

16  and equipment?

17      MS. KERBER:  No.

18      MS. HONG:  No?  But the camera belongs to

19  the debtor?

20      MS. KERBER:  They were given by parents,

21  a gift.

22      MS. HONG:  Okay.  I -- so as I stated at

23  the top of the hour, before I started

24  questioning, as Ms. Doherty indicated at the

25  IDI, Schedule AB needs to list everything that

```
 1   the debtor owns, not just the real property

 2   and the animals.  So any cameras, medicine,

 3   supplements, laboratory equipment, whatever

 4   the debtor has, as in Villa Chardonnay Horses

 5   with Wings, they all need to be listed

 6   properly.  So --

 7        MR. TOTARO:  Ms. Hong, we've gone --

 8   we've gone through this a number of times.

 9   There is nothing owned by the debtor.  It's

10   owned by the individuals who have placed the

11   equipment on the property, small tools, things

12   like that.  I haven't seen anything that's

13   actually owned by the debtor.  I will ask

14   again, though, after the hearing.

15        MS. HONG:  Okay.  I mean, so I -- so the

16   supplements, medicines, that doesn't belong to

17   the debtor either, Ms. Kerber?

18        MR. TOTARO:  You know -- you know, when

19   you buy supplements in the morning and you use

20   them in the afternoon, they're gone.

21        MS. HONG:  Mr. Totaro --

22        MR. TOTARO:  I mean, I, I don't know on

23   any one, one day you want to catch the stuff

24   that's there, but everything is transitory.

25   You buy fluid in the morning, it's gone in the
```

1   afternoon.  You buy Band-Aids in the morning,

2   they're gone in the afternoon.  So I -- you

3   and I can talk afterwards and see exactly what

4   you want.  I'll give you what you want.  I

5   just -- try to figure it out.  That's all.

6        MS. HONG:  Well, my question was directed

7   to Ms. Kerber.  And, yes, we can discuss

8   afterwards.  But, again, Ms. Kerber, does the

9   debtor have, like, medicines, supplements?

10        MS. KERBER:  Yes, we do.  We use them

11   every day.

12        MS. HONG:  Okay.  So --

13        MS. KERBER:  So like Mr. Totaro stated,

14   we have them.  We use them.  We get them.  We

15   use them.

16        MS. HONG:  That's fine.  They all need to

17   be listed as of the petition date so it's

18   accurate that we know what kind of asset the

19   debtor has.  Okay.  So as of this morning,

20   there was another Statement of Financial

21   Affairs filed.  The first question of the

22   Statement of Financial Affairs is regarding

23   the gross revenue of the case.

24        And it lists, for year to date of 2025,

25   that the debtor had received gross revenue of

1   $1,300,000.  I understand, from reviewing the

2   previous case, that the debtor filed and was

3   dismissed, that as of September 2025,

4   September 1, 2025, the year-to-date income was

5   $800,000.  Did the debtor receive $500,000 of

6   donation between September 1, 2025 and October

7   14, 2025?

8       MS. KERBER:  The first numbers we gave

9   you on the first pages were dismissed and I

10  mentioned it, that you can estimate.

11      MS. HONG:  I'm sorry.  So my question was

12  -- and your answer was a bit fuzzy.  So my

13  question was, between September 1, 2025, when

14  the last petition was filed, and October 14,

15  2025, which is the petition date of this case,

16  did the debtor receive $500,000 of donation?

17      MS. KERBER:  Ms. Hong, whenever you asked

18  me the first time on the first schedule, it

19  was an estimate and I stated because that was

20  -- whenever you asked me at that moment, I

21  didn't know exactly how much it was.  But this

22  time, I went through bank statements and

23  everything.  So that was an estimate,

24  guesstimate the first one.

25      MS. HONG:  I see.  So you're saying the

1   $800,000 that was listed in the first case was

2   not accurate?

3        MS. KERBER:  That is correct.  It's not

4   that it was not accurate.  I answered --

5   whenever I said, that was a guesstimate.

6        MS. HONG:  So the Statement of Financial

7   Affairs response that was filed this morning

8   showing $1,300,000 is accurate as of October

9   14, 2025.

10        MS. KERBER:  Mr. Totaro asked me to go

11   back and check all my statements to look

12   exactly how much it was.  So that's what I

13   did.  So whenever I answered the first time, I

14   told you that it was an estimate, but I, I was

15   not sure on the number.

16        MR. TOTARO:  Ms. Hong, I think you're

17   looking at a wrong line on that statement.

18        MS. HONG:  No.

19        MR. TOTARO:  Can you look at that again,

20   please?

21        MS. HONG:  I'm looking at this morning's

22   Statement of Financial Affairs.  And I'm just

23   asking -

24        MR. TOTARO:  Unless I uploaded the wrong

25   -- unless I uploaded the wrong one, I put in

1   the $755,000 from the bank statements.

2        MS. HONG:  Well, I don't know what you're

3   referring to, but what got filed as docket

4   number 30, question number 1, first line shows

5   $1,300,000 as gross revenue from January 1,

6   2025 to filing date.

7        MR. TOTARO:  That sounds like the

8   estimate from the prior case.  I, I -- well, I

9   can't check.  Well, maybe I can check on my

10  phone, but that's not what I typed in this

11  morning.

12       MS. HONG:  Okay.  Well, then I'm going to

13  leave this as an open item that needs to be

14  reviewed and revised if it's wrong.  Is that a

15  fair thing to do?

16       MR. TOTARO:  Yeah, that's fair.  I'm

17  opening it now, so I'm going to figure --

18       MS. HONG:  Okay.

19       MR. TOTARO:  -- out if -- I'm trying to

20  open it.

21       MS. HONG:  All right.  At this time, I'm

22  going to open up questioning to the creditors.

23  Ms. King, do you have any questions for the

24  debtor?

25       MS. KING:  Yes, I do.

1      MS. HONG:  Okay.  Go ahead.

2      MS. KING:  Ms. Kerber, today you

3  testified that you took in three cats

4  recently.  Is that correct?

5      MS. KERBER:  I mean --

6      MR. TOTARO:  Yeah.

7      MS. KERBER:  -- maybe Mr. --

8      MR. TOTARO:  It's speculative.  He's

9  still alive and will be for some time.

10     MS. KING:  Mr. Totaro, I'm going to ask

11 that Ms. Kerber respond.  Ms. Kerber --

12     MR. TOTARO:  Yeah.  I'm trying to --

13 yeah.  I'm trying to figure out where this

14 other thing is in response to.  Sometimes I

15 have to send her a document.  I have to figure

16 out where -- what was your question again, Ms.

17 King?  See if I can send you the document.

18     MS. KING:  Her, her testimony today, she

19 said that she -- they received, based on the

20 petition date, three or four cats.

21     MR. TOTARO:  Oh, okay.

22     MS. KING:  Is that accurate, Ms. Kerber?

23     MS. KERBER:  I mean, it depends.  What

24 time are you talking about, Ms. king?

25     MS. KING:  Since October 14th, today.

```
 1        MS. KERBER:  Okay.  Yeah, since October,
 2   probably we have received more.  I mean, they
 3   call us every day to take some.  We can help
 4   as many as we can.
 5        MS. KING:  Yeah.  Estimate as to how many
 6   animals you've received since October 14th.
 7        MS. KERBER:  I don't know exactly how
 8   many.
 9        MS. KING:  Do you know where the animals
10   were received from?
11        MS. KERBER:  Some, they come from the
12   Orange County, some from people.  Well, it
13   depends.
14        MS. KING:  The --
15        MS. KERBER:  It's not from just one
16   place.
17        MS. KING:  The county -- the Orange
18   County government?
19        MS. KERBER:  The Orange County Shelter.
20        MS. KING:  Can you give me the name of
21   that shelter?  You'll have to forgive me.  I'm
22   not familiar with the animal shelters.
23        MS. KERBER:  Oh, me neither.  It's just,
24   just -- I just know it's the Orange County.
25   And some people, they need -- some people
```

1   passed away.  They need a placement for their

2   cats.

3        MS. KING:  Okay.  So you're not.  You

4   don't know the name of the animal shelter in

5   Orange County --

6        MS. KERBER:  Yeah.

7        MS. KING:  -- from which you --

8        MS. KERBER:  I told you I just know it's

9   Orange County Shelter.

10       MS. KING:  Oh, just call it the Orange

11   County?

12       MS. KERBER:  Yeah.

13       MS. KING:  Did you receive animals from

14   any other shelters since the filing of the

15   bankruptcy?

16       MS. KERBER:  I, I don't know.  I don't

17   know if they, they came from other places.  If

18   people ask us -- or people that they advocate

19   for cats.  So, no, I don't know exactly where

20   they come from.

21       MS. KING:  So do you have an intake

22   process for folks to provide you animals?

23       MS. KERBER:  Yes, we do.  We ask for the

24   bed records if they have any, all information

25   regarding the well-being of the -- of the cat,

1   if they have it, but not necessarily they --

2   unless we know they come from a shelter.  But

3   like I say, it comes from a person that

4   probably we know.

5        MS. KING:  Do you maintain an inventory

6   of all the animals?

7        MS. KERBER:  Yes, we do.

8        MS. KING:  And how is that -- how are

9   those records kept?

10        MS. KERBER:  We have -- we have them

11   filed, file cabinets from all of them.  So

12   whenever they come with all that information,

13   we have it -- put a name.

14        MS. KING:  You have a paper filing

15   cabinet?

16        MS. KERBER:  Yes, we do.

17        MS. KING:  And who maintains those paper

18   records?

19        MS. KERBER:  I do.

20        MS. KING:  So do you typically receive

21   calls from people asking you to take an

22   animal?

23        MS. KERBER:  Sometimes.

24        MS. KING:  Are there any other ways you

25   are contacted?

1         MS. KERBER:  Email.

2         MS. KING:  Do you -- have you turned away

3  any animals in the last month?

4         MS. KERBER:  No.

5         MS. KING:  You mentioned -- you testified

6  today that you were looking to hire specific

7  people in January 2026.  Is that correct?

8         MS. KERBER:  Yes.

9         MS. KING:  How -- and you --- have you

10  identified the specific people whom you intend

11  to hire?

12         MS. KERBER:  No.  I think I mentioned

13  that -- we already talk about it -- we have to

14  see the skills of the people we'll hire.

15         MS. KING:  Are you looking into hiring

16  the people that are currently volunteering?

17         MS. KERBER:  We don't know.  We haven't

18  discussed.

19         MS. KING:  And when you say we, to whom

20  are you referring?

21         MS. KERBER:  Okay.  I myself, our board.

22         MS. KING:  You, you discussed it with

23  yourself?

24         MS. KERBER:  With our board.

25         MS. KING:  With your --

November 19, 2025

```
 1        MS. KERBER:  Board.

 2        MS. KING:  And you mentioned today that's

 3  one specific board member?

 4        MS. KERBER:  No.  More than one.

 5        MS. KING:  How many people are on your

 6  board?

 7        MS. KERBER:  Right now there's four of

 8  them.

 9        MS. KING:  Are any of the members of your

10  board also volunteers on the property?

11        MS. KERBER:  Yes.

12        MS. KING:  Are all of the members of your

13  board also volunteers?

14        MS. KERBER:  Not all.

15        MS. KING:  You testified today that you

16  cannot identify the name of the board member.

17  Can you identify -- can you provide the names

18  of any of the board members?

19        MS. KERBER:  No, not on this call.

20        MS. KING:  Can you explain why?

21        MS. KERBER:  I think I did.

22        MS. KING:  Did any of the board members

23  direct you not to disclose their names?

24        MS. KERBER:  Yes, they have.

25        MS. KING:  Did they provide you that
```

```
 1  direction in writing?

 2       MS. KERBER:  No.  Verbally.

 3       MS. KING:  How long have the four been --

 4  four board members been members of Villa

 5  Chardonnay board?

 6       MS. KERBER:  It's, it's been different.

 7  They're all not the same.

 8       MS. KING:  Could you repeat that?  Sorry.

 9       MS. KERBER:  We cannot say they're all

10  being for the exact same time, different

11  times.

12       MS. KING:  What is the longest and

13  shortest?

14       MS. KERBER:  The longest, I would say

15  probably nine years.

16       MS. KING:  And the shortest?

17       MS. KERBER:  The shortest, I would say

18  probably for three, two, three years.

19       MS. KING:  Sorry.  Please repeat that.

20       MS. KERBER:  Two or three years.

21       MS. KING:  Two or three.  All right.  Are

22  any members of the board your family members?

23       MS. KERBER:  No, not right now.

24       MS. KING:  And how often does the board

25  meet?
```

```
 1        MS. KERBER:  We go once a month, month
 2   and a half, depending on everybody's schedule.
 3        MS. KING:  Are any of the -- so have you
 4   -- and I apologize if, if I just -- I'm
 5   misunderstanding this, but can you -- so the
 6   people you're intending to hire on January
 7   '26, have you identified specific individuals
 8   that you are discussing hiring?
 9        MS. KERBER:  I think I already gave you
10   my answer.
11        MS. KING:  Could you repeat it, please?
12   I'm sorry.  I don't recall.
13        MS. KERBER:  Oh, well, we don't know.
14        MS. KING:  You, you -- so the answer
15   would be no, you have not identified specific
16   individuals at this time?
17        MS. KERBER:  We are -- we will be working
18   on -- depending on those skills that they
19   have.
20        MS. KING:  Are you -- do you have any job
21   postings?
22        MS. KERBER:  Ms. King, could you repeat
23   again?
24        MS. KING:  Do you have any job postings
25   advertised anywhere?
```

1     MS. KERBER:  No.  We're still in

2  November.  So we will be deciding by December,

3  the beginning of January.

4     MS. KING:  And what are the specific

5  positions that you're discussing hiring for?

6     MS. KERBER:  We are working on it.

7     MS. KING:  What -- sorry.  You said

8  you're working on the position.  Have you

9  identified any specific positions that you --

10     MS. KERBER:  No, we haven't -- no, we

11  haven't.

