MANATT, PHELPS & PHILLIPS, LLP
KEVIN P. DWIGHT (Bar No. CA 239476)
kdwight@manatt.com
CONNOR J. FARLEY (Bar No. CA 361715)
cfarley@manatt.com
203 Redwood Shores Parkway, Suite 125
Redwood City, CA 94065
Telephone:  (650) 812-1300
Facsimile:   (650) 213-0260

Counsel for Creditors
CELINE MYERS AND
THE ARK WATCH FOUNDATION

UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>Villa Chardonnay Horses With Wings, Inc.,<br><br>        Debtor. | Case No. 3:25-bk-04245-JBM11<br><br>Chapter 11<br><br>**CREDITORS CELINE MYERS AND THE ARK WATCH FOUNDATION'S RESPONSE TO THE CHAPTER 11 TRUSTEE'S STATUS REPORT DATED FEBRUARY 24, 2026**<br><br>         **Status Conference**<br>Date:        March 3, 2026<br>Time:       10:00 AM<br>Ctrm.:      Department 1, Room 218<br>                United States Bankruptcy Court<br>                325 West F Street<br>                San Diego, California 92101 |

Celine Myers and The Ark Watch Foundation (together, "Ark Watch") hereby respond to Chapter 11 Trustee Leslie T. Gladstone's ("Trustee") *Status Report from Trustee for Court Scheduled Status Conference on Chapter 11 Petition* [D.I. 123] ("Status Report").  Ark Watch respectfully states as follows:

## BACKGROUND

1. On October 14, 2025 ("Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code").

2. Ark Watch timely filed Proofs of Claim Nos. 4 and 6 asserting secured claims of $2,289,774.43 and $203,132.63, respectively, against the Debtor.

3. On January 20, 2026, Ark Watch filed an adversary proceeding, Case No. 26-90011-JBM, objecting to the Debtor's discharge of the debt reflected in Proof of Claim No. 4 pursuant to 11 U.S.C. § 523(a)(6).

4. On February 24, 2026, the Trustee filed a status report in advance of the Court's Status Hearing on March 3, 2026.  The report states that the Trustee "has not observed any evidence of animal cruelty or abuse" and that allegations of abuse are "primarily centered around Debtor's philosophy of not implementing euthanasia."  The status report also notes that "Debtor's officer requested a three-week period to relocate the animals, after which Trustee will directly arrange transport of the animals to other suitable locations."

## STATEMENT

5. This case presents a unique circumstance, under which listed assets of the Estate are living animals that require constant upkeep and care.  Ark Watch appreciates the efforts the Trustee has taken to investigate the Debtor and its property, confer with the Attorney General's Office and other interested parties, monitor the Debtor's expenditures, and provide a detailed report.  However, Ark Watch remains concerned about the condition and care of the animals on the Debtor's property, and these concerns include, but are not "primarily centered" on, Debtor's "philosophy" of not implementing euthanasia.  Status Report 3: 10-23.  Instead, Ark Watch's concerns are based on documented animal abuse and neglect, refusal to vaccinate the animals, a failure to provide proper medical care when needed, and the chronic financial shortfalls that have

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
SILICON VALLEY

1

404566705.4

constantly consumed the Debtor and Debtor's Officer throughout the organization's history. Ark Watch asserts that the delay of three weeks for Debtor's Officer, Monika Kerber Perez, who is also a debtor in a Chapter 7 bankruptcy in this District, to remove animals from the property is too long considering the costs to the Estate of maintaining the animals, the time needed to arrange for responsible placement and transport of the animals, and the fact that other third parties are available now to relieve the Estate of this cost and burden by safely transporting the horses to well-established sanctuaries specializing in the care and rescue of equines.