12     MS. KING:  So can you kind of provide

13  generally what the discussions with the board

14  have been.  If it hasn't been the hiring of

15  any specific individuals or hiring any

16  specific positions, what has the nature of the

17  discussions regarding hiring been?

18     MS. KERBER:  Well, it has to be people

19  that -- they, they know how to handle animals.

20  They know how to clean stalls.  They know how

21  to feed.  And so, it depends on the

22  responsibilities of each person we're going to

23  be hiring.

24     MS. KING:  So you're, you're interested

25  in hiring people to assist with the care of

 1    the animals?

 2        MS. KERBER:  Well, we all assist on the

 3    care of the animals if we are here.  Correct.

 4        MS. KING:  I'm sorry.  Could you repeat

 5    that?

 6        MS. KERBER:  I said if we are here -- we

 7    hire people.  We have volunteers.  It's

 8    because we are seeking the well-being of the

 9    animals.

10        MS. KING:  So you're looking to hire

11    people to assist in the care of the animals?

12        MS. KERBER:  If you want to say it like

13    that, yeah, cleaning everything up.  All we do

14    is for the well-being of the animal.

15        MS. KING:  Okay.  You mentioned or

16    testified that someone else was residing on

17    the property.  Could you provide the name of

18    the individual residing on the property?

19        MS. KERBER:  Yeah.  Her name is Mercedes

20    Flores.

21        MS. KING:  You testified today that you

22    received money from your father and your

23    mother, about 75 -- 70,000 -- excuse me --

24    last month.  Is that correct?

25        MS. KERBER:  Correct.

```
 1        MS. KING:  Was that a donation or a loan
 2   or some other donation?
 3        MS. KERBER:  Donation
 4        MS. KING:  Was that money deposited into
 5   the DIP account?
 6        MS. KERBER:  No, it was not.  It was
 7   given in cash.
 8        MS. KING:  How much of the 100,000 in
 9   donations was received in cash?
10        MS. KERBER:  You just mentioned.
11        MS. KING:  Just the 70,000?
12        MS. KERBER:  Correct.
13        MS. KING:  This other approximately
14   30,000, how was that received?
15        MS. KERBER:  Donation.
16        MS. KING:  Was that a check?  Was that a,
17   a bank transfer?  How was that payment --
18        MS. KERBER:  It's varied -- it's varied.
19        MS. KING:  I'm sorry.  Could you repeat
20   that?  I couldn't quite hear that.
21        MS. KERBER:  Yeah.  That is varied.
22        MS. KING:  It was varied?  It was cash
23   that you received?
24        MS. KERBER:  No.  You already ask about
25   the cash.  You ask about the other ones, if
```

1  they give it in there.

2      MS. KING:  Yeah.  And I, I apologize.

3      MS. KERBER:  Okay.

4      MS. KING:  I understand.  Was it -- did

5  you receive checks for 40,000?

6      MS. KERBER:  No.

7      MR. TOTARO:  Monika, we're not

8  understanding you.  Just tell her -- how did

9  you receive the money?  Because it's not in

10 the DIP account.  How did you get this money?

11 Was it all cash?  Was it a, a check that you

12 cashed?  What was it?

13     MS. KERBER:  Some were cash.  Some were

14 checks.

15     MS. KING:  And the checks, what bank

16 account were they deposited into?

17     MS. KERBER:  Into the Wells Fargo

18 account.

19     MS. KING:  Do you recall that?-- is that

20 that bank account you opened when the Villa

21 Chardonnay bankruptcy was filed?

22     MS. KERBER:  Yes.  There, there were two,

23 one that we opened the first time, but it had

24 to be closed and then this new one that we

25 just opened.

Audio Transcription                                    November 19, 2025

 1        MS. KING:  Oh, so all checks received in
 2   the last month were deposited into either one
 3   of those accounts?
 4        MS. KERBER:  Yes, Ms. King.
 5        MS. KING:  You testified that you were
 6   looking into new marketing strategies and had
 7   talked to some marketing agencies.  Do you
 8   have the name of any of those marketing
 9   agencies with whom you've spoken?
10        MS. KERBER:  I haven't talked to them.
11   They came to us and one is actually the
12   daughter of a good friend of ours.  I believe
13   she's there in LA.  It's an Asian family.  I
14   know her name is Christine.  And she just said
15   that she was willing to do something pro bono
16   for us.
17        MS. KING:  Do you know her last name?
18        MS. KERBER:  No, no, we don't.  I can
19   provide the last name, but, no, I don't have
20   on -- in my head.
21        MS. KING:  So you don't know?
22        MS. KERBER:  Yes.  No.  I just told you.
23   No, I don't.
24        MS. KING:  Okay.  You testified that you
25   may have made the mortgage payment that came

November 19, 2025

 1  due this -- during the bankruptcy.  Is that

 2  accurate?

 3        MS. KERBER:  That's accurate.

 4        MS. KING:  What was the date of that

 5  payment and the amount?

 6        MS. KERBER:  The last one, I mean, I know

 7  -- I don't know exactly the date, but I would

 8  say it was probably before April.

 9        MS. KING:  So have you made --

10        MS. KERBER:  March.  Yeah.

11        MS. KING:  Have you made mortgage

12  payments since March or April of this year?

13        MS. KERBER:  The mortgage payments were

14  already due.  I mean, they're paid off.  Like

15  I mentioned to Ms. Hong, this is for the loan

16  payment.

17        MS. KING:  Have you remitted any monthly

18  payments to -- on your mortgage since April?

19        MS. KERBER:  No.  There were no mortgage

20  payments anymore, so no.

21        MS. KING:  SO you testified today that

22  you keep medicines and food on hand to care

23  for the animals.  Is that correct?

24        MS. KERBER:  That is correct.

25        MS. KING:  Do you have a stockpile or are

1  those purchased each day and used each day?

2       MS. KERBER:  Yes, we do.

3       MS. KING:  You have a -- you have a

4  stockpile?

5       MS. KERBER:  I'm sorry?

6       MS. KING:  You have a stockpile and

7  inventory that you keep on hand for use?

8       MS. KERBER:  A few things.  But

9  everything else is being purchased every

10  single day.

11       MS. KING:  So you have volunteers that go

12  to the store each day and buy what the animals

13  will consume that day?

14       MS. KERBER:  No.  I do myself.

15       MS. KING:  So every day you go to the

16  store --

17       MS. KERBER:  Every single day.

18       MS. KING:  -- and, and buy, buy food?

19       MS. KERBER:  That's correct.

20       MS. KING:  Medicine?

21       MS. KERBER:  No.  That is whenever we

22  need to call the vet.  And they bring the

23  medication.  What I buy is the feed, feed --

24       MS. KING:  Does the vet --

25       MS. KERBER:  -- and supplement.

November 19, 2025

1      MS. KING:  Feed and supplements?

2      MS. KERBER:  Yes.

3      MS. KING:  Does the vet come every day to

4   provide medicine?

5      MS. KERBER:  No.  We don't need to

6   provide medicines every day.

7      MS. KING:  Are, are there medicines that

8   are kept on hand for the animals?

9      MS. KERBER:  Well, we have the -- it's

10   not reached to the -- to anybody.

11      MS. KING:  Sorry.  Can you --

12      MS. KERBER:  So we have --

13      MS. KING:  -- repeat that?

14      MS. KERBER:  -- a special -- I say we

15   have a special place for medication.  It's not

16   just to the reach of anybody (indiscernible).

17      MS. KING:  Do you have any tractor that

18   you use on the property?

19      MS. KERBER:  Not at the moment.

20      MS. KING:  In the past six months, have

21   you had a tractor on the property?

22      MS. KERBER:  Not the past -- but, but we

23   did if we needed to lease one.

24      MS. KING:  But you no longer have access

25   to a tractor?

1    MS. KERBER:  This past week, yes, had a

2  tractor.

3    MS. KING:  I'm sorry.  I couldn't

4  understand you.  Could you repeat that?

5    MS. KERBER:  I said these past days, we

6  did have a tractor.

7    MS. KING:  These past days?  Can you

8  clarify what you mean by that?

9    MS. KERBER:  I mean we, we, we lease a

10  tractor.

11    MS. KING:  You lease a tractor?

12    MS. KERBER:  Yes.

13    MS. KING:  And from whom do you lease a

14  tractor?

15    MS. KERBER:  I, I don't recall the name

16  of the company.  No.

17    MS. KING:  Do you have any UTVs or ATVs

18  that you use to travel across the property?

19    MS. KERBER:  No, not right now.

20    MS. KING:  Have you, in the past year,

21  had any UTVs or ATVs that you used to travel?

22    MS. KERBER:  Yes.

23    MS. KING:  And how many?

24    MS. KERBER:  Last year, probably -- or at

25  the beginning of this year, we had probably

1  two of them.

2      MS. KING:  And what happened to those?

3      MS. KERBER:  We sold them because they

4  already had too many hours.

5      MS. KING:  Too many hours?

6      MS. KERBER:  Yes.

7      MS. KING:  Can you explain what that

8  means?

9      MS. KERBER:  Okay.  You're not familiar

10  with that?  Whenever you have an ATV, it's not

11  by miles.  It's by hours.  So if you have too

12  many hours equivalent to, to miles, it's --

13  they're, they're already finished or they need

14  a little bit more of a minute.

15      MS. KING:  Thank you.  And when were

16  those sold?

17      MS. KERBER:  I mean, I don't know

18  exactly.  Only one was sold in maybe February,

19  maybe another one a couple months later.  I

20  don't know exactly when.

21      MS. KING:  And how much did you receive

22  for those?

23      MS. KERBER:  Probably for one, maybe we

24  got 3,000.  Maybe for another one -- I don't

25  know -- maybe 5,000 for that.

1      MS. KING:  And were those sold to any

2   member of your family?

3      MS. KERBER:  No.

4      MS. KING:  All right.  I'm going to ask

5   you a question about Schedule B that you filed

6   in your case.  I understand you do not have

7   that in front of you, so I will represent what

8   I see on it.  Mr. Totaro, if anything I say

9   seems inaccurate, please let me know so we can

10  correct the record.  Does that sound good?

11     MR. TOTARO:  Yeah.

12     MS. KING:  So on the Schedule B filed

13  with the court on October 14th, which I

14  understand you reviewed, based on your

15  testimony today, at question 2.3, you

16  identified Carol Armbrust as a creditor with a

17  lien on what you identified as a horse

18  sanctuary in an unknown amount.  Mr. Totaro,

19  is that accurate?

20     MR. TOTARO:  I can't access mine either,

21  but it sounds accurate because I think at the

22  time, we didn't know the division of the loan

23  between the, the parties.  That's, that's the

24  one on the mortgage, right?  I kind of

25  recognize the name.

1       MS. KERBER:  Yes, Michael.

2       MR. TOTARO:  I think -- I was talking to,

3   to Ms. King.

4       MS. KERBER:  No.  I was --

5       MS. KING:  Carol Armbrust?

6       MR. TOTARO:  Isn't she one of your

7   clients?

8       MS. KING:  Yes.  But I think Ms. Kerber

9   accurately testified on the record that she is

10  a mortgager -- that is a mortgager.

11      MR. TOTARO:  Oh.

12      MS. KING:  So on this -- on question 2.3,

13  if -- the claim is marked as disputed.  Ms.

14  Kerber, this question is directed to you.

15  What is the basis of your dispute as to the

16  amount owed to the Armbrust Trust?  Ms.

17  Kerber, are you there?

18      MR. TOTARO:  Monika, are you there?

19  Hello?

20      MS. HONG:  This is Haeji Hong.  Mr.

21  Totaro, do you think you could try pinging Ms.

22  Kerber to see if she could dial back in?

23      MR. TOTARO:  Yeah.  I'm going to call her

24  from the other phone.  Hold on, please.

25      MS. HONG:  Thank you.

 1      MR. TOTARO:  She's moving around, trying

 2   to find better service.  She'll be calling in

 3   a second.

 4      MS. HONG:  Okay.  Thank you.

 5      MR. TOTARO:  I had a thought about how

 6   they should have gone down to Santa Monica.  I

 7   just didn't think about.

 8      MS. HONG:  Ms. King, do you have a lot

 9   more questions to ask?

10      MS. KING:  I probably have 15 or 20

11   minutes of questions, I would say.

12      MS. HONG:  Okay.  I am going to ask that

13   you try to consolidate to another five minutes

14   or so after Ms. Kerber gets back on.  I will

15   ask if other creditors have any questions.

16   And I will end up continuing this.  And you'll

17   have another chance at the continued meeting.

18      MS. KING:  That's what I was going to

19   ask.  Yeah.  I think that's fine.  We'll -- I

20   will consolidate this, given the amendments

21   that I understand coming, provided additional

22   time is, is given to question regarding the

23   amendment.

24      MS. HONG:  Okay.

25      MS. KING:  I would ask --

1       MR. TOTARO:  Ms. Hong, she's telling me -

2    - she's texting me that she can't get in.

3    It's not letting her get in for some reason.

4       MS. HONG:  To the line?  Well, that's --

5       MR. TOTARO:  Yeah.  I'm going to try and

6    see what's going on.

7       MS. HONG:  Can she hang up and call back

8    on?  I don't think -- this is just telephonic.

9    As long as you punch in the passcode, you

10   should be able to get in.

11      MR. TOTARO:  Yeah.  I'm texting her now,

12   to see what's going on.  So I can't even get a

13   text message to go through.

14      MS. KERBER:  Ms. Hong, I apologize, but I

15   cannot find good signal.  I'm trying to go

16   wherever I can get it.

17      MS. HONG:  Oh, good.  Ms. Kerber, you're

18   back up.

19      MR. TOTARO:  Okay, Ms. Hong.

20      MS. HONG:  Ms. King, please continue.

21   You have five minutes.

22      MS. KING:  Thank you, Ms. Hong.  Ms.

23   Kerber, the question before you was, what is -

24   - the Schedule  you filed with the amounts

25   owed to Carol Armbrust as disputed, can you

Audio Transcription                                November 19, 2025

1    describe the nature of the dispute you

2    identified?