6. *First*, the animals on Debtor's property which are listed on the Debtor's Schedules as assets of the Estate, are not being vaccinated, presenting a health risk to the humans who care for the animals and visit the property, the animals themselves, and the local wildlife. At the Debtor's 341 meeting, the Debtor's Officer testified that she did not believe in vaccination. Vaccination is an essential component of responsible sanctuary management. Animal sanctuary accrediting organizations, such as the Global Federation of Animal Sanctuaries, require accredited members to administer annual core vaccines to animals. For example, the American Association of Equine Practitioners (AAEP), the preeminent authority on equine care in the United States, recommends that all horses receive four "core" vaccines: Eastern/Western equine encephalomyelitis (EEE/WEE), rabies, tetanus, and West Nile virus (WNV). Am. Ass'n Equine Practitioners, *Vaccine Guidelines*, https://aaep.org/guidelines-resources/vaccination-guidelines/. The American Veterinary Medical Association also recommends core vaccines for all dogs and cats. Am. Veterinary Med. Ass'n, *Vaccinating your pet*, https://www.avma.org/resources-tools/pet-owners/petcare/vaccinations. The introduction of a respiratory virus to the Debtor's cattery would be devastating to unvaccinated animals and result in the death of most, if not all, the cats. Ark Watch also has multiple pieces of evidence that there are dogs living on the Villa Chardonnay property. This includes: a) multiple reports by San Diego Animal Control Services; b) a fundraising letter from the Debtor's Officer, Monika Kerber;[1] c) multiple Facebook photos of dogs on the Villa Chardonnay property, including photos taken in October and December 2025, despite the dogs not being listed in Debtor's Schedules and Debtor's Officer, Monika Kerber's

---

[1] A copy of the fundraising letter and Villa Chardonnay's 2019-2020 balance sheet are attached as **Exhibit 1**.

2

404566705.4

testimony at the Debtor's 341 hearing that the Debtor did not own any dogs. California law requires all dogs three months or older to be vaccinated for rabies. Cal. Health & Safety Code § 121690(b). Refusing to vaccinate the dogs for rabies creates a public health hazard and risks both civil and criminal liability for the Debtor's Estate. Failure to vaccinate the animals living on the Villa Chardonnay property unnecessarily puts all of the animals on the property at risk and endangers the local wildlife.

7. *Second*, Ark Watch's personal experience in placing, and later recovering, horses from the Debtor demonstrates a lack of care at best, and animal abuse, at worst. When given Ark Watch equines in 2016 and 2018, Debtor's officer signed Terms of Transfer Agreements agreeing to vaccinate Ark Watch's horses and donkeys. Ark Watch would not have placed the animals with an organization that refused to vaccinate considering the danger to the animals. The Terms of Transfer Agreement also required Debtor to give the two horses placed with Debtor, Dylan and Sundae, bi-annual knee injections, which she did not do. In fact, Ark Watch obtained evidence that Debtor's officer falsified documents that she sent to Ark Watch to misrepresent that the horses were receiving these contractually required injections. In sworn testimony, the veterinarian that Debtor's Officer claimed administered these injections, Dr. Arturo Esquivel, stated he never gave any knee injections to either horse (or any horse on Debtor's property) and did not write the calendar of knee injections that was provided to Ark Watch. Furthermore, Debtor's officer failed to provide the two Ark Watch horses with the daily anti-inflammatory medication and daily supplements necessary to keep them comfortable, as she had agreed to do when she took the horses into the Debtor's care.

8. Thus, the animals Ark Watch placed with the Debtor were not vaccinated by Debtor as contracted, not vetted as needed, not provided with bi-annual injections as promised, and not given proper medication or supplements to help mitigate their pain. This lack of care ultimately resulted in Ark Watch obtaining a court order to recover the animals. The two Ark Watch horses placed in the Debtor's care died while in the Debtor's possession. An inspection of the eight donkeys recovered by Ark Watch's veterinarian revealed that all the animals were

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
SILICON VALLEY

3

404566705.4

obese, and their bloodwork showed evidence of metabolic disorders. These animals were all at a healthy weight when placed with the Debtor.

9. Ark Watch has further requested the return of four equines it placed on behalf of other rescues, which Debtor has declined. When the Debtor's officer agreed to take in those four animals, she voiced no objection to providing them with annual vaccines. There is no reason for creditors to continue to pay for their care when the horses can be cared for by other rescues.