3        MS. KERBER:  That was from the advice

4    from my attorney.

5        MS. KING:   Okay.  And same question as

6    to the amount owed to Private Mortgage Lending

7    that is identified on your Schedule B is

8    disputed.  Can you provide the basis for that

9    dispute?

10       MS. KERBER:  From the advice from my

11   attorney.

12       MS. KING:  Same question as to the

13   secured claim of River Falls LLC.

14       MS. KERBER:  From the advice from my

15   attorney.

16       MS. KIN:  As you sit here testifying

17   today, can you think of any factual basis as

18   to why Villa Chardonnay would not owe Carol

19   Armbrust, Private Mortgage Lending, River

20   Falls LLC the debt secured by an interest in

21   Villa Chardonnay's property?

22       MS. KERBER:  Ms. King, you seem lost.  I,

23   I cannot hear you.

24       MS. KING:  Sure.  I'll rephrase.  I'll

25   say it again.  As you sit here today --

 1      MS. KERBER:  This is now -- it's going

 2  off.  I'm, I'm so sorry.

 3      MR. TOTARO:  Okay.  Ms. King, as to --

 4  there's no dispute as to the money that's owed

 5  your client.

 6      MS. KING:  Okay.

 7      MR. TOTARO:  There's no dispute --

 8  there's no dispute to the factual loan, any

 9  money owed to your client.  So --

10      MS. KING:  Ms. Kerber, do you have any

11  formal agreements, written agreements with any

12  donors to Villa Chardonnay?

13      MS. KERBER:  What kind of agreement?

14      MS. KING:  Written agreements with

15  donors.

16      MS. KERBER:  What kind of agreement?

17      MS. KING:  Regarding this donor lien.

18      MS. KERBER:  Ms. King?

19      MS. KING:  Yes.  I'm sorry, Ms. Kerber.

20  Could you repeat that?

21      MS. KERBER:  Yes.  I, I can't hear the

22  last question because she's cutting off.  It's

23  just, like, few words here and there.

24      MS. KING:  Do you have any written

25  agreements with donors?

November 19, 2025

```
 1        MS. KERBER:  No, I don't.

 2        MS. KING:  Do you use any computer

 3   programs to track donations?

 4        MS. KERBER:  Repeat again.

 5        MS. KING:  Do you have computer programs

 6   that you use to track donations, a software

 7   program?

 8        MS. KERBER:  No, not really.

 9        MS. KING:  Can you explain not really.

10        MS. KERBER:  We don't.

11        MS. KING:  Do you provide receipts to

12   donors when they provide a donation?

13        MS. KERBER:  Yes.

14        MS. KING:  How are those receipts

15   prepared?

16        MS. KERBER:  The computer.

17        MS. KING:  What computer -- what computer

18   program?

19        MS. KERBER:  Just doing Word.

20        MS. KING:  Do you have any spreadsheets

21   you use to track donate donations?

22        MS. KERBER:  No, we don't.

23        MS. KING:  How are your records of

24   donations maintained?

25        MS. KERBER:  We -- doing Excel.
```

1        MS. KING:  You have an Excel spreadsheet

2    with donations?

3        MS. KERBER:  Yes.

4        MS. KING:  Do you -- do you collect

5    information, contact information for your

6    donors?

7        MS. KERBER:  Sometimes we do.

8        MS. KING:  Are those maintained in the

9    spreadsheet you described?

10       MS. KERBER:  Correct.

11       MS. KING:  Do you provide donors

12   summaries or thank you letters after they,

13   they provide donations?

14       MS. KERBER:  Yes, we do.

15       MS. KING:  Moving on to question 26 of

16   the SOFA, you identify S.M. Kazim Raza as an

17   accountant or bookkeeper.  Can you describe

18   the services they provide the debtor?

19       MS. KERBER:  What do you mean?

20       MS. KING:  What, what work do they do for

21   the debtor?

22       MS. KERBER:  (indiscernible).

23       MS. KING:  Sorry.  Could you repeat that?

24       MS. KERBER:  Hello?

25       MS. KING:  Yes, Ms. Kerber?  Ms. Kerber,

 1  are you there?  Ms. Hong, can you hear me?

 2      MS. HONG:  I can hear you.  It looks like

 3  we may have lost Ms. Kerber again.  So Ms.

 4  King, once she gets back on, I think this will

 5  be your last question for today.  And then --

 6  we've been at it for two hours.  I don't know

 7  if people would like a short break.

 8      But I think before I start asking other

 9  creditors if they would like to ask questions,

10  perhaps we can pick the continued date and

11  time.  And I'm going to take roll to see

12  whether or not in-person meeting for the

13  continued date will be acceptable to

14  everybody.  Mr. Totaro, are you online?

15      MR. TOTARO:  Yes, I am.

16      MS. HONG:  Could you ping Ms. Kerber

17  again to see if she could come back on?

18      MR. TOTARO:  I'll see what I can do, but

19  my other phone died and I got to charge.  This

20  one is dying also.  They do this every once in

21  a while.  They just set off the electricity

22  and they don't tell us.  Let me see what I can

23  do.

24      All right.  It's Michael.  I was finally

25  able to get through a little bit.  She's just

1   having trouble dialing out.  It just doesn't

2   connect at all to the service.  So she's going

3   to dial in now.  And Ms. Hong, I would

4   suggest, if we continue this, that we do it in

5   person in your office.

6        MS. HONG:  Yes.  I was actually furiously

7   trying to get permission to do that.  So --

8        MR. TOTARO:  I know it's -- I know it's

9   hard.  Nobody wants to do it anymore, but this

10  is impossible.

11       MS. HONG:  So --

12       MS. KERBER:  This keep on dropping.  Oh,

13  yes.  I'm trying to move wherever I can get

14  signal.

15       MS. HONG:  Oh.

16       MS. KERBER:  And it's just calling,

17  calling, calling, but it didn't --

18       MR. TOTARO:  All right.  Go ahead.

19       MS. KERBER:  -- allow me to call.

20       MS. HONG:  There we go.  Ms. King, your

21  last question.  And then I'm going to pause

22  and start taking poll on the continued date

23  and time.  Ms. King, go ahead.

24       MS. KING:  Ms. Kerber the question I

25  asked before you dropped off was -- you

1  identified S.M. Kazim Raza as an accountant or

2  bookkeeper on the Statement of Financial

3  Affairs filed, I believe, today.  And I, I

4  asked what services they provided the debtor,

5  what work.

6      MS. KERBER:  Well, he -- you're talking

7  about the bookkeeping.  Correct?

8      MS. KING:  The -- well, he's the -- S.M.

9  Kazim Raza is identified on the Statement of

10  Financial Affairs as an accountant or

11  bookkeeper.

12      MS. KERBER:  Yeah, yeah, bookkeeping.

13      MS. KING:  Each month they prepare

14  financial statements?

15      MS. KERBER:  Ms. King?

16      MS. KING:  They provide financial

17  statements.  Yes?

18      MS. KERBER:  Ms. King, I cannot hear you.

19  I'm so sorry.

20      MS. HONG:  Okay.  Ms. King, I --

21      MR. TOTARO:  Monika, can you hear me?

22  Can you hear me, Monika?

23      MS. KERBER:  The, the phone lost -- it's,

24  it's my signal.  Let me -- I'm trying to move

25  wherever I can get signal.

1       MS. HONG:  Okay.  All right.

2       MS. KERBER:  Ms. Hong, I can do that?

3       MS. HONG:  Yeah.  I think at this time,

4   I'm going to pause.  And I'm looking at the

5   dates.  I apologize to others who are on the

6   call, who have not been able to ask any

7   questions, but let me -- let me do that before

8   turning to anything else.

9       So when I.  Mr. Totaro, I'm assuming

10  you're going to need some time in order to

11  file the amendments and get us other

12  documentations.  Does, does -- December 3 or

13  December, 5 is that acceptable deadline for

14  the debtor to comply with what will be

15  outstanding from the U.S. trustee standpoint?

16      MS. TOTARO:  December --

17      MS. HONG:  December 5 is a Friday.  I'm

18  giving you a couple of extra days --

19      MS. TOTARO:  Yeah.

20      MS. HONG:  -- two weeks from today to

21  allow for --

22      MS. TOTARO:  That, that would be -- yeah.

23  That would be good.

24      MS. HONG:  Okay.

25      MR. TOTARO:  December 5 is fine.  I have

1   -- I have an appointment at 7:00 in the

2   morning, but other than that, clear.

3        MS. HONG:  Yeah.  That -- and that's just

4   for deadline for debtor to comply.  And I'm

5   allowing for a couple of days of Thanksgiving

6   next week as -- just holidays.  So December 16

7   at, let's say, 9 o'clock, would that work, to

8   come into the U.S. trustee's office to

9   continue the meeting of the creditors?  So

10  first, I'm going to ask Ms. Kerber.  Are you

11  available December 16 at 9:00 to come into

12  Downtown San Diego?

13       MS. KERBER:  I'll make myself available.

14       MR. TOTARO:  Ms. Hong, I might be gone

15  from December 20 until the end of the year.

16       MS. HONG:  Oh.

17       MR. TOTARO:  But I could do it on the

18  14th.

19       MS. HONG:  14th?  You mean a Sunday?

20       MR. TOTARO:  Oh, sorry.  But frankly, at

21  this -- at this point, yes, I would be fine.

22  Let's see.  December (indiscernible).  What

23  about Friday, December 13th?

24       MS. HONG:  Okay.  So --

25       MR. TOTARO:  And I'm assuming you don't

Audio Transcription                                    November 19, 2025

1  want to carry this over until January.  So --

2      MS. HONG:  If I'm looking at the previous

3  time, I think -- Thursday, December 11 in the

4  morning, would that work or Wednesday,

5  December 10th at 1 o'clock?

6      MR. TOTARO:  15, as far as I'm concerned.

7      MS. HONG:  So 15, December 15?  Okay.

8      MR. TOTARO:  I'm sorry, you said 10.  So

9  --

10      MS. HONG:  Looking at --

11      MR. TOTARO:  -- December, Thursday 11 is

12  fine.

13      MS. HONG:  Thursday 11:00 either morning

14  or Thursday, 10 -- Wednesday, the 10th

15  December at 1 o'clock.  Which --

16      MS. KERBER:  I have another -- I have

17  another 341 now.  So Thursday in the morning

18  is better on my end.

19      MS. HONG:  Thursday morning at 9:00.  Ms.

20  Kerber, are you available?  Ms. Kerber?  All

21  right.  When she comes back on, I'll ask her.

22  Ms. King, are you available on Thursday,

23  December 11 at 9:00?  It will be in our

24  office.

25      MS. KING:  Yes.

1      MS. HONG:  Okay.  Ms. Grace Wainscot, are

2   you available to come into Downtown San Diego

3   on December 11 at 9:00?

4      MS. WAINSCOT:  Ms. Hong, I'm not

5   available to come in in person, but is there a

6   possibility of attending remotely?

7      MS. HONG:  Okay.  I will see if you could

8   call in.  I think when we dock it, it only

9   gives me one, one choice on how to notice out.

10   But I -- I'm assuming I am allowed to let you

11   in through the same, same phone number and the

12   passcode.

13      MS. WAINSCOT:  Okay.

14      MS. HONG:  Mr. Farley, are you available

15   December 11 at 9:00 a.m. to attend in person?

16      MR. FARLEY:  Available.  Although, I also

17   would prefer remote.

18      MS. HONG:  Okay.  Ms. Myers, are you

19   available to attend in person on December 11

20   at 9:00 a.m.?

21      MS. MYERS:  I'm available, but I too

22   would prefer to attend via remote.

23      MS. HONG:  Okay.  Mr. Totaro, I

24   understand your battery might be kind of low.

25   Is, is there any way that you can somehow

1   reach Ms. Kerber to see if she is available to

2   come in person on December 11 at 9:00 a.m.?

3        MR. TOTARO:  She said she would be

4   available anytime.  So I -- hold on.  My

5   phone's actually ringing.  Maybe I can get

6   her.

7        MS. HONG:  Okay.  All right.  So then I

8   can continue this, once Ms. Kerber gets back

9   online, to December 11 at 9:00 and -- with the

10  understanding that I will have the telephone

11  line also available for people to call in

12  remotely so that they can ask questions.  By

13  my count, Ms. Wainscot, Mr. Farley, and Ms.

14  Myers, I still have not asked whether or not

15  you have any questions.  To the extent that

16  Ms. Kerber is unable to join back in -- I am

17  very sorry, but I think your questions would

18  have to be at the continuing meeting of

19  December 11.  If you don't mind waiting a few

20  more minutes, let's see if Ms. Kerber is able

21  to get back.  And we'll take it from there.

22       MR. TOTARO:  Ms. Hong, I will extend an

23  invitation to all counsel that's on the line.

24  If somebody wants to notice a 2004 exam before

25  that date -- maybe we can clear up all your

```
 1   questions so that the U.S. trustee doesn't
 2   have to sit around for 2 hours listening to
 3   questions -- I would be amenable to that.  So
 4   if somebody wants to contact me offline to do
 5   that, that's fine.
 6       MS. HONG:  All right.  So I gave it a
 7   couple minutes.  Ms. Kerber, are you on?
 8       MR. TOTARO:  I can't -- I can't reach her
 9   either, I can't.
10       MS. HONG:  Okay.  I am deeply apologetic
11   to Ms. Wainscot, Mr. Farley, and Ms. Myers.  I
12   -- obviously with the technical difficulties
13   and the amount of questioning, I -- I'm sorry
14   that you did not have a chance to ask
15   questions today.  But I am going to continue
16   this for in-person continued meeting of
17   creditors on December 11 at 9:00 a.m.  Our
18   office is located at 880 Front Street, suite
19   number 3230.
20       We will not be conducting downstairs in
21   the first floor, but it will be in our
22   conference room.  And anybody who have
23   expressed to join remotely are allowed to come
24   in person and ask questions in person.  I
25   would encourage you to do it, just so that we
```

 1   don't have any more technical difficulties.
 2   It might be a little easier, although I
 3   understand that it might not make logistical
 4   sense.
 5       But otherwise, I will dock it for in-
 6   person and I will -- and I just got word that
 7   it may actually -- I may actually be able to
 8   conduct it, not in our conference room, but
 9   downstairs.  So it may not be a notice docket
10   today.
11       It might be tomorrow.  And for Ms.
12   Wainscot, Mr. Farley, and Ms. Myers, could you
13   email me directly so that I can email back to
14   you and make sure you are aware of how to
15   attend the continued meeting so you can ask
16   your questions if you're attending remotely?
17   Let me --
18       MR. FARLEY:  Okay.
19       MS. HONG:  Let me give you my email
20   address.  I just -- I just wanted to make sure
21   that you're not locked by the dockets and
22   whatnot.  So my email address is Haeji, H-A-E-
23   J-I, dot Hong, H-O-N-G at U.S. DOJ dot gov.
24   Again, that's Haeji, H-A-E-J-I, dot Hong, H-O-
25   N-G at U.S. DOJ dot gov, G-O-V.