10. *Third*, the Debtor and its Officer have a documented history of improper care and animal abuse. A review of Animal Control Services reports beginning in February 20, 2021, attached to this Response as **Exhibit 2**, demonstrates that some of the horses were in a dire state. One horse named Negrita was covered in pressure sores and scalding from lying in her own waste.[2] Other horses' hooves were not properly groomed, resulting in balance issues and possible injury. Furthermore, Ark Watch's horse Dylan had suffered an eye injury. Debtor's Officer represented to Animal Control Services that the horse had arrived with eye injury, which is not true. Ark Watch has veterinary testimony, attached as **Exhibit 2**, that no such eye injury existed when Ark Watch placed Dylan with the Debtor. The eye injury was not vetted when it occurred, resulting in total blindness to the injured eye. The Debtor's poor recordkeeping, as noted at the 341 meeting, is further evidence that the animals are not receiving proper care. Without proper records, the Debtor cannot ensure that the hundreds of equines that Debtor claims to own are receiving regular necessary veterinary care, such as dental floats and deworming, or proper supplements and medicine. Finally, Debtor's refusal to euthanize also prolongs the animals' suffering. The Animal Control Services report unequivocally states "[Negrita's] quality of life is extremely concerning. I consider this horse to be suffering." Many other horses also appeared to be in poor shape according to the reports.

11. *Fourth*, care for the hundreds of animals on the Debtor's Estate is a significant burden on the financial assets of the Estate, and transfer of the animals to rescue organizations will reduce the Estate's upkeep. Currently, the first-lien lender is disbursing up to $400,000.00 at an interest rate of 8% to preserve and protect the assets of the Estate, including for the large costs

---

[2] A photo of Negrita from a San Diego Animal Control Services report is attached as **Exhibit 3**.

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Silicon Valley

4

404566705.4

of the care of the animals.  These costs can be significantly reduced by allowing other organizations to take possession of the animals.  In the Status Report, the Trustee identifies "an outpouring of support and offers of assistance from many non-profits and concerned citizens." Status Report 3: 17-18.  By calling upon these resources immediately instead of delaying further, the Trustee can relieve the Debtor's Estate of the cost of caring for the animals.

12.  *Finally*, a delay of three weeks for Debtor to move the animals will prolong efforts to remove the animals from the Debtor's property should the Debtor fail to relocate them.  Safe transportation of large animals is expensive and extensive planning is required.  Moving the animals will require significant resources from several different organizations.  Monitoring weather conditions, arranging for trailers and other transport vehicles, and protecting the health of the animals during the moving process all require advance planning.  Moreover, many of the animals will require vaccinations and other medical care before being placed with rescue organizations.  Based on the Debtor's reported assets, it lacks the resources to effectuate such a move.  The $70,000 per month Debtor financing is an amount required to currently care for the animals and pay for other costs of the Estate and does not appear to include transportation costs.  Neither has the Debtor's Officer, who is currently in chapter 7 bankruptcy, demonstrated that she has the financial or operational resources to safely transport hundreds of animals.  Debtor has had chronic financial issues, including stating in a 2019 e-mail request for emergency funding that "[a]fter buying the feed this week I have only $347.50 in the bank."[3]  If the Debtor is unable to correct her non-profit status, Debtor will be unable to solicit or expend funds to continue the care of these animals.  Marshalling the required resources is difficult while the Debtor is still exploring options to relocate the animals.  Debtor's officer has had months to plan an alternate location for the animals, and she should not be given another three weeks to delay transportation of the animals off the Debtor's property.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, Ark Watch respectfully requests that the Court reduce the amount of time for Debtor to remove the animals from the property and

---

[3] A copy of the e-mail is attached as **Exhibit 4**.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Silicon Valley

5

404566705.4

implement stricter monitoring of animal care.

Dated: March 2, 2026

MANATT, PHELPS & PHILLIPS, LLP

By: _____
Kevin P. Dwight
Attorney for Creditors
CELINE MYERS AND THE ARK WATCH FOUNDATION