Audio Transcription                                   November 19, 2025

1       Please just include your -- the case name

2   and number, Villa Chardonnay Horses with

3   Wings, case number 25-04245, that you were a

4   creditor who appeared or a party in interest

5   who appeared this morning and -- so that I

6   have your contact info so that I can let you

7   know how to attend remotely if that is your

8   preference or if that's the only way of

9   attending at the continued meeting.  All

10  right.

11      With that, the meeting will stand

12  continued to December 11 at 9:00 a.m., to be

13  in person for debtor and debtor's counsel.

14  That's mandatory.  So Mr. Totaro, I am

15  expecting you to appear here in person with

16  Ms. Kerber.

17      All of the compliance requirements that

18  the U.S. trustee had requested, including --

19  based on the testimony today, they are due by

20  December 5, including filing of any

21  amendments.  Okay?  All right.  This meeting -

22  -

23      MR. TOTARO:  (indiscernible).  By the

24  way, for everybody, the call in number is

25  still the same, that ends in 3441.  That is

```
 1   correct?
 2        MS. HONG:  I, I believe so.  I -- but I
 3   don't want to make that commitment until I get
 4   some internal confirmation because we've moved
 5   away from conducting in-person meetings of
 6   creditors.  I'm not sure if there's some other
 7   phone number that I may be asking the
 8   creditors to utilize.
 9        And so, that's why I would like all of
10   the other creditors to -- and the party in
11   interest, who were not able to ask questions
12   to email me directly so that I have your
13   contact information.  Okay.  This meeting
14   stands to continue --
15        MR. TOTARO:  Will you be -- will you be
16   available for a conversation this afternoon?
17   I have another 341 in your office at 1
18   o'clock, but besides that --
19        MS. HONG:  Yes.  I -- yes, I am
20   available, if you want to give me a call after
21   your 341.  If not this afternoon, then we can
22   touch base tomorrow morning?
23        MR. TOTARO:  That is fine.
24        MS. HONG:  Okay.  Great.  Thank you.
25        MR. TOTARO:  Thank you.
```

Audio Transcription                                    November 19, 2025

1

2    (End of audio recording.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Audio Transcription                                November 19, 2025

```
 1        CERTIFICATE OF TRANSCRIPTIONIST

 2

 3        I, MARY KARANJA, do hereby certify:

 4

 5        That said audio transcription is a true

 6   record as reported by me, a disinterested

 7   person.

 8

 9        I further certify that I am not

10   interested in the outcome of said action, nor

11   connected with, nor related to any of the

12   parties in said action, nor to their

13   respective counsel.

14

15        IN WITNESS THEREOF, I have hereunto set

16   my hand this 6th day of January, 2026.

17

18

19        _____

20        Mary Karanja

21

22

23

24

25
```

Audio Transcription

November 19, 2025

**$**

**$1,300,000** 59:1 60:8 61:5

**$10,666.67** 40:6

**$100,000** 29:7

**$143,000** 39:4

**$3,625,000** 30:11 43:16

**$500,000** 59:5,16

**$755,000** 61:1

**$800,000** 59:5 60:1

**0**

**0** 9:6

**1**

**1** 29:18 30:6 59:4, 6,13 61:4,5 93:5, 15 99:17

**1,000** 22:12

**1,650,000** 40:4

**10** 23:10 93:8,14

**10,000** 55:24

**100** 29:8

**100,000** 72:8

**10th** 93:5,14

**11** 2:5,10 51:10 93:3,11,23 94:3, 15,19 95:2,9,19 96:17 98:12

**11:00** 34:13 93:13

**12** 23:10

**13th** 92:23

**14** 2:7 22:21 29:19 59:7,14 60:9

**14th** 62:25 63:6 80:13 92:18,19

**15** 82:10 93:6,7

**16** 92:6,11

**18** 23:8

**19** 2:8 22:21 23:8

**2**

**2** 96:2

**2.3** 80:15 81:12

**2.5** 43:18

**20** 82:10 92:15

**2004** 95:24

**2009** 19:11

**2022** 10:9 11:7,11

**2023** 12:17 13:25 14:3

**2024** 12:13 13:25 14:4

**2025** 2:8 12:18 13:8,25 14:4 22:21 38:22 43:15 49:17 58:24 59:3, 4,6,7,13,15 60:9 61:6

**2026** 24:20 26:12 55:5 66:7 101:16

**21** 38:22

**23** 19:10 47:14

**24/7** 24:4

**25-04245** 98:3

**25-04245-JBM11** 2:7

**26** 69:7 87:15

**3**

**3** 91:12

**3,000** 79:24

**30** 11:6 28:2 61:4

**30,000** 72:14

**31** 12:13

**3230** 96:19

**341** 8:1 93:17 99:17,21

**341(a)** 2:10

**3441** 98:25

**365** 24:4

**3870** 9:4

**4**

**40,000** 28:2 73:5

**42** 21:16

**4430** 30:21 31:2

**4554** 30:23 31:1

**5**

**5** 91:13,17,25 98:20

**5,000** 55:24 79:25

**501(c)(3)** 19:11 42:1

**55** 29:14,19 30:7

**55.1** 30:7

**6**

**6** 43:15

**6th** 101:16

**7**

**7** 56:9

**70,000** 28:24 71:23 72:11

**75** 71:23

**7:00** 92:1

**8**

**8** 26:11

**880** 96:18

**9**

**9** 92:7

**90** 10:21

**90-day** 11:24

**9030** 9:17

**92036** 30:9

**9:00** 92:11 93:19, 23 94:3,15,20 95:2,9 96:17 98:12

**9:03** 2:8

**9:45** 34:23

**A**

**a.m.** 2:9 34:13 94:15,20 95:2 96:17 98:12

**AB** 29:13 30:7 31:11,18 56:25

**abilities** 6:22

**ability** 47:4

**absolutely** 18:9

**accept** 21:10

**acceptable** 88:13 91:13

**accepted** 22:24

**access** 77:24 80:20

**account** 9:4,6,9, 10,17,20,24 10:4, 7 12:16 55:2,8,11, 17 72:5 73:10,16, 18,20

**accountant** 87:17 90:1,10

**accounts** 12:17 54:20 55:7 74:3

**accuracy** 13:14

**accurate** 10:4 13:8,21 39:7 40:2 43:19 58:18 60:2,

4,8 62:22 75:2,3 80:19,21

**accurately** 44:19 45:6,15 81:9

**acres** 21:16

**action** 101:10,12

**acts** 2:14

**add** 53:13

**additional** 82:21

**additionally** 9:1

**address** 7:11 30:23,24 31:4,12, 14 97:20,22

**addressed** 7:13 13:14

**addresses** 30:14,17

**administration** 2:17

**advertised** 69:25

**advice** 84:3,10,14

**advised** 44:13

**advocate** 64:18

**Affairs** 13:8,12 15:6,14,18,23 16:3,7 58:21,22 60:7,22 90:3,10

**affect** 2:17

**affiliated** 48:3

**afford** 21:1

**afternoon** 57:20 58:1,2 99:16,21

**agencies** 48:1, 11,24 74:7,9

**agency** 46:10 48:20 49:3

**agreement** 85:13,16

**agreements** 85:11,14,25

**ahead** 4:9 17:7 24:2 35:4 62:1

Audio Transcription

November 19, 2025

89:18,23

**AI** 7:24

**alert** 55:8

**Alexa** 7:22

**alive** 62:9

**Allen** 13:3

**allowed** 5:16 94:10 96:23

**allowing** 92:5

**amenable** 96:3

**amend** 12:20 13:2,5,7

**amendment** 31:11,17 82:23

**amendments** 82:20 91:11 98:21

**amount** 22:18 29:9 40:5 46:1 75:5 80:18 81:16 84:6 96:13

**amounts** 13:25 83:24

**Anderson** 42:7

**animal** 19:10,20 23:4,18 47:18 48:4,13,14,15,17 49:1,6,11,17 50:25 51:5 63:22 64:4 65:22 71:14

**animals** 12:25 18:7 19:13,24 20:2,6,9,12,14,18, 21 21:10,13,18 22:3,12,19,24 23:12,15,22 57:2 63:6,9 64:13,22 65:6 66:3 70:19 71:1,3,9,11 75:23 76:12 77:8

**anymore** 75:20 89:9

**anytime** 95:4

**APN** 31:14

**apologetic** 96:10

**apologize** 38:15 41:8 69:4 73:2 83:14 91:5

**appearance** 3:4 5:3,19

**appeared** 3:6 98:4,5

**appearing** 3:13, 23

**appears** 42:20 43:17,20

**applied** 14:2

**appointment** 92:1

**appraisal** 43:14, 16,19 44:3

**approached** 14:5

**approved** 14:2

**approximately** 72:19

**April** 75:8,12,18

**Arc** 4:12,18

**area** 17:1 21:24 25:14,19

**areas** 21:16

**Armbrust** 3:15 52:5 80:16 81:5, 16 83:25 84:19

**Asian** 74:13

**asks** 8:2 29:19 38:22 39:15

**assess** 42:1

**assessing** 41:25

**asset** 58:18

**assets** 12:21

**assigned** 2:4

**assist** 70:25 71:2, 11

**Association** 4:2 48:5 54:7,14

**assuming** 91:9

92:25 94:10

**assured** 20:3

**attend** 94:15,19, 22 97:15 98:7

**attending** 94:6 97:16 98:9

**attorney** 2:2 84:4,11,15

**ATV** 79:10

**ATVS** 78:17,21

**audio** 100:2 101:5

**avenue** 46:12

**aware** 8:12 16:1 22:2 97:14

_____

**B**

**back** 3:4 5:12 11:5 25:13,18 33:20,23 37:16 51:6,7 60:11 81:22 82:14 83:7, 18 88:4,17 93:21 95:8,16,21 97:13

**bad** 18:8

**balance** 9:6 12:10

**Band-aids** 58:1

**bank** 9:8,14,17, 20,24,25 10:5 12:16 54:20 55:6, 17,20 59:22 61:1 72:17 73:15,20

**bankruptcy** 2:5, 19 15:7 16:15 17:18 22:20 26:19 40:12,22 45:21 51:8,10,21 52:25 56:1,4,7 64:15 73:21 75:1

**barely** 33:17

**base** 99:22

**based** 11:14 12:9 21:11 45:1 62:19 80:14 98:19

**basis** 81:15 84:8, 17

**battery** 94:24

**bed** 64:24

**beginning** 18:12 33:9 70:3 78:25

**behalf** 3:14,23 4:1,12 44:24

**belong** 57:16

**belongs** 56:18

**bit** 19:2 20:16 22:22 25:9 29:12 32:7 44:3 59:12 79:14 88:25

**bluntly** 18:7

**board** 27:2,4,6,10 66:21,24 67:1,3,6, 10,13,16,18,22 68:4,5,22,24 70:13

**bono** 46:9 74:15

**bookkeeper** 87:17 90:2,11

**bookkeeping** 90:7,12

**Boulder** 30:8,24 31:2

**break** 88:7

**breakdown** 12:2

**breaking** 32:6

**bring** 17:22 18:14 22:12 44:6 52:8 76:22

**building** 29:20

**burden** 17:14

**business** 10:4 18:21 54:7,14

**buy** 57:19,25 58:1 76:12,18,23

_____

**C**

**cabinet** 65:15

**cabinets** 65:11

**calculated** 39:3

**California** 2:4 30:9 31:2 52:16

**call** 7:15 18:6 20:4 23:20 25:13, 18 27:14,15 37:5, 16 38:8 41:4 49:22 63:3 64:10 67:19 76:22 81:23 83:7 89:19 91:6 94:8 95:11 98:24 99:20

**called** 50:13

**calling** 17:2 37:16 82:2 89:16, 17

**calls** 49:5,22,23 65:21

**camera** 56:18

**cameras** 12:22 56:12 57:2

**capacity** 21:9,19 22:5,13

**care** 22:7,9,12 23:20,21 70:25 71:3,11 75:22

**caring** 19:12

**Carol** 52:5 80:16 81:5 83:25 84:18

**carry** 93:1

**case** 2:5,6 12:8 13:12 14:19 16:14,15 21:8 22:20 26:7,20 45:21 51:8,11,21 53:1,24 56:7 58:23 59:2,15 60:1 61:8 80:6 98:1,3

**cases** 20:23

**cash** 10:21 11:24 12:2,5,6,11 72:7, 9,22,25 73:11,13

**cashed** 73:12

Audio Transcription                                                November 19, 2025

**cat** 23:18 64:25

**catch** 57:23

**cats** 21:20,24 23:1,7,9 62:3,20 64:2,19

**Celine** 4:13,19,23

**cell** 17:5

**CERTIFICATE** 101:1

**certify** 101:3,9

**challenging** 51:15

**chance** 11:21 18:20 82:17 96:14

**Chapter** 2:5 51:10 56:8

**Chardonnay** 2:6 5:25 19:7 20:4 31:3 47:15 54:22 57:4 68:5 73:21 84:18 85:12 98:2

**Chardonnay's** 84:21

**charge** 88:19

**check** 5:14 35:23 48:12,20 49:6 50:17 60:11 61:9 72:16 73:11

**checked** 4:4,21, 25 33:24 55:21,23

**checks** 73:5,14, 15 74:1

**choice** 94:9

**Christina** 45:23

**Christine** 74:14

**claim** 54:15 81:13 84:13

**clarify** 78:8

**clean** 70:20

**cleaning** 71:13

**clear** 92:2 95:25

**client** 85:5,9

**clients** 81:7

**close** 49:23

**closed** 9:7,18 73:24

**closing** 9:3,7,8, 10,14

**co-** 54:16

**co-debtor** 53:24

**collect** 87:4

**combined** 12:1

**commitment** 99:3

**communications** 14:7,9

**comp** 42:22

**company** 14:5 78:16

**compensation** 42:21 53:13

**complaints** 49:12

**complete** 36:13

**compliance** 8:8 33:5,7 36:11,19 42:25 98:17

**comply** 91:14 92:4

**computer** 35:23 86:2,5,16,17

**computers** 12:23 56:15

**concerned** 93:6

**condition** 2:16

**conducive** 25:21

**conduct** 2:15 97:8

**conducting** 96:20 99:5

**conference** 26:2 96:22 97:8

**confirmation** 9:25 10:7 99:4

**connect** 89:2

**connected** 101:11

**connection** 36:24 41:9

**Connor** 4:11

**considered** 28:5

**consolidate** 82:13,20

**consume** 76:13

**contact** 49:21 87:5 96:4 98:6 99:13

**contacted** 65:25

**contained** 15:13, 17,21

**continue** 34:24 42:24 47:16 83:20 89:4 92:9 95:8 96:15 99:14

**continued** 8:5 82:17 88:10,13 89:22 96:16 97:15 98:9,12

**continuing** 82:16 95:18

**contractors** 8:20

**control** 48:15,17 49:1,7,11,17 50:25 51:5

**controlled** 20:23

**conversation** 99:16

**copies** 12:13,15

**copy** 2:23,25 10:12 29:18 31:1 36:17

**corporation** 52:17

**correct** 5:24 15:3 28:18,20 39:13 47:10 52:18 55:3 56:1,6 60:3 62:4 66:7 71:3,24,25 72:12 75:23,24

76:19 80:10 87:10 90:7 99:1

**corrections** 16:1

**counsel** 5:4 6:21 10:6,19 38:18 95:23 98:13 101:13

**counsel's** 8:22 9:21

**count** 95:13

**country** 29:24

**county** 49:10 63:12,17,18,19,24 64:5,9,11

**couple** 11:5 22:25 55:6 79:19 91:18 92:5 96:7

**court** 2:19 10:25 12:8 15:7 16:8 25:1 42:23 80:13

**cover** 8:20

**CPA** 53:7,9,13

**creditor** 80:16 98:4

**creditors** 2:9,12 3:2,15 4:3,19 8:3 61:22 82:15 88:9 92:9 96:17 99:6,8, 10

**Creek** 30:9,24 31:2

**current** 13:22 40:9 41:2,12

**cut** 20:15 25:8

**cutting** 27:9 40:18 85:22

---

**D**

**daily** 24:5

**date** 12:12,15,18, 21 13:7,9 14:1,4 22:18,23 23:4 45:3 58:17,24 59:15 61:6 62:20 75:4,7 88:10,13

**89:22 95:25**

**dates** 91:5

**daughter** 74:12

**day** 21:21 22:10 57:23 58:11 63:3 76:1,10,12,13,15, 17 77:3,6 101:16

**days** 10:21 78:5,7 91:18 92:5

**deadline** 91:13 92:4

**deal** 17:13

**debt** 38:25 39:11 84:20

**debtor** 2:13 5:3,6, 15,16,23 8:3,9,16, 25 10:18 12:21 13:3,4,6,18,19 14:13,15,16 16:14 17:17 18:20 19:8, 20 20:12,18,20 21:10,13 22:2,3, 18,23 23:11,14 24:13,15,19,24 26:12,18,21 27:18,22 28:4 29:2,6,10,21 30:8, 12,15,18 31:5 33:2 37:24 40:3,7, 9,12,21,23 41:2, 12 42:10,14,21,25 43:5,7,10,17 44:5, 11,14,17,24 45:12,14,20 47:2, 12,17 48:1,13,24 51:9 52:12,21 53:18 54:3,11,17, 21,24 55:4,5,10, 12,20 56:3,11,14, 19 57:1,4,9,13,17 58:9,19,25 59:2,5, 16 61:24 87:18,21 90:4 91:14 92:4 98:13

**debtor's** 2:14,17 5:3 9:21 10:19 15:2 18:21,23 53:15,23 54:2 98:13

**debtor-in-** 55:7,

Audio Transcription                                      November 19, 2025

16

**debtor-in-position** 55:2

**debtor-in-possession** 9:23 55:11

**debts** 53:15,20, 25

**December** 12:13 41:24 70:2 91:12, 13,16,17,25 92:6, 11,15,22,23 93:3, 5,7,11,15,23 94:3, 15,19 95:2,9,19 96:17 98:12,20

**decided** 51:10

**deciding** 70:2

**decisions** 2:18, 19

**deed** 31:1

**deeply** 96:10

**delinquent** 39:17

**denied** 14:2

**depend** 26:15

**depending** 49:9 69:2,18

**depends** 20:22 21:7 62:23 63:13 70:21

**deposited** 72:4 73:16 74:2

**describe** 16:13 17:15 84:1 87:17

**description** 30:10

**designated** 9:23

**detailed** 12:5 13:24 14:1

**device** 5:10

**devices** 7:22,24

**dial** 3:4 5:11 33:20 81:22 89:3

**dialing** 33:23

89:1

**dice** 44:2

**die** 20:10

**died** 88:19

**Diego** 42:7 92:12 94:2

**difference** 19:22 20:1

**difficulties** 96:12 97:1

**DIP** 10:7 72:5 73:10

**direct** 67:23

**directed** 6:20 58:6 81:14

**direction** 68:1

**directly** 14:15 44:24 97:13 99:12

**disappear** 5:11

**disbursement** 10:22 11:25 12:7

**disbursements** 12:3

**disclose** 17:25 27:13,14 67:23

**disclosed** 30:8

**disconnect** 33:19

**discrepancy** 11:16

**discuss** 58:7

**discussed** 24:25 25:6 52:14 66:18, 22

**discussing** 46:11 69:8 70:5

**discussions** 12:19 44:10 70:13,17

**disinterested** 101:6

**dismissed** 56:4 59:3,9

**dispute** 81:15 84:1,9 85:4,7,8

**disputed** 81:13 83:25 84:8

**distant** 25:14

**District** 2:4

**divide** 30:20

**divided** 31:8

**division** 80:22

**dock** 94:8 97:5

**docket** 29:18 30:6 61:3 97:9

**dockets** 97:21

**document** 38:11 62:15,17

**documentation** 9:13 14:7

**documentations** 91:12

**documented** 9:5

**documents** 8:8, 10,16 32:23 37:21 38:16 51:1

**Doherty** 10:9 44:13 56:24

**DOJ** 97:23,25

**domain** 51:3

**donate** 28:23 86:21

**donated** 13:24

**donation** 26:23 27:12,18 45:11 59:6,16 72:1,2,3, 15 86:12

**donations** 27:17, 22 28:1 29:5 44:23 45:16 46:2 72:9 86:3,6,21,24 87:2,13

**donor** 85:17

**donors** 13:24 18:5 85:12,15,25 86:12 87:6,11

**dot** 97:23,24,25

**downstairs** 96:20 97:9

**Downtown** 92:12 94:2

**drop** 3:3 5:7 11:6

**dropped** 89:25

**dropping** 41:4 89:12

**due** 41:19 45:4 75:1,14 98:19

**dying** 88:20

――――――――

**E**

**earlier** 33:25 56:4

**easier** 97:2

**EF** 54:1

**effective** 43:14

**elaboration** 46:15

**electricity** 16:23 17:3 32:16 35:19 88:21

**emaciated** 50:14

**email** 18:3 32:11, 15 37:22 49:21 51:4 66:1 97:13, 19,22 99:12

**emails** 18:10 38:15

**employ** 53:13

**employed** 2:2 53:10

**employee** 24:18

**employees** 24:12,16 55:10,13

**employs** 55:4

**encourage** 96:25

**end** 18:4 45:5 82:16 92:15 93:18 100:2

**ending** 9:17

**ends** 3:5 98:25

**entered** 12:9

**equine** 19:9

**equipment** 12:22,24 56:16 57:3,11

**equivalent** 79:12

**ERC** 14:6

**essentially** 20:8

**estate** 2:18 29:20 53:10

**estimate** 59:10, 19,23 60:14 61:8 63:5

**euthanize** 23:12, 21

**euthanizes** 23:15

**events** 44:5

**everybody's** 69:2

**exact** 68:10

**exam** 95:24

**Excel** 86:25 87:1

**excludes** 39:10

**excluding** 38:25

**excuse** 11:4 23:13 71:23

**excused** 35:22

**exigent** 51:9

**expand** 21:24

**expanding** 21:23

**expect** 45:5

**expectation** 26:14

**expecting** 24:15, 19,24 26:12 98:15

**expenses** 10:23 38:25 39:3,4 44:19

Audio Transcription

November 19, 2025

**explain** 18:21,23 31:13 67:20 79:7 86:9

**explained** 17:20

**explanation** 10:12 11:16

**expressed** 96:23

**extend** 95:22

**extent** 95:15

**extra** 91:18

---

**F**

**F-A-R-L-E-Y** 4:16

**facilities** 21:12

**fact** 48:22

**factors** 25:6

**factory** 19:10

**factual** 84:17 85:8

**fair** 61:15,16

**Falls** 3:15 84:13, 20

**familiar** 63:22 79:9

**family** 28:17,21 29:5,6 45:24 46:3, 13 68:22 74:13 80:2

**Fargo** 73:17

**Farley** 4:6,8,10, 11,16,18 34:17,19 94:14,16 95:13 96:11 97:12,18

**Farming** 4:2

**father** 28:13 71:22

**February** 79:18

**federal** 48:11

**feed** 39:5 70:21 76:23 77:1

**figure** 58:5 61:17 62:13,15

**figured** 26:10

**file** 42:22 51:10 65:11 91:11

**filed** 2:7 10:13 11:13,17 13:12 15:7,10 16:7,15 17:18 22:20 29:17,18 40:23 51:8,21 53:23 54:9 56:1,3,8 58:21 59:2,14 60:7 61:3 65:11 73:21 80:5,12 83:24 90:3

**files** 33:7

**filing** 40:12 53:4 61:6 64:14 65:14 98:20

**filled** 31:19

**final** 8:24

**finally** 88:24

**finances** 22:6 51:23

**financial** 2:15 10:20 11:23 12:13 13:7,12 15:6,14, 18,23 16:3,7 58:20,22 60:6,22 90:2,10,14,16

**find** 19:25 37:17 38:11 82:2 83:15

**fine** 6:14 40:3 46:25 49:14 58:16 82:19 91:25 92:21 93:12 96:5 99:23

**finished** 79:13

**firm** 3:13

**floor** 96:21

**Flores** 71:20

**flows** 12:12

**fluid** 57:25

**folks** 64:22

**follow-up** 50:22

**food** 12:24 50:14 75:22 76:18

**foreclosure** 51:18,24

**forever** 19:18 20:3

**forgive** 63:21

**form** 42:21

**formal** 85:11

**forms** 44:23

**forthcoming** 8:23

**forum** 2:12

**forward** 44:17

**forwarded** 31:20

**foundation** 4:12, 18 17:23

**foundations** 18:5 51:13

**founded** 47:14

**four-** 36:7

**Franklin** 3:14

**frankly** 92:20

**Friday** 91:17 92:23

**friend** 74:12

**front** 14:25 29:15 30:1 80:7 96:18

**full** 8:15

**funds** 14:3

**furiously** 89:6

**furniture** 12:22

**fuzzy** 25:3 59:12

---

**G**

**G-O-V** 97:25

**gave** 59:8 69:9 96:6

**general** 9:23 10:3 27:1 55:7,11

**generally** 25:14 70:13

**gift** 56:21

**gifts** 44:23

**give** 19:17 21:2 22:7 58:4 63:20 73:1 97:19 99:20

**giving** 91:18

**good** 2:1 5:9 38:9 41:10 46:1 52:19 74:12 80:10 83:15,17 91:23

**gov** 97:23,25

**government** 8:11,13 63:18

**Grace** 3:18,24 4:1 94:1

**gradually** 19:25

**grant** 14:3 31:1

**grants** 14:1,2

**Great** 43:4 45:19 99:24

**grid** 17:3

**gross** 58:23,25 61:5

**guarantee** 53:15 54:1

**guarantor** 53:19

**guess** 13:10 37:15

**guesstimate** 59:24 60:5

**guys** 18:2 51:4

---

**H**

**H-A-E-** 97:22

**H-A-E-J-I** 97:24

**H-O-** 97:24

**H-O-N-G** 97:23

**Haeji** 2:2 81:20 97:22,24

**half** 7:25 69:2

**hand** 6:2,18 75:22 76:7 77:8 101:16

**handle** 70:19

**hang** 34:6 83:7

**happened** 22:9 50:19 79:2

**happening** 55:9

**hard** 38:19 89:9

**head** 74:20

**healthy** 20:13,20

**hear** 7:4 16:24 31:25 32:3 33:17, 21 34:3 35:6 40:14 41:4 72:20 84:23 85:21 88:1, 2 90:18,21,22

**heard** 11:7

**hearing** 4:5 5:1 57:14

**held** 2:10

**helped** 37:20

**helping** 27:2 45:25

**hereunto** 101:15

**hesitancy** 14:10

**high-** 18:3

**hire** 24:16,19 26:12,17 55:13 66:6,11,14 69:6 71:7,10

**hiring** 66:15 69:8 70:5,14,15,17,23, 25

**historical** 13:23

**hold** 81:24 95:4

**holidays** 92:6

**home** 19:18,25 20:3

Audio Transcription                                      November 19, 2025

**Hon** 20:15 53:3

**Hong** 2:1,2 3:10, 18,21,25 4:3,7,9, 14,17,20,24 5:13, 22 6:1,5,9,13,17, 25 7:4,6,8,11,16, 18 11:2,3,10 13:17 14:20,21 15:2,5,9,12,16,20, 25 16:5,10,17,19, 20,21 17:2,10,12, 17,19 18:15,18 19:1,3,6,14,16,19, 23 20:11,17 21:9, 25 22:17 23:3,11, 13,14,23 24:2,4,6, 9,12,15,18,23 25:2,8,16,20,23 26:1,8,10,18,25 27:3,6,8,10,16,21 28:3,7,11,12,14, 16,19,21,25 29:4, 9,13,17,25 30:5,6, 17,23 31:10,23 32:2,4,6,9,11,18 33:1,4,10,14,22 34:4,6,9,14,17,20, 23 35:4,21,24 36:1,3,6,15,22,25 37:4,7,8,14,19,24 38:2,5,7,9,14,17 39:10,14,23 40:8, 9,15,20 41:1,3,6, 11,18,21 42:5,8, 13,17 43:2,4,6,7, 10,13,24 44:1,9 45:3,8,9,10,13,18, 19 46:4,14,16,18, 21,24 47:1,8,11, 17,20,21,25 48:7, 10,17,22 49:2,8, 11,16,25 50:4,11, 16,19,24 51:6,17, 20,24 52:2,6,10, 12,16,19,21,24 53:7,9,12,18,22 54:6,9,13,20,24 55:1,4,15,16,19, 25 56:3,7,10,11, 14,18,22 57:7,15, 21 58:6,12,16 59:11,17,25 60:6, 16,18,21 61:2,12, 18,21 62:1 75:15 81:20,25 82:4,8,

12,24 83:1,4,7,14, 17,19,20,22 88:1, 2,16 89:3,6,11,15, 20 90:20 91:1,2,3, 17,20,24 92:3,14, 16,19,24 93:2,7, 10,13,19 94:1,4,7, 14,18,23 95:7,22 96:6,10 97:19,23, 24 99:2,19,24

**hope** 20:4

**hoping** 45:20

**horse** 23:19 30:8 80:17

**horses** 2:6 5:25 19:7 31:3 50:13, 17 57:4 98:2

**hour** 13:11 56:23

**hours** 79:4,5,11, 12 88:6 96:2

**house** 35:12

**Humane** 4:2

---

## I

**idea** 26:6

**ideal** 38:17

**identified** 66:10 69:7,15 70:9 80:16,17 84:2,7 90:1,9

**identify** 2:21 67:16,17 87:16

**IDI** 10:8 12:19 16:12 44:10 56:25

**ill** 20:13,19

**illness** 20:24

**impossible** 89:10

**imprisonment** 6:14

**in-** 97:5

**in-person** 88:12 96:16 99:5

**inaccurate** 80:9

**include** 6:14 12:20 39:5 98:1

**included** 24:6

**including** 15:9 98:18,20

**income** 12:11 13:8,15 59:4

**incomplete** 31:16

**Incorporated** 3:17

**indiscernible** 26:7,9 32:5 38:4 77:16 87:22 92:22 98:23

**individual** 71:18

**individuals** 57:10 69:7,16 70:15

**info** 98:6

**information** 13:15 14:10,14, 16,17 15:13,17,21 17:25 64:24 65:12 87:5 99:13

**inherit** 46:1

**initial** 51:7

**initiated** 51:25

**insider** 42:21,22 53:12

**inspect** 48:12,24

**installment** 39:16 40:5

**instantly** 17:11

**instructions** 2:25

**insurance** 8:19, 24 9:2 43:17,20, 25 44:12

**insure** 43:23

**intake** 64:21

**intend** 66:10

**intending** 52:24 69:6

**interest** 2:13 4:4 29:22 30:13,15 84:20 98:4 99:11

**interested** 70:24 101:10

**internal** 99:4

**internet** 32:17 35:20 36:20

**interrupt** 16:22 18:19

**inventories** 12:25

**inventory** 65:5 76:7

**invitation** 95:23

**IRS** 10:11,13 11:14,15,17 52:22

**issue** 26:3 50:25

**issued** 12:14

**issues** 8:6 9:8 17:21

**item** 61:13

---

## J

**J-I** 97:23

**January** 24:17,20 26:12 36:14 55:5 61:5 66:7 69:6 70:3 93:1 101:16

**job** 69:20,24

**Joel** 42:7

**join** 95:16 96:23

**judgment** 4:19 13:2,4 54:5,6

**Julian** 30:9 31:2 41:10

---

## K

**Karanja** 101:3,19

**Kazim** 87:16 90:1,9

**Kerber** 5:20,21, 24 6:4,8,12,16,24 7:2,3,6,10,12,14, 15,17 9:12 14:5,9, 20,24 15:1,4,8,11, 15,19,24 16:4,9, 17 17:14,19 18:15,16,18,25 19:4,9,15,17,22 20:15,22 21:15 22:5,25 23:6,13, 16 24:1,3,8,11,14, 17,21,25 25:5,10 26:3,9,15,23 27:1, 5,8,13,19,24 28:6, 10,13,15,18,20,24 29:3,8,11,16,23 30:3,16,19 31:6, 21 32:11 33:1,4, 13,17 34:5 35:4,9, 15,21,25 36:15 37:1,9 38:7,9,14 39:8,13,22 40:8, 13,15,18 41:3,7, 14,20,23 42:6,11, 15,18 43:1,6,9,12 44:8 45:2,8,18,22 46:7 47:8,10,13, 20,24 48:3,9,14, 19 49:1,4,9,13,18 50:2,8,12,18,21 51:2,12,19,22 52:1,3,7,11,15,18, 20,23 53:2,5,8,11, 14,16,21 54:4,8, 12,18,22,25 55:3, 15,18,22,25 56:2, 6,8,10,13,17,20 57:17 58:7,8,10, 13 59:8,17 60:3, 10 62:2,5,7,11,22, 23 63:1,7,11,15, 19,23 64:6,8,12, 16,23 65:7,10,16, 19,23 66:1,4,8,12, 17,21,24 67:1,4,7, 11,14,19,21,24 68:2,6,9,14,17,20, 23 69:1,9,13,17, 22 70:1,6,10,18 71:2,6,12,19,25 72:3,6,10,12,15, 18,21,24 73:3,6,

---

Audio Transcription                                    November 19, 2025

13,17,22 74:4,10, 18,22 75:3,6,10, 13,19,24 76:2,5,8, 14,17,19,21,25 77:2,5,9,12,14,19, 22 78:1,5,9,12,15, 19,22,24 79:3,6,9, 17,23 80:3 81:1,4, 8,14,17,22 82:14 83:14,17,23 84:3, 10,14,22 85:1,10, 13,16,18,19,21 86:1,4,8,10,13,16, 19,22,25 87:3,7, 10,14,19,22,24,25 88:3,16 89:12,16, 19,24 90:6,12,15, 18,23 91:2 92:10, 13 93:16,20 95:1, 8,16,20 96:7 98:16

**KIN** 84:16

**kind** 10:22 17:14 20:18 24:18 26:10 28:8 46:5 47:22 49:2 50:25 58:18 70:12 80:24 85:13,16 94:24

**king** 3:8,9,12,13 34:11,13 37:8,10 61:23,25 62:2,10, 17,18,22,24,25 63:5,9,14,17,20 64:3,7,10,13,21 65:5,8,14,17,20, 24 66:2,5,9,15,19, 22,25 67:2,5,9,12, 15,20,22,25 68:3, 8,12,16,19,21,24 69:3,11,14,20,22, 24 70:4,7,12,24 71:4,10,15,21 72:1,4,8,11,13,16, 19,22 73:2,4,15, 19 74:1,4,5,17,21, 24 75:4,9,11,17, 21,25 76:3,6,11, 15,18,20,24 77:1, 3,7,11,13,17,20, 24 78:3,7,11,13, 17,20,23 79:2,5,7, 15,21 80:1,4,12 81:3,5,8,12 82:8, 10,18,25 83:20,22

84:5,12,22,24 85:3,6,10,14,17, 18,19,24 86:2,5,9, 11,14,17,20,23 87:1,4,8,11,15,20, 23,25 88:4 89:20, 23,24 90:8,13,15, 16,18,20 93:22,25

**King's** 34:25

---

## L

**LA** 74:13

**labeled** 33:7

**laboratory** 12:23 57:3

**land** 29:20 43:24

**laundry** 14:22

**law** 3:13

**lawsuit** 54:9

**leads** 22:15

**lease** 77:23 78:9, 11,13

**leave** 3:5,8 61:13

**Leeds** 3:14

**left** 11:8

**lender** 52:1

**lenders** 39:16

**lending** 40:4 84:6,19

**letters** 87:12

**letting** 83:3

**level** 8:15

**liabilities** 2:15

**liability** 8:24

**license** 47:18

**lie** 18:4,5 50:15

**lied** 18:7,10

**lien** 80:17 85:17

**lies** 49:23 50:13 51:13

**limit** 21:10,13 22:2,4

**limitation** 34:11, 19,25 37:13

**limitations** 34:10,15,18,21,22

**list** 13:2,8 14:22 39:19 40:1 42:25 53:14 56:25

**listed** 13:1 22:18 31:12 39:6,18 40:2,3,4 53:25 54:14,15,18 57:5 58:17 60:1

**listening** 96:2

**listing** 8:25 13:23,24 14:1 39:2

**lists** 58:24

**lives** 21:7

**living** 3:16 42:19

**LLC** 3:15 84:13, 20

**loan** 41:15 53:19 72:1 75:15 80:22 85:8

**loans** 54:2

**local** 48:10 49:8

**locate** 33:2

**located** 21:16 96:18

**location** 30:10

**locked** 97:21

**logistical** 97:3

**long** 68:3 83:9

**longer** 20:25 77:24

**longest** 68:12,14

**looked** 10:14

**lose** 36:15

**lost** 48:6 51:12 84:22 88:3 90:23

**lot** 8:10 26:24 82:8

**loudly** 2:22

**low** 94:24

**lower** 6:17

---

## M

**made** 2:18,19 3:4 40:21 41:15,17 44:14 45:11 74:25 75:9,11

**maintain** 65:5

**maintained** 86:24 87:8

**maintains** 65:17

**majorly** 46:12

**make** 5:2,14,18 7:21 8:23 11:16 16:2 26:19 92:13 97:3,14,20 99:3

**making** 40:13 45:14 47:6

**Manatt** 4:11

**mandatory** 98:14

**March** 75:10,12

**marked** 81:13

**marketing** 45:24 46:4,5,10 74:6,7,8

**Mary** 101:3,19

**match** 10:10 11:12

**matter** 2:16

**max** 22:2,4,5

**maximum** 21:11

**MBA** 47:9,12

**meaning** 39:11 40:22

**means** 20:9 79:8

**meat** 21:20

**medication** 12:24 76:23 77:15

**medicine** 57:2 76:20 77:4

**medicines** 57:16 58:9 75:22 77:6,7

**meet** 25:7,23 68:25

**meeting** 2:9,11, 20 3:1,5,6 8:5 82:17 88:12 92:9 95:18 96:16 97:15 98:9,11,21 99:13

**meetings** 99:5

**member** 27:2,4, 6,11 67:3,16 80:2

**members** 28:19, 21 29:6 55:5 67:9, 12,18,22 68:4,22

**mentioned** 31:7 45:22,25 59:10 66:5,12 67:2 71:15 72:10 75:15

**Mercedes** 71:19

**Meredith** 3:8,12 34:10 37:10

**mess** 36:13

**message** 83:13

**Michael** 5:1,5 33:13,18 35:9 43:1 81:1 88:24

**middle** 36:10

**miles** 79:11,12

**million** 43:18,21

**mind** 34:25 95:19

**mine** 80:20

**minute** 79:14

**minutes** 35:22 82:11,13 83:21 95:20 96:7

**missing** 8:17 10:17

**misunderstanding** 69:5

**moment** 24:14 59:20 77:19

Audio Transcription

November 19, 2025

**money** 26:19 28:5 46:1,3 55:19 71:22 72:4 73:9, 10 85:4,9

**Monica** 82:6

**Monika** 5:20 33:5 35:8,18 40:14,17, 24 73:7 81:18 90:21,22

**month** 22:22 27:18,21 28:3,22 29:1,4 39:4,8,9 66:3 69:1 71:24 74:2 90:13

**monthly** 12:4 38:24 41:16 44:15,20,25 45:3, 7 53:4 75:17

**months** 50:3,5 77:20 79:19

**morning** 2:1 15:10,25 16:4 34:12 57:19,25 58:1,19 60:7 61:11 92:2 93:4, 13,17,19 98:5 99:22

**morning's** 60:21

**mortgage** 3:16 39:11,24 40:6,10, 13,21,23 41:13,14 74:25 75:11,13, 18,19 80:24 84:6, 19

**mortgager** 81:10

**mortgages** 39:20

**mother** 28:15 71:23

**motion** 42:22 53:13

**move** 89:13 90:24

**moved** 11:23 99:4

**moving** 82:1 87:15

**Myers** 4:13,19,23 34:20,22 94:18,21

95:14 96:11 97:12

---

## N

**N-G** 97:25

**named** 33:10 54:4

**names** 39:16 67:17,23

**nature** 70:16 84:1

**necessarily** 65:1

**needed** 23:17,19 77:23

**night** 10:15,17 11:20

**nonprofit** 18:22 19:11 27:19 41:25 42:3 52:16,21

**note** 13:10

**notice** 9:1 94:9 95:24 97:9

**November** 2:8 22:21 50:4 70:2

**number** 2:6 8:4 9:4,17 27:20 29:18 30:6 32:23 53:25 57:8 60:15 61:4 94:11 96:19 98:2,3,24 99:7

**numbers** 59:8

---

## O

**oath** 6:10

**obtain** 2:23,25 14:14

**occasionally** 25:13

**October** 2:7 22:21 27:22,25 28:1,4,22 29:1,4 38:22 43:15 59:6, 14 60:8 62:25 63:1,6 80:13

**offer** 46:9 47:5

**office** 2:3 7:21 8:13 9:16 10:10 11:13,18 12:22 14:11,12 26:1 31:20 37:12 42:7 55:9 89:5 92:8 93:24 96:18 99:17

**officially** 7:20

**offline** 96:4

**online** 4:5,21,25 5:14 25:10,11,12 31:23 33:14 88:14 95:9

**open** 8:3 12:17 54:21 55:6 61:13, 20,22

**opened** 73:20,23, 25

**opening** 9:20 10:3 61:17

**operate** 47:18,22

**operating** 10:3 44:15,20 45:1,4,7 53:4

**operation** 18:24 19:8

**operations** 52:13

**Orange** 63:12,17, 19,24 64:5,9,10

**order** 12:9 42:23 47:18,22 91:10

**organization** 18:22

**outcome** 101:10

**outstanding** 8:6, 21 10:2,8 11:25 14:22 39:17 91:15

**oversees** 48:1

**owe** 84:18

**owed** 13:6 81:16 83:25 84:6 85:4,9

**owned** 57:9,10, 13

**owner** 42:19

**owns** 29:21 57:1

---

## P

**package** 35:11

**packet** 33:6,8 35:15,16 36:11,19

**pages** 38:21 59:9

**paid** 24:12,16 41:22,24 42:2 44:11 55:13 75:14

**Palisades** 5:8 16:23

**paper** 30:4 65:14, 17

**parcels** 30:21 31:8,13

**parents** 26:23 28:6,11 56:20

**part** 28:8 48:4

**parties** 2:12 4:4 13:4 45:17 80:23 101:12

**partner** 42:12,14

**party** 9:1 98:4 99:10

**pass** 22:15

**passcode** 83:9 94:12

**passed** 23:4,7 64:1

**past** 77:20,22 78:1,5,7,20

**pause** 33:23 35:1 89:21 91:4

**paused** 33:25

**pay** 24:24 40:23 42:3,14 52:8

**paying** 42:20 44:18,23

**payment** 40:5,7, 10,13,22,23 41:13,16 72:17 74:25 75:5,16

**payments** 39:11, 16,17,18 41:14,16 44:14 45:6,11,15 75:12,13,18,20

**payout** 9:5

**payroll** 55:16

**PDF** 29:19 33:11

**penalty** 6:10,13

**pendency** 52:25

**pending** 51:17, 24

**Penny** 53:5

**people** 8:12 17:21 18:2,4,6 20:25 23:23 24:3, 7,22 26:11,16 27:1 34:10 44:11 46:9 51:14 52:9 63:12,25 64:18 65:21 66:7,10,14, 16 67:5 69:6 70:18,25 71:7,11 88:7 95:11

**Perez** 5:17,21 7:2,12

**period** 10:23 12:1

**periodically** 5:13 48:11

**perjury** 6:11,13

**permission** 89:7

**permits** 47:22

**person** 6:18 24:8 25:24 32:20 42:9, 12 65:3 70:22 89:5 94:5,15,19 95:2 96:24 97:6 98:13,15 101:7

**personal** 28:17 29:6 53:19 54:23 56:1,7,15

**personally** 23:16 53:15 54:1,10

**petition** 12:12,15, 21 13:6 14:23,25 15:3,5,13,17,22 16:2,6 22:17,19,

Audio Transcription

November 19, 2025

23 23:3 58:17 59:14,15 62:20

**Phelps** 4:11

**Phillips** 4:12

**phone** 17:2,5 36:2 37:5,6 49:22 61:10 81:24 88:19 90:23 94:11 99:7

**phone's** 95:5

**pick** 88:10

**piece** 9:1

**ping** 88:16

**pinging** 81:21

**place** 33:20 44:12 63:16 77:15

**placement** 64:1

**places** 20:5 64:17

**plan** 47:11

**point** 35:1 92:21

**points** 5:7

**poll** 89:22

**position** 70:8

**positions** 70:5,9, 16

**possession** 5:6 33:2 55:8,17

**possibility** 94:6

**post** 41:2

**post-petition** 40:10,21 41:13

**postings** 69:21, 24

**pre-petition** 9:4, 9 12:16

**precaution** 54:19

**preceding** 12:15

**prefer** 37:25 94:17,22

**preference** 98:8

**preliminary** 39:20

**prem** 40:1

**premise** 21:12 23:24

**premises** 48:12

**prepare** 90:13

**prepared** 8:4 86:15

**preparing** 53:3

**presence** 5:17

**present** 3:8,19,20

**presented** 53:6

**president** 5:22 42:19

**pretty** 22:6 51:2

**previous** 59:2 93:2

**principal** 39:17 40:5

**prior** 61:8

**private** 3:16 40:4 84:6,19

**pro** 46:9 74:15

**problem** 16:25 49:15 55:18

**proceeding** 7:19 16:13

**process** 64:22

**program** 86:7,18

**programs** 86:3,5

**projected** 10:21 11:24

**projection** 10:23

**proof** 9:3,8,19 18:10

**proper** 22:9

**properly** 57:6

**properties** 56:15

**property** 2:15 13:5,23 21:17 22:7 29:24 30:10, 12,14,20,22 31:8,

18 32:12 33:3 36:7,8 38:20,25 39:15,21 41:18,21 42:9 43:5,8,11,16 57:1,11 67:10 71:17,18 77:18,21 78:18 84:21

**provide** 2:11 11:8 14:6 15:16 64:22 67:17,25 70:12 71:17 74:19 77:4, 6 84:8 86:11,12 87:11,13,18 90:16

**provided** 8:16,25 9:15,19 10:2,16 11:12,18 14:12,18 15:12,21 82:21 90:4

**providing** 10:1,6 14:10

**public** 51:3

**punch** 83:9

**purchased** 76:1, 9

**purpose** 2:11

**pursuant** 2:10

**put** 21:3,21 60:25 65:13

---

**Q**

**question** 5:16 7:4,7 18:19 22:1 30:2 33:24 35:1,5, 8,14 38:12 40:25 41:5 48:7 51:7 58:6,21 59:11,13 61:4 62:16 80:5, 15 81:12,14 82:22 83:23 84:5,12 85:22 87:15 88:5 89:21,24

**questioning** 5:15 13:19 34:1, 24 56:24 61:22 96:13

**questionnaire** 31:19 32:12 33:3 36:7,8 38:20 39:6,

15

**questions** 2:13, 14 6:19,20 8:2,4 11:22 38:6,23 47:3 61:23 82:9, 11,15 88:9 91:7 95:12,15,17 96:1, 3,15,24 97:16 99:11

**quickly** 44:4

---

**R**

**raise** 6:1

**Raza** 87:16 90:1,9

**reach** 77:16 95:1 96:8

**reached** 77:10

**readjust** 51:22

**real** 29:20 30:12, 13 31:18 32:12 33:3 36:7,8 38:19 39:15 57:1

**realprop.pdf.** 33:12

**rearranged** 37:12

**reason** 3:3 17:24 30:25 48:25 51:9, 21 53:22 83:3

**rebates** 14:6

**recall** 69:12 73:19 78:15

**receipts** 10:21 11:24 12:2,6 86:11,14

**receive** 9:3,13 22:9 42:16 59:5, 16 64:13 65:20 73:5,9 79:21

**received** 8:10 9:19 10:10,14 11:19 14:3 33:11 38:21 43:14 45:16 58:25 62:19 63:2, 6,10 71:22 72:9, 14,23 74:1

**recently** 62:4

**reception** 5:9

**recognize** 80:25

**record** 7:19 80:10 81:9 101:6

**recorded** 2:20 7:23 16:12

**recording** 2:24 3:1 7:22 100:2

**recordings** 7:20

**records** 8:18 10:20 11:23 64:24 65:9,18 86:23

**reference** 27:3

**referencing** 27:11

**referring** 35:17 61:3 66:20

**reflect** 13:5 44:14

**reflected** 44:20, 25 45:7

**reflects** 45:15

**regular** 48:15

**regulatory** 47:25

**relate** 2:14

**related** 14:6 22:6 101:11

**relationship** 49:24

**release** 14:16

**remain** 10:1

**remind** 44:21

**remitted** 75:17

**remote** 94:17,22

**remotely** 94:6 95:12 96:23 97:16 98:7

**rent** 42:14,20

**rented** 43:11

**reopened** 8:12

Audio Transcription                                                    November 19, 2025

**repeat** 7:7 16:17 25:3 43:6 68:8,19 69:11,22 71:4 72:19 77:13 78:4 85:20 86:4 87:23

**repetitive** 16:11

**rephrase** 84:24

**report** 43:14 44:3,16,20 45:1,4

**reported** 101:6

**reports** 45:7 53:4

**represent** 80:7

**representation** 8:22 9:22

**represented** 37:25

**representing** 3:11,22 4:10,17

**request** 31:17

**requested** 10:12, 21 12:10 13:22 98:18

**requesting** 14:17

**requirements** 98:17

**rescue** 19:23,24

**resend** 35:10,15, 16

**residing** 42:9 71:16,18

**respect** 26:11 27:11,17

**respective** 101:13

**respond** 62:11

**response** 60:7 62:14

**responsibilities** 70:22

**rest** 21:6

**restate** 25:9

**return** 10:9,13 11:11

**returns** 10:15,16 11:7,10,20

**revenue** 26:20,22 28:5,9 29:1 51:16 58:23,25 61:5

**revenues** 44:7

**review** 10:16 11:21 14:18

**reviewed** 16:6 61:14 80:14

**reviewing** 59:1

**reviews** 18:6

**revised** 61:14

**Richard** 3:15

**ringing** 95:5

**River** 84:13,19

**Road** 30:9 31:2

**roll** 88:11

**Ronald** 13:3

**room** 7:1,2,9 26:2 96:22 97:8

_____

**S**

**S.M.** 87:16 90:1,8

**salary** 26:13 42:16 52:25

**sale** 13:23

**San** 42:7 92:12 94:2

**sanctuary** 19:20, 21,23 20:1,2 21:5, 17 47:19,23 48:2, 5,13,15,21,23 80:18

**sanctuary-4554** 30:8

**Santa** 82:6

**SBA** 54:9

**schedule** 29:13 30:1,7 31:11,18 37:13 53:23,25 54:15,16 56:25

59:18 69:2 80:5, 12 83:24 84:7

**schedules** 12:20 13:2,5 14:24 15:6, 14,18,22 16:2,6 22:19 29:14

**seasons** 44:7

**seconds** 11:6

**Section** 2:10

**secure** 54:15

**secured** 3:14 84:13,20

**seeking** 71:8

**sell** 43:5,8

**send** 36:2,10,17 62:15,17

**sense** 97:4

**September** 59:3, 4,6,13

**service** 17:6 39:1,11 82:2 89:2

**services** 87:18 90:4

**set** 27:20 88:21 101:15

**shape** 18:8

**shared** 51:4

**She'll** 82:2

**sheet** 12:11

**shelter** 21:3,22 23:1 63:19,21 64:4,9 65:2

**shelters** 63:22 64:14

**short** 43:21 88:7

**shortest** 68:13, 16,17

**shortly** 8:23

**show** 10:3

**showing** 9:5 31:15 43:15 60:8

**shows** 9:14 18:11 31:1 53:24 61:4

**shut** 8:14 16:22, 25 17:8

**shutdown** 8:11, 13

**sick** 18:17 20:7, 25

**side** 18:13 26:21 27:24

**sign** 15:5,11 53:19

**signal** 83:15 89:14 90:24,25

**signed** 13:13 33:8 38:21

**single** 22:10 76:10,17

**Siri** 7:22

**sit** 84:16,25 96:2

**sixth** 24:8

**skills** 26:16 66:14 69:18

**slice** 44:2

**slowly** 36:20

**small** 23:18 54:7, 13 57:11

**SOFA** 87:16

**software** 86:6

**sold** 79:3,16,18 80:1

**Soto** 3:14

**sound** 16:11 37:1 80:10

**sounded** 8:21

**sounds** 61:7 80:21

**source** 28:25

**sources** 45:16

**Southern** 2:4

**speak** 2:22 3:7 35:6

**speaking** 2:22

**special** 44:5,6 77:14,15

**specific** 19:2 66:6,10 67:3 69:7, 15 70:4,9,15,16

**speculative** 62:8

**spell** 4:14

**spoke** 37:11

**spoken** 74:9

**spreadsheet** 87:1,9

**spreadsheets** 86:20

**staff** 24:22 55:5

**staffed** 8:14

**stalls** 70:20

**stand** 98:11

**standing** 17:5 52:19

**standpoint** 91:15

**stands** 99:14

**start** 14:23 88:8 89:22

**started** 8:1,7 18:14 21:23 39:8 56:23

**starting** 24:17,19

**state** 3:10,21 5:2, 18 48:11 49:8

**stated** 7:25 25:4 56:22 58:13 59:19

**statement** 9:7, 10,14 12:11 13:7, 11 15:6,14,18,22 16:2,6 58:20,22 60:6,17,22 90:2,9

**statements** 12:14,16 47:7 51:1 59:22 60:11 61:1 90:14,17

**States** 2:3

Audio Transcription                                                      November 19, 2025

**status** 19:11 52:22

**stay** 18:1 20:9 21:6

**steps** 11:5

**Stock** 53:5

**stockpile** 75:25 76:4,6

**store** 76:12,16

**strategies** 45:24 46:4,5 74:6

**Street** 96:18

**strictly** 38:5

**structures** 43:25

**stuff** 57:23

**substantially** 19:12

**sued** 54:10

**sufficient** 43:21

**suggest** 89:4

**suite** 96:18

**summaries** 87:12

**Sunday** 92:19

**supplement** 76:25

**supplements** 12:24 57:3,16,19 58:9 77:1

**supplies** 12:25

**supposed** 9:22

**suspect** 25:12

**swear** 6:5

**sworn** 6:18 13:20 16:12 47:2

---

**T**

**takes** 20:18 53:18

**taking** 89:22

**talk** 58:3 66:13

**talked** 74:7,10

**talking** 41:15 46:6,8 62:24 81:2 90:6

**tax** 10:9,15,16 11:7,10,11,20

**taxes** 13:6 41:19, 21

**technical** 38:6 96:12 97:1

**technology** 25:22 26:2

**telephone** 37:2 95:10

**telephonic** 3:1 83:8

**telling** 83:1

**testified** 18:3 62:3 66:5 67:15 71:16,21 74:5,24 75:21 81:9

**testifying** 6:10 84:16

**testimony** 47:2 62:18 80:15 98:19

**text** 83:13

**texting** 83:2,11

**Thanksgiving** 92:5

**that?--** 73:19

**THEREOF** 101:15

**thing** 11:7 50:23 61:15 62:14

**things** 46:8 57:11 76:8

**thinking** 32:19

**third-parties** 12:14 14:13,14 44:22

**third-party** 44:15 45:6

**thorn** 18:13

**thought** 82:5

**threatened** 17:21

**Thursday** 93:3, 11,13,14,17,19,22

**tied** 17:3

**time** 12:17 34:2, 10,11,15,18,19, 21,22,25 38:3 49:12 55:21 59:18,22 60:13 61:21 62:9,24 68:10 69:16 73:23 80:22 82:22 88:11 89:23 91:3,10 93:3

**times** 32:24 49:14,16 50:6,10 57:8 68:11

**today** 2:8 5:10 6:10,19 14:23 22:21 33:25 37:13 52:14 54:21 55:20,23 62:2,18, 25 66:6 67:2,15 71:21 75:21 80:15 84:17,25 88:5 90:3 91:20 96:15 97:10 98:19

**told** 18:1 60:14 64:8 74:22

**tomorrow** 97:11 99:22

**tools** 57:11

**top** 56:23

**total** 39:3

**Totaro** 4:7 5:2,5 11:2,4 13:16,17 15:15 16:19,21 17:4,11,16 25:11, 12,17,21,25 26:5 31:23,24,25 32:3, 4,5,7,8,10,13,19 33:5,14,15,19,22 34:3,4,8 35:2,3,7, 13,18 36:1,4,9,16, 23 37:3,5,15,20 38:1,3 40:14,17, 19,24 42:17 43:2,

3,23 45:10 46:14, 17,19,23,25 47:6 53:6 57:7,18,21, 22 58:13 60:10, 16,19,24 61:7,16, 19 62:6,8,10,12, 21 73:7 80:8,11, 18,20 81:2,6,11, 18,21,23 82:1,5 83:1,5,11,19 85:3, 7 88:14,15,18 89:8,18 90:21 91:9,16,19,22,25 92:14,17,20,25 93:6,8,11 94:23 95:3,22 96:8 98:14,23 99:15, 23,25

**touch** 99:22

**track** 86:3,6,21

**tractor** 77:17,21, 25 78:2,6,10,11, 14

**transcription** 101:5

**TRANSCRIPTIONIST** 101:1

**transfer** 72:17

**transferred** 17:4 31:3

**transitory** 57:24

**travel** 78:18,21

**trouble** 89:1

**true** 49:5 101:5

**Trust** 3:16 52:5 81:16

**trustee** 2:3 8:2 9:24 10:20,24 12:10 38:20 39:3 43:13 91:15 96:1 98:18

**trustee's** 7:21 31:20 39:15 92:8

**truth** 6:6,7

**turned** 7:23 66:2

**turning** 91:8

**two-month** 10:23 12:1

**type** 44:6

**typed** 61:10

**typical** 29:9

**typically** 65:20

---

**U**

**U.S.** 7:20 8:2 9:24 10:20,24 12:10 31:20 38:20 39:3, 14 43:13 91:15 92:8 96:1 97:23, 25 98:18

**ultimately** 11:17

**unable** 95:16

**understand** 6:9, 15,23 8:19 9:16, 21 10:5 11:11 16:11 18:22 38:10,18 40:11,25 43:3 44:9 46:21 47:8 59:1 73:4 78:4 80:6,14 82:21 94:24 97:3

**understanding** 73:8 95:10

**United** 2:3

**unknown** 80:18

**unmute** 3:7

**unwanted** 19:13

**upload** 36:21,24

**uploaded** 60:24, 25

**uploading** 36:19

**USC** 2:10

**UST** 8:25

**utilities** 39:5

**utilize** 99:8

**UTVS** 78:17,21

Audio Transcription

November 19, 2025

## V

**vacant**  43:23

**valuation**  30:11

**varied**  72:18,21, 22

**Verbally**  68:2

**verbiage**  39:25

**vet**  23:17,20 76:22,24 77:3

**veterinary**  12:23

**Villa**  2:5 5:24 19:6 20:4 31:3 47:15 54:22 57:4 68:4 73:20 84:18,21 85:12 98:2

**visit**  50:24

**volunteer**  23:25

**volunteering**  66:16

**volunteers**  8:20 24:10 67:10,13 71:7 76:11

## W

**Wainscot**  3:18, 20,24 4:1 34:14, 16 94:1,4,13 95:13 96:11 97:12

**wait**  9:24

**waiting**  95:19

**wanted**  8:23 17:7 20:6 36:6 37:11 38:11 44:21 97:20

**warn**  17:7

**watch**  4:12,18 19:17

**ways**  65:24

**web**  9:5

**website**  2:24 10:11 11:15

**Wednesday**  93:4,14

**week**  45:5 78:1 92:6

**weeks**  91:20

**well-being**  64:25 71:8,14

**Wells**  73:17

**whatnot**  97:22

**Wings**  2:6 5:25 19:7 31:4 57:5 98:3

**wishing**  2:23 14:14

**women**  18:11 48:6

**wondering**  30:11

**word**  86:19 97:6

**words**  85:23

**work**  23:24 87:20 90:5 92:7 93:4

**working**  24:7 69:17 70:6,8

**writing**  68:1

**written**  85:11,14, 24

**wrong**  12:7 47:7 60:17,24,25 61:14

## Y

**year**  12:15,18 13:8,25 14:3,4 41:23 44:7 49:17, 18 50:1,7,8 56:5 58:24 75:12 78:20,24,25 92:15

**year-to-date**  13:14 59:4

**years**  17:22 19:10 23:8,10 47:14 68:15,18,20

**yesterday**  8:17 55:23

# EXHIBIT "7"

**Friday, January 23, 2026 at 1:50:32 PM Pacific Standard Time**

**Subject:** Re: Villa Chardonnay Horses with Wings, Inc. 25-04245-JBM11 - continued 341 to 1/7/26
**Date:** Tuesday, December 9, 2025 at 4:51:30 PM Pacific Standard Time
**From:** Meredith King
**To:** Hong, Haeji (USTP)
**CC:** Dougherty, Christina (USTP), Paul J. Leeds

Haeji:

Thank you for your update about the 341(a) continuance.  I can confirm that I am available at the proposed continued date-- 1/7/26 at 1:00 pm.
 However, on behalf of my clients, we respectfully object to the continuance.

There are several outstanding compliance issues (see below) that require prompt attention and place my clients and their collateral at risk.  Postponement of the 341(a) meeting is hindering my clients' ability to exercise their rights and make informed decisions about the bankruptcy process and increases risks of further asset dissipation.  We intend to raise these issues at the status conference and, at a minimum, request strict deadlines be imposed to address these issues, among others.  In the interim, I wanted to share our concerns. If you have any information, insight, or updates on the issues below it would be greatly appreciated. I am also happy to have a call to discuss.

Best,

**Meredith King**

1.  **Registry of Charitable Trusts Suspension**
    The debtor's current registry status with the California Attorney General's Registry of Charitable Trusts ("Registry") is listed as "Suspended."
    ([https://rct.doj.ca.gov/Verification/Web/Details.aspx?result=a7c474b3-7cbf-4dd8-bf8c-888d3c0cd24b](https://rct.doj.ca.gov/Verification/Web/Details.aspx?result=a7c474b3-7cbf-4dd8-bf8c-888d3c0cd24b))

    It is my understanding that entities subject to the supervision of the Registry must remain in good standing to operate or solicit for charitable purposes in California and that if an entity's registration is delinquent, suspended, or revoked the entity is prohibited from soliciting for charitable purposes. This would seem to indicate that the debtor is illegally operating. *See* 11 CCR & 312.

2.  **Insufficient Evidence of Adequate Insurance**
    The terms of my client's priority deed of trust require the debtor to "provide, maintain and deliver. . . fire insurance satisfactory to and with loss payable to [my clients]" and assign to my client proceeds to which the debtor is entitled for damage to the property.

1 of 4

I understand the debtor is asserting it has obtained a California Fair Plan fire policy ("Fair Plan"), a general liability policy through Kinsdale Insurance Company ("GL Policy"), and a State Fund worker's compensation policy.  However, despite several requests, my clients have not been provided documentation that they have been made an additional insured on the GL Policy or a loss payee on the Fair Plan.

Despite repeated requests, we have also not received copies of insurance applications, statements, or submissions used to obtain coverage and it is unclear whether injuries third parties sustained on the property or County of San Diego, Department of Animal Services (DAS) complaints made in the past several years (see below) have been adequately disclosed to the insurers.  Notably, the GL Policy contains a "Representations" condition, (Section IV. F.), which would likely apply to render the Policy void if any answers or information provided by the debtor was inaccurate.

Finally, documents provided in connection with the Fair Plan list only the 4554 Boulder Creek Rd. Location under Property Information, and not the 4430 Boulder Creek Rd. Location.

In short, we still lack sufficient information to conclude my clients interests in the property are sufficiently protected.

3. **Department of Animal Services Complaints**

My clients have received documents from DAS that indicate several complaints have been filed against the debtor in the last several years. A link to these documents is below.

DAS Records for UST
Password: xctrXd77xp79
https://fsl.egnyte.com/fl/RPtMP4h7mh4B

We are concerned the debtor may be subject to ongoing investigations or compliance actions that could result in citations, fines, or criminal charges, which in turn may: (a) compromise insurance coverage the debtor claims to have received; (b) impact the value of my clients' collateral; and/or (c) jeopardize the debtor's non-profit status. It also not clear whether DAS has received notice of the bankruptcy.

4. **Operating Reports**

The debtor's October operating report does not include a schedule of cash receipts/disbursements, despite Ms. Kerber testifying at her 341(a) meeting that the debtor received cash donations. Ms. Kerber's response to Part 7(a) also reflects payments on prepetition debt without explanation.

It is our position that the debtor's October report requires amendment, and that it is

essential for the debtor to submit the November report promptly to ensure the accurate reporting of all cash.

5. **Note Purchase**

Mr. Totaro advises in his status report that the debtor "has approached another entity to purchase the first Deed of Trust and the Small Business Loan." We can confirm that we have been in discussions with Mr. Totaro regarding a potential purchase of our Note. However, these discussions have not progressed as we have been informed that the identity of the owners of the entity interested in purchasing the Note will not be disclosed "under any circumstances" and debtor's counsel has proposed that he act as "both counsel and manager for the buyer" with money for the purchase coming from his client trust account. We have advised Mr. Totaro that we cannot accept payment from an anonymous source funneled through his trust account, including because Mr. Totaro's continuing obligations under Rule 2014 would prevent him from acting as counsel for the debtor and counsel for a creditor of the estate.

photo-logo

**Meredith King**

Admitted in CA

| ☐       444 W C St, Ste 300
San Diego, CA 92101

☐ 600 17th St. Ste 2800 S
Denver, CO 80202

☐ FSL.law | ☐ 619.872.2581

IMPORTANT: This message is confidential. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your system; you may not copy this message or disclose its contents to anyone.

**From:** Hong, Haeji (USTP) <Haeji.Hong@usdoj.gov>
**Date:** Monday, December 8, 2025 at 10:38 AM
**To:**
**Cc:** Dougherty, Christina (USTP) <Christina.Dougherty@usdoj.gov>
**Subject:** RE: Villa Chardonnay Horses with Wings, Inc. 25-04245-JBM11 - continued 341 to 1/7/26

Dear All,
The continued meeting of creditors in this case, scheduled for 12/11/25 at 9:00 am will be continued likely to 1/7/26 at 1:00 pm.  I understand the Debtor's representative cannot appear due to unforeseen personal reasons, and the UST will continue the meeting of creditors without having the Debtor appear.  Once I have confirmed that 1/7/26 at 1:00 pm is acceptable for the Debtor and Debtor's counsel to appear in person (all creditors MUST appear by telephone), I will docket the new date and time.
Thank you,

**Haeji Hong**
Trial Attorney
U.S. Trustee's Office
880 Front Street, Suite 3230
San Diego, CA 92101
T:  (619) 557-5013 ext 4798

**From:** Hong, Haeji (USTP)
**Sent:** Thursday, November 20, 2025 9:11 AM
**Cc:** Dougherty, Christina (USTP) <Christina.Dougherty@usdoj.gov>
**Subject:** Villa Chardonnay Horses with Wings, Inc. 25-04245-JBM11 - continued 341

Dear All,
I have bcc'ed the creditors and debtor's counsel's emails who appeared at the meeting of creditors earlier this week.  Please note that the debtor and debtor's counsel MUST appear in person.  **All other creditors MUST appear by telephone** – creditors will not be allowed to appear in person at the continued meeting of 12/11/25 at 9:00 a.m.  Telephone access information is the same.
Thank you,

**Haeji Hong**
Trial Attorney
U.S. Trustee's Office
880 Front Street, Suite 3230
San Diego, CA 92101
T:  (619) 557-5013 ext 4798