Nissan Thomas, Esq. (SBN 250273)
Law Offices of Nissan Thomas
6230 Wilshire Blvd., Suite 2015
Los Angeles, CA 90048
Telephone: (424) 781-7653
Email: info@nissanthomaslaw.com

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF CALIFORNIA

In re:
VILLA CHARDONNAY HORSES WITH WINGS, INC.,
Debtor


LESLIE T. GLADSTONE,
Chapter 11 Trustee,

CASE NO.: 25-04245-JBM11
Adv. No.:    26-90029-JBM

EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE; TO STAY, VACATE, OR MODIFY TURNOVER ORDERS; FOR PRESERVATION ORDER; AND FOR EMERGENCY EVIDENTIARY HEARING

Date:
Time:
Place:  Dept. 2, room 118
Judge: Hon J. Barret Marum

EMERGENCY MOTION TO REMOVE OR RESTRICT CHAPTER 11 TRUSTEE; TO STAY, VACATE, MODIFY, OR CLARIFY MAY 1 TURNOVER ORDER; AND FOR PRESERVATION, ACCOUNTING, PAYOFF DISCLOSURE, AND EMERGENCY EVIDENTIARY HEARING

Debtor Villa Chardonnay Horses With Wings, Inc. ("Debtor" or "Villa Chardonnay"), by and through counsel, Nissan Thomas, respectfully files this Emergency Motion to remove Chapter 11 Trustee Leslie T. Gladstone for cause under 11 U.S.C. § 324(a), or alternatively to suspend or limit her authority; to stay, vacate, modify, or clarify the May 1, 2026 turnover order and related property-control orders under Bankruptcy Rule 9024; to require return, retrieval, preservation, and animal-by-animal accounting of Villa Chardonnay animals; to require accounting of estate

EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE

funds and animal-care funds; to require immediate payoff disclosure; to restrict third-party use of estate property; to preserve evidence and claims; to appoint a neutral examiner, replacement trustee, or neutral animal-care/property fiduciary; and to set an emergency evidentiary hearing.

I. INTRODUCTION

1. This emergency motion is about five urgent failures in estate administration: due process, funding, turnover, payoff, and possession control.

2. First, due process failed. Villa Chardonnay's reliable mailing address was P.O. Box 1000, Julian, California. USPS does not deliver ordinary mail to the physical property addresses in the area. Flores Decl. ¶¶ 4–8, Exs. H–J. Yet Debtor contends that beginning in approximately mid-February 2026 and continuing until approximately June 2026, mail connected to P.O. Box 1000, including Villa-related mail, bankruptcy mail, personal mail, and residential mail, was forwarded or routed away from Debtor and to Trustee Gladstone's office at 5656 La Jolla Boulevard, La Jolla, California. Flores Decl. ¶¶ 7–10, Exs. J–K; Kerber Decl. ¶ 10, Ex. C.

3. That is not a technical service issue. It strikes at the foundation of notice. Notices could appear proper on paper because they were addressed to P.O. Box 1000, while the actual mail stream was allegedly redirected away from Debtor and toward the Trustee's office. During that same period, the Trustee pursued funding relief, adversary relief, animal-related relief, turnover relief, possession-related relief, sale-related relief, default-related consequences, and carve-out activity. See Request for Judicial Notice ("RJN") ¶¶ –.

4. Second, the funding record raises serious fiduciary concerns. The Trustee sought, obtained, controlled, or relied on funding represented as necessary for preservation, animal care, feed, administration, and continued estate operations, including post-petition financing of approximately $400,000. RJN . Yet Debtor contends that the people actually feeding and caring for the animals received no Trustee-controlled funds for feed, veterinary care, farrier care, medication, or daily animal needs, despite requests from Monika Kerber.

EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE

5. Third, the May 1 turnover was entered on an incomplete record and without a meaningful opportunity to be heard. Prior animal-control review did not support neglect. Kerber Decl. ¶ 8, Ex. A. April 23 information reflected that animals had plenty of food and water. Kerber Decl. ¶ 11, Ex. D. Monika Kerber obtained equine veterinary follow-up on April 29 and cat veterinary evaluation on April 30, before the May 1 turnover hearing. Kerber Decl. ¶¶ 14–19, Exs. E–F. The Court did not receive the full veterinary context before ordering sanctuary-wide turnover.

6. Fourth, payoff transparency is being obstructed or conditioned. Debtor and its funder seek to pay, cure, escrow, refinance, or otherwise satisfy liens and claimed payoff amounts necessary to preserve the property. Instead of providing full payoff information, the Trustee stated in substance that payoff information would be provided only after Monika Kerber and Mercedes Flores vacated or were removed, after cleaning and repairs, and after the property was prepared for sale. Flores Decl. ¶ 26, Ex. O.

7. Fifth, the Trustee's possession theory is internally inconsistent. To the extent the Trustee relies on any 60-day turnover, termination, or vacate theory to force Monika Kerber and Mercedes Flores from the property, that position cannot be reconciled with the Trustee allegedly authorizing, adding, permitting, or recognizing a new tenant, occupant, licensee, or third-party user of the same property after that asserted period. A trustee cannot use one theory to remove the sanctuary operators and another theory to allow substitute users without disclosure, Court approval, insurance, compensation, access limits, and proof of estate benefit.

8. These five issues are not separate technical disputes. Together, they show a breakdown in fiduciary neutrality, due process, estate preservation, animal protection, funding accountability, and Court-supervised administration. Cause exists to remove Trustee Gladstone under 11 U.S.C. § 324(a), or at minimum to suspend or sharply limit her authority pending an evidentiary hearing and appointment of a neutral fiduciary.

II. RELEVANT FACTS

A. Due Process, Address Inconsistencies, and Mail Forwarding

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

9. Villa Chardonnay's official principal street address is 4554 Boulder Creek Road, Julian, California 92036. Its official mailing address is P.O. Box 1000, Julian, California 92036. Mercedes Flores is identified as Secretary and agent for service of process in the California Secretary of State records. Flores Decl. ¶ 4, Ex. H.

10. USPS does not deliver ordinary mail to the physical property addresses in the area. P.O. Box 1000 was the reliable mailing address for Villa Chardonnay, Villa-related mail, property and animal-related mail, and personal/residential mail. Flores Decl. ¶ 6.

11. Mercedes Flores prepared and reviewed a combined service and address chart showing address and service inconsistencies in the Villa Chardonnay main bankruptcy case, Monika Kerber Perez's personal bankruptcy case, and the related adversary proceeding. The chart shows that records and proofs of service used P.O. Box 1000, 4554 Boulder Creek Road, and 4430 Boulder Creek Road at different times. Flores Decl. ¶ 5, Ex. I.

12. Debtor contends that mail connected to P.O. Box 1000 was forwarded away from the P.O. Box and routed to Trustee Gladstone's office at 5656 La Jolla Boulevard, La Jolla, California beginning in approximately mid-February 2026 and continuing until approximately June 2026, when Monika Kerber and Mercedes Flores were able to address the issue and re-establish control over the mailbox and mail delivery. Flores Decl. ¶¶ 7–10, Exs. J–K; Kerber Decl. ¶ 10, Ex. C.

13. Mercedes Flores did not authorize the forwarding of her personal mail, residential mail, or any mail that would interfere with her ability to receive notice, protect personal rights, protect Villa Chardonnay's rights, protect the animals, or respond timely in this bankruptcy case. Flores Decl. ¶¶ 7–10, Exs. J–K.

14. This occurred during the same period when major bankruptcy events were occurring, including Trustee administration, Attorney General-related filings, post-petition financing, animal-related proceedings, adversary proceedings, default issues, emergency turnover proceedings, possession-related proceedings, and sale/carve-out activity. RJN ¶¶ –.

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

15. A proof of service showing mailing to P.O. Box 1000 does not establish meaningful notice if mail addressed to P.O. Box 1000 was being forwarded to the Trustee's own office. Likewise, use of 4554 or 4430 did not cure the problem where ordinary USPS mail was not delivered to the physical property addresses and where Debtor disputes 4430 as a reliable residence or mailing address. Flores Decl. ¶¶ 5–8, Exs. H–J.

16. The due-process injury is structural. The notice channel used for deadlines, defaults, hearings, emergency filings, adversary papers, turnover relief, funding relief, and sale-related matters was allegedly redirected without Court order, without Debtor's consent, and without notice reasonably calculated to reach Debtor.

B. Funding Represented for Animal Care Was Not Given to the Operators

17. The Trustee sought, obtained, controlled, or relied on estate funding represented as necessary for animal care, feed, preservation, administration, and continued estate operations. RJN ¶¶ –.

18. The Attorney General-related filings and orders, continued-use-of-funds filings, Trustee status reports, and post-petition financing filings are central because they show the Trustee's funding and preservation representations. RJN ¶¶ –.

19. Debtor contends that approximately $400,000 in post-petition financing or estate-controlled funding was available, approved, sought, or controlled under the Trustee's administration for preservation-related purposes, including animal-related needs. RJN ¶¶ –.

20. Yet Debtor contends that the operators who were actually feeding and caring for the animals did not receive those funds for feed, veterinary care, farrier care, medication, supplies, or daily animal needs. Kerber Decl. ¶¶ __, Ex. __.

21. Monika Kerber repeatedly requested funds or assistance for animal needs, including animal-care expenses, but Debtor contends the Trustee did not provide funds to Monika, Mercedes, or the Villa Chardonnay operators for actual daily animal care. Kerber Decl. ¶¶ __, Ex. __.

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

22. At the same time, estate resources were used for Trustee professionals, legal fees, consultants, security, litigation, property control, and sale-related administration. RJN ¶¶ –.

23. This funding disparity is a fiduciary issue. If funding was represented as necessary to preserve animals and the sanctuary estate, estate administration should have prioritized food, veterinary care, farrier care, medication, supplies, and continuity of care. A trustee cannot seek money for preservation and animal care, deny or withhold actual care funding from the operators, and then rely on alleged animal-care distress to justify turnover, removal, property clearing, professional-fee expansion, and sale-related relief.

C. Sale-First Conduct, Possession Control, and the 60-Day/New-Tenant Contradiction

24. Trustee Gladstone was appointed on January 29, 2026. By February 23, 2026, before the May 1 animal turnover, trustee communications referenced Paul Buie / Onyx coming to the property to plan for sale and changing or adding locks to the guest house. Kerber Decl. ¶ 9, Ex. B.

25. The Trustee's adversary filings sought possession-related and vacate-related relief, including turnover of property and assistance of U.S. Marshals. RJN ¶¶ –. The May 1 animal turnover occurred in the same broader sequence of possession-control and sale-clearing activity. RJN ¶¶ –.

26. Debtor contends the May 1 turnover was used to accomplish, through emergency animal turnover, the same possession-control and sale-clearing objectives the Trustee had already been pursuing in the adversary proceeding: removal of animals, restriction of residents, third-party control, and practical clearing of the property for sale.

27. The Trustee's 60-day turnover, termination, or vacate theory is internally inconsistent if the Trustee simultaneously authorized, added, permitted, or recognized a new tenant, occupant, licensee, vendor, security user, third-party animal organization, volunteer, contractor, broker, realtor, consultant, or other third-party user of the same real property after that asserted period.

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

28. If the asserted purpose of turnover or termination was to clear, preserve, secure, or protect the real property, adding or allowing a new tenant or occupant undermines the Trustee's stated justification. It suggests selective possession control: removing Debtor's principals and sanctuary operators while allowing others to use or benefit from the same property.

29. The Court should require the Trustee to identify, under oath, every tenant, occupant, licensee, vendor, security person, animal organization, volunteer, contractor, broker, realtor, auctioneer-like person, consultant, or other third party allowed to occupy, use, access, store property on, conduct activity on, or benefit from Villa Chardonnay's real property after any asserted 60-day turnover, termination, or vacate period. The Trustee should also identify the legal authority, Court order, lease, license, insurance, compensation, indemnity, access limits, and estate benefit for each.

D. The Veterinary Record Did Not Support Sanctuary-Wide Turnover

30. Prior animal-control review did not support emergency seizure or turnover of the entire sanctuary. Vaughn Maurice, then Director of San Diego County Department of Animal Services, responded to accusations concerning Villa Chardonnay and stated that the prior matter had been closed, that there had not been signs of neglect, and that complaints or statements about Villa Chardonnay had been misrepresented for years. Kerber Decl. ¶ 8, Ex. A.

31. On or about April 23, 2026, before the April 27 unannounced entry, animal-control and/or veterinary personnel observed animals at the property. That April 23 information reflected that animals had plenty of food and water. Kerber Decl. ¶ 11, Ex. D.

32. Debtor disputes that either the April 15 contact or the April 27 unannounced SDHS/Jace Huggins visit justified sanctuary-wide turnover. If the April 15 contact truly revealed an emergency requiring seizure of the sanctuary, emergency veterinary demands should have been made then. They were not.

33. On April 27, SDHS/animal-control personnel, including Jace Huggins, came to the property without advance notice to Mercedes Flores. Flores Decl. ¶ 13. The visit did not

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

identify a sanctuary-wide emergency requiring removal of all animals. At most, concerns were raised regarding a limited number of animals.

34. Debtor disputes the denied-access narrative. Mercedes Flores states that Villa Chardonnay did not receive any call, note at the gate, written request, or proper notice from animal control stating that access had been attempted and denied. Flores Decl. ¶¶ 11–16, Exs. L–M. She also provided communications and a photograph showing prior access by animal-control/veterinary personnel. Flores Decl. ¶ 15, Ex. M.

35. After the April 27 visit, follow-up veterinary care was requested within approximately forty-eight hours. Kerber Decl. ¶¶ 14–15. Monika obtained an equine veterinary examination on April 29, 2026, and Dr. Max examined horses at Villa Chardonnay. Kerber Decl. ¶ 16, Ex. E.

36. Trustee Gladstone spoke with Dr. Max by speakerphone in front of Jace Huggins, Jeff Wiemann, and other officers. The Trustee also spoke with Dr. Flores. Kerber Decl. ¶ 17.

37. Monika obtained veterinary evaluation for the cats on April 30, 2026. The cat veterinary information was emailed to the Trustee before the May 1 emergency hearing. Kerber Decl. ¶ 18, Ex. F.

38. The Court was not presented with the full veterinary context before the May 1 turnover, including the April 23 observations, the April 29 equine veterinary follow-up, the Trustee's direct speakerphone communication with Dr. Max, and the April 30 cat veterinary information. Kerber Decl. ¶ 19, Exs. D–F.

E. May 1 Was Not a Meaningful Opportunity to Be Heard

39. On May 1, 2026, a search warrant was executed at the Villa Chardonnay property shortly before the emergency turnover hearing. Phones, computers, and electronic devices were seized. Kerber Decl. ¶ 20.

40. The seizure impaired Villa Chardonnay's ability to communicate with counsel, access records, access email, gather veterinary evidence, review filings, and present evidence at the emergency hearing. Kerber Decl. ¶ 21.

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

41. Because of the timing of the warrant execution, device seizure, and emergency hearing, Villa Chardonnay, Mercedes Flores, and Monika Kerber were not meaningfully able to be heard before the animals were turned over. Kerber Decl. ¶ 22.

42. The May 1 order also treated animals broadly as estate property without animal-by-animal ownership review. Debtor disputes that every animal taken belonged to Debtor or the estate. Personal animals, privately owned animals, animals subject to different custody arrangements, and animals not listed in Debtor's schedules required individualized ownership review before seizure, transfer, adoption, euthanasia, release, relocation, medication, or disposition. Flores Decl. ¶¶ 17–19.

43. Physical presence on estate real property does not automatically establish that every animal is property of the estate. Section 542 requires property-specific analysis, not blanket treatment of every living animal as estate property without ownership review.

F. Post-Turnover Harm and Need for Accounting

44. Since turnover, animals have been moved from the sanctuary and placed outside Villa Chardonnay's care and control. Kerber Decl. ¶ 23.

45. Horses later tested positive for strangles after removal. Kerber Decl. ¶ 24, Ex. G.

46. Many Villa Chardonnay animals are elderly, fragile, disabled, special-needs, or hospice animals. Transfer, commingling, quarantine exposure, unfamiliar handling, separation, stress, medication changes, illness, adoption, or euthanasia can cause irreversible harm. Kerber Decl. ¶ 25.

47. Every additional day without Court protection increases the risk that animals will be transferred, adopted out, medicated, euthanized, become ill, die, or be placed beyond the Court's ability to restore. Kerber Decl. ¶¶ 26–30.

48. Villa Chardonnay has not received a complete animal-by-animal accounting showing each animal's current location, condition, medication, transfer history, illness status, death status, euthanasia status, ownership status, or custodian. Kerber Decl. ¶ 28.

G. Residential Privacy, False Reports, and Third-Party Use

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

49. Trustee Gladstone admitted that Monika Kerber and Mercedes Flores resided in the main house as holdover tenants. They were not trespassers without privacy, possessory, or due-process rights.

50. Since the Trustee and her agents took control, Mercedes Flores has experienced serious interference with her personal residence, privacy, and safety. On or about May 26, 2026, the Trustee and/or persons acting with or for her entered private residential areas and inspected or photographed personal areas, including drawers, closets, personal belongings, and private spaces. Flores Decl. ¶¶ 20–22.

51. Mercedes objected to this intrusion and called law enforcement. She has video of personal drawers being opened and photographs being taken of personal items, closets, and drawers, and she repeatedly told the Trustee to stop. Flores Decl. ¶ 21.

52. On or about June 6, 2026, a report was made suggesting that a female was inside the house when Mercedes was not home. Mercedes states she and Monika entered the property at approximately 6:40 p.m. and were not at the property all day. Flores Decl. ¶¶ 23–24, Ex. N.

53. Through animal removal, lock changes, security presence, access restrictions, third-party occupation, threats of removal, property-control measures, and sale-related activity, the Trustee created de facto constructive displacement and possession-control pressure.

54. SDHS, Humane Society, animal-control personnel, security, agents, vendors, volunteers, auctioneer-like persons, realtors, contractors, brokers, consultants, tenants, licensees, and other third parties have used or accessed estate property without transparent occupancy terms, accounting, payment, insurance, or Court-approved access protocol. Villa Chardonnay owns the land. Third-party use cannot be invisible, uncompensated, uninsured, or outside Court supervision.

H. Payoff Obstruction

55. Debtor and its funder are attempting to pay, cure, refinance, escrow, or otherwise satisfy the liens and claimed payoff amounts necessary to stop sale pressure and preserve the real property. Debtor seeks a full payoff, not a partial payoff or informal estimate.

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

56. Mercedes Flores, as Secretary of Villa Chardonnay, submitted an email requesting payoff information and copied U.S. Trustee Trial Attorney Haeji Hong. Trustee Gladstone responded that payoff information would be provided only after Monika Kerber and Mercedes Flores vacated or were removed. Flores Decl. ¶ 26, Ex. O.

57. Conditioning payoff information on vacating the property, cleaning, repairs, listing, or marshal removal is improper. Payoff information is needed to preserve estate property and pay creditors. It should not be used as leverage to force possession surrender, sale-clearing, or liquidation.

58. The Trustee should not be permitted to control payoff information, refuse or delay disclosure, and then argue that sale, carve-out, displacement, or liquidation is inevitable. Paying, curing, escrowing, or refinancing all liens and claimed payoff amounts necessary to preserve the property should protect the estate. It should not be blocked in order to create leverage for a Trustee-led liquidation.

III. LEGAL STANDARD

59. Under 11 U.S.C. § 324(a), the Court may remove a trustee, other than the United States Trustee, for cause after notice and a hearing. The Bankruptcy Code does not define "cause" for purposes of § 324(a); cause is determined based on the facts and circumstances of the case. Dye v. Brown (In re AFI Holding, Inc.), 530 F.3d 832, 845 (9th Cir. 2008).

60. A Chapter 11 trustee is a fiduciary charged with administering estate property, accounting for estate property, investigating estate affairs, and preserving value. See 11 U.S.C. §§ 704(a)(2), 1106; Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985). Cause exists where continued trustee control threatens estate value, due process, fiduciary accountability, neutrality, or public confidence in estate administration.

61. Bankruptcy Rule 9024 incorporates Civil Rule 60 in bankruptcy cases. Rule 60(b) permits relief from an order affected by mistake, newly discovered evidence, fraud, misrepresentation, misconduct, voidness, or other extraordinary circumstances. Relief is appropriate where an order was entered through a process in which a party lacked

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

meaningful notice, access to counsel and records, access to evidence, or opportunity to oppose extraordinary relief.

62. Due process requires notice reasonably calculated, under all circumstances, to inform interested parties and allow them to object. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). Due process also requires the opportunity to be heard at a meaningful time and in a meaningful manner. Armstrong v. Manzo, 380 U.S. 545, 552 (1965). When a party knows ordinary notice has failed or is unreliable, additional reasonable steps may be required before property rights are affected. Jones v. Flowers, 547 U.S. 220, 234 (2006). Bankruptcy Rule 9014 similarly requires reasonable notice and an opportunity for hearing in contested matters. These principles are especially important here because Debtor contends its only reliable USPS mailing channel, P.O. Box 1000, was forwarded away from Debtor and to the Trustee's office from approximately mid-February 2026 until June 2026, while ordinary USPS mail was not deliverable to the physical property addresses and major bankruptcy, adversary, turnover, possession, funding, and sale/carve-out proceedings were moving forward.

63. Sections 541 and 542 require property-specific analysis. Physical presence on estate real property does not automatically establish that every animal, personal item, document, record, donation, or item of property belongs to Debtor or the estate. Turnover cannot be used as an eviction shortcut, possession shortcut, sale-clearing shortcut, or liability shield that bypasses disputed ownership, occupancy rights, personal property rights, animal ownership issues, and due-process protections.

64. Section 363 requires Court oversight for use, sale, or lease of estate property. Section 105(a) authorizes this Court to issue orders necessary or appropriate to carry out the Bankruptcy Code and prevent abuse of process. These authorities support preservation orders, accounting orders, access protocols, evidence preservation, payoff-transparency orders, animal-preservation orders, third-party property-use restrictions, funding accounting, and limitation of trustee authority pending evidentiary hearing.

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

65. Bankruptcy courts are courts of equity, but equitable authority cannot override the Bankruptcy Code or constitutional protections. Law v. Siegel, 571 U.S. 415, 421 (2014).

66. California Civil Code § 2943 recognizes the right of an entitled person or authorized agent to obtain a payoff demand statement. Separately, this Court has authority under 11 U.S.C. §§ 105 and 363 to prevent abuse of process, condition any sale process, and require transparency necessary to preserve estate value.

IV. ARGUMENT

A. Due Process Was Compromised.

67. Due process is the first and controlling issue. Villa Chardonnay's reliable mailing address was P.O. Box 1000 because USPS does not deliver ordinary mail to the physical property addresses. Flores Decl. ¶¶ 4–8, Exs. H–J. Yet service and address records used P.O. Box 1000, 4554 Boulder Creek Road, and 4430 Boulder Creek Road inconsistently. Flores Decl. ¶ 5, Ex. I.

68. Debtor contends that mail connected to P.O. Box 1000 was forwarded away from Debtor and to the Trustee's office during the same period when the Trustee pursued major relief. Flores Decl. ¶¶ 7–10, Exs. J–K; Kerber Decl. ¶ 10, Ex. C.

69. The Trustee should not benefit from alleged lack of opposition, missed deadlines, default, claimed silence, or alleged noncompliance where Debtor's only reliable mail channel was compromised and address records were inconsistent.

70. The May 1 due-process problem was compounded because Debtor's principals were deprived of meaningful access to phones, records, counsel, and evidence immediately before the emergency hearing. Kerber Decl. ¶¶ 20–22.

71. The May 1 order should therefore be stayed, vacated, modified, clarified, or set for immediate evidentiary hearing under Bankruptcy Rule 9024 and Civil Rule 60(b).

B. The Funding Record Supports Removal or Restriction of the Trustee.

72. The Trustee's funding conduct supports cause under 11 U.S.C. § 324(a). The Trustee sought or controlled funding represented as necessary for preservation and animal care,

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

including Attorney General-related funding and post-petition financing of approximately $400,000. RJN ¶¶ –.

73. Debtor contends that the operators received no money for daily feed, veterinary care, farrier care, medication, or animal needs despite repeated requests. Kerber Decl. ¶¶ __, Ex. __.

74. At the same time, estate funds were used for Trustee professionals, legal fees, consultants, security, litigation, property control, and sale-related administration. RJN ¶¶ –.

75. That is not neutral preservation of a sanctuary estate. If the Trustee believed animal care was urgent, she had a fiduciary duty to use available estate resources to support actual care before seeking sweeping turnover relief.

76. The Trustee should not be permitted to withhold animal-care funding, allow conditions to worsen or appear worse, and then rely on those conditions to justify animal removal, possession control, and sale-clearing relief.

77. This funding disparity supports removal, restriction, accounting, surcharge review, and appointment of a neutral fiduciary or examiner.

C. Cause Exists to Remove or Restrict the Trustee.

78. Cause exists because the Trustee's continued control threatens estate value, due process, fiduciary accountability, neutrality, and public confidence in estate administration.

79. The Trustee is now a central disputed actor in issues requiring Court review: mail forwarding, notice, service, emergency turnover, animal accounting, funding use, professional fees, sale efforts, payoff obstruction, residential privacy, third-party occupancy of estate land, evidence preservation, animal ownership, liability-release language, 60-day turnover/termination inconsistencies, and sanctuary-value destruction.

80. Sale-first conduct began early. By February 23, trustee communications referenced Paul Buie / Onyx coming to the property to plan for sale and changing or adding locks to the guest house. Kerber Decl. ¶ 9, Ex. B.

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

81. The Trustee's June payoff position confirms the problem. Mercedes Flores requested payoff information and copied Haeji Hong. Trustee Gladstone responded that payoff would be provided only after Monika Kerber and Mercedes Flores vacated or were removed. Flores Decl. ¶ 26, Ex. O.

82. The Trustee's 60-day possession theory also supports removal or restriction. If the Trustee relies on a 60-day turnover, termination, or vacate theory to remove Debtor's principals, she cannot simultaneously allow another tenant or third-party user to occupy, use, or benefit from the property without Court approval and transparent estate-benefit findings.

83. The Trustee, Jeff Wiemann, and related third parties are necessary witnesses regarding notice, access, mail forwarding, funding, veterinary information, payoff communications, animal disposition, third-party use of estate property, fundraising, 60-day possession/tenant issues, and the May 1 turnover process. A trustee cannot fairly administer the estate while simultaneously being a central witness to disputed events forming the basis for emergency relief.

D. The May 1 Turnover Order Should Be Vacated, Modified, or Clarified.

84. The May 1 turnover order was entered through emergency procedures that deprived Debtor of meaningful notice and a meaningful opportunity to respond. It affected extraordinary rights and property interests, including animals, estate records, corporate records, occupancy rights, personal property, residential privacy, and property control.

85. Relief is appropriate under Civil Rule 60(b)(3) because the record was incomplete or materially misleading. Prior animal-control review did not show neglect. Kerber Decl. ¶ 8, Ex. A. April 23 information reflected plenty of food and water. Kerber Decl. ¶ 11, Ex. D. Debtor had already arranged and obtained veterinary follow-up for the identified animals. Kerber Decl. ¶¶ 14–19, Exs. E–F.

86. Relief is also appropriate under Civil Rule 60(b)(4) and 60(b)(6) because the May 1 order was entered without meaningful notice and under extraordinary circumstances involving hundreds of elderly, sick, hospice, medically fragile, disabled, blind, lame, and special-

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

needs animals; the sanctuary's charitable mission; estate land; residential/occupancy interests; corporate and veterinary records; evidence access; donor goodwill; and sale-clearing property control.

87. The order should be vacated, modified, or clarified because it appears to have treated all animals located at Villa Chardonnay as estate property without an animal-by-animal ownership determination. Physical presence on estate real property does not automatically establish that every animal belonged to Debtor or the bankruptcy estate. Flores Decl. ¶¶ 17–19.

88. Any liability-release, waiver, Barton-doctrine, indemnity, immunity, or protective language entered through the May 1 emergency process should also be vacated, modified, or clarified. Such language should not protect Trustee Gladstone, Jeff Wiemann, SDHS, Humane Society, or others from accountability for acts taken without meaningful notice, outside the scope of bankruptcy authority, based on disputed ownership, or on an incomplete or materially misleading record.

E. Payoff Transparency Is Necessary to Preserve the Estate.

89. Debtor's ability to pay, cure, escrow, refinance, or otherwise satisfy liens and claimed payoff amounts is central to estate preservation. Full payoff transparency is not optional where the Trustee is using alleged secured debt, sale pressure, carve-out pressure, and property-control measures to justify irreversible loss of the real property.

90. Debtor seeks full payoff information for all liens and claimed payoff amounts necessary to preserve the property, including first-position debt, junior liens, recorded liens, asserted post-petition financing, default interest, lender fees, legal fees, protective advances, trustee-asserted cure amounts, and any disputed sums the Trustee or any secured creditor contends must be escrowed to stop sale pressure.

91. The Trustee's duty is not to make payoff impossible. If a full payoff, escrow, refinancing, or cure path can preserve the real property, protect creditors, and avoid destruction of the sanctuary, the Trustee must facilitate transparency rather than use control of information as leverage for a forced sale.

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

92. The Trustee's written response conditioning payoff on vacating or removal is inconsistent with 11 U.S.C. §§ 704(a)(7), 1106(a)(1), and 1109(b). It is also inconsistent with due process because a meaningful opportunity to preserve property does not exist where the Trustee controls the sale/carve-out process while withholding payoff information necessary to satisfy liens and preserve the property. Flores Decl. ¶ 26, Ex. O.

93. The Court should order the Trustee, lenders, lender counsel, and any party asserting liens or payoff amounts to provide, by a date certain, a complete itemized payoff demand, wire or escrow instructions, per diem interest, good-through date, lien-release conditions, and identification of any disputed amounts to be escrowed pending further Court order.

94. The Court should further order that no sale, auction, carve-out approval, lockout, possession-control expansion, third-party occupancy expansion, or property-clearing activity proceed until Debtor has received a meaningful opportunity to tender, escrow, cure, refinance, or otherwise satisfy the full payoff amounts necessary to preserve the property.

F. Third-Party Use, Residential Privacy, and 60-Day/New-Tenant Issues Require Court Control.

95. Villa Chardonnay owns the real property. SDHS, Humane Society, security, agents, vendors, volunteers, auctioneer-like persons, realtors, contractors, consultants, animal organizations, tenants, occupants, licensees, and other third parties have occupied or used estate property, including land, structures, barns, animal areas, access roads, gates, and private residential areas.

96. Third-party use cannot be invisible, uncompensated, uninsured, or outside Court supervision. If third parties contend they must remain on the property, they should be required to identify the exact bankruptcy authority, purpose, scope, duration, insurance, indemnity, compensation, and Court order authorizing that presence.

97. On or about May 26, 2026, trustee-side persons entered or accessed residential and personal areas, including drawers, closets, personal belongings, and private spaces. Flores Decl. ¶¶ 20–22. That did not preserve the estate. It invaded private residential space.

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

98. The 60-day turnover/termination and new-tenant/occupant issue shows why Court supervision is urgently needed. If the Trustee contends existing residents must be removed under a turnover, termination, or vacate theory, she cannot simultaneously authorize or permit a substitute tenant, licensee, or third-party user without Court approval and full disclosure.

G. Animals, Fundraising, and Evidence Must Be Preserved.

99. Animals taken from Villa Chardonnay already had a forever home. Many were senior, disabled, blind, lame, hospice, medically fragile, elderly, or sick animals. Kerber Decl. ¶¶ 5–7, 23–30. Since turnover, animals remain outside Debtor's custody and Debtor has not received a complete animal-by-animal accounting. Kerber Decl. ¶ 28.

100.    If animals were adopted, transferred, fostered, relocated, released, medicated, euthanized, or placed with third parties, records should exist identifying each animal, adopter, transferee, foster, custodian, current location, medical status, medication status, fundraising history, and disposition.

101.    Public fundraising materials appear to have solicited donations connected to Villa Chardonnay animals, their seizure, care, transfer, and adoption. Any funds, donations, grants, matching funds, adoption fees, sponsorships, reimbursements, restricted gifts, unrestricted gifts, in-kind benefits, media fundraising, television fundraising, or other proceeds generated from Villa Chardonnay animals, estate goodwill, estate property, or the turnover narrative should be preserved and accounted for pending further Court order.

102.    The Court should order immediate return, retrieval, preservation, and animal-by-animal accounting to the extent legally and physically possible, and should preserve all bankruptcy-related evidence.

V. REQUESTED RELIEF

Debtor respectfully requests that the Court enter an order granting the following relief:

1. Remove Trustee Leslie T. Gladstone for cause under 11 U.S.C. § 324(a), or alternatively suspend or limit her authority pending an emergency evidentiary hearing;

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

2. Appoint a replacement trustee, neutral examiner, neutral animal-care/property fiduciary, or other neutral fiduciary to preserve the estate pending further order;

3. Stay, vacate, modify, or clarify the May 1 turnover order and any related order to the extent entered without meaningful notice, on an incomplete or materially misleading record, or without animal-by-animal ownership review;

4. Order immediate return, retrieval, preservation, and animal-by-animal accounting of all animals taken from Villa Chardonnay, including species, identifying description, medical status, current location, custodian, transfer/adoption/foster history, medication history, euthanasia/death status if applicable, and legal basis for each disposition;

5. Prohibit adoption, transfer, euthanasia, relocation, release, medication, or disposition of any Villa Chardonnay animal except emergency veterinary care necessary to prevent imminent suffering, pending further order;

6. Require any party claiming return is impossible to identify the specific animal, current custodian, legal basis, factual basis, medical status, disposition history, and reason return is allegedly impossible;

7. Require SDHS, Humane Society, security, agents, vendors, volunteers, auctioneer-like persons, realtors, contractors, consultants, animal organizations, tenants, occupants, licensees, and other third parties to vacate estate property unless expressly authorized by this Court under a written access protocol;

8. Require any authorized access protocol to include person-by-person identification, purpose, dates, times, insurance, indemnity, compensation, gate logs, visitor logs, and limitations on access, including prohibitions against residential/private-area entry and opening drawers, closets, files, storage areas, computers, phones, or personal-property areas without further order;

9. Require the Trustee to disclose, under oath, whether any new tenant, occupant, licensee, vendor, security person, animal organization, volunteer, contractor, broker, realtor, auctioneer-like person, consultant, or other third party has been authorized, permitted, invited, or allowed to occupy, use, access, store property on, conduct activity on, or

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

benefit from Villa Chardonnay's real property after any asserted 60-day turnover, termination, or vacate period, and to identify the legal authority, Court order, lease, license, insurance, compensation, indemnity, access limits, and estate benefit for each such person or entity;

10. Require a complete accounting of all estate funds, post-petition financing, cash collateral, donations, grants, advances, professional payments, security payments, consultant payments, animal-related charges, and preservation-related expenditures, including a specific line-item disclosure of whether any funds were provided to Monika Kerber, Mercedes Flores, or Villa Chardonnay operators for feed, veterinary care, farrier care, medication, supplies, or daily animal needs, and if not, why not;

11. Require accounting and appropriate payment, surcharge, reimbursement, disgorgement, administrative rent, use-and-occupancy value, or other recovery for prior third-party use, occupation, control, or benefit from Villa Chardonnay property;

12. Require preservation and accounting of all funds, donations, grants, matching funds, adoption fees, sponsorships, reimbursements, restricted gifts, unrestricted gifts, in-kind benefits, media fundraising, television fundraising, or other proceeds generated from Villa Chardonnay animals, estate goodwill, estate property, or the May 1 turnover narrative;

13. Require the Trustee, secured creditors, lender counsel, title, escrow, or any party asserting liens or payoff amounts to provide a complete itemized payoff demand by a date certain, including all liens, per diem interest, wire instructions, escrow/title instructions, good-through date, release conditions, disputed amounts, and amounts the Trustee contends must be paid or escrowed to preserve the property;

14. Stay any sale, auction, carve-out approval, lockout, possession-control expansion, third-party occupancy expansion, property-clearing activity, eviction activity, marshal-removal activity, liquidation activity, or irreversible sale-related action until Debtor has received a meaningful opportunity to tender, escrow, cure, refinance, or otherwise satisfy the full payoff amounts necessary to preserve the property;

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

15. Require any Trustee, secured creditor, or party opposing payoff to state under oath the legal and factual basis for opposing payoff, including each amount, lien, condition, release issue, disputed item, or Court order allegedly preventing payoff;

16. Preserve all bankruptcy-related evidence, including mail records, USPS records, electronic records, emails, texts, veterinary records, animal records, photographs, videos, communications with SDHS/Humane Society, communications with creditors, payoff communications, funding communications, animal-care funding requests, fundraising records, third-party access logs, security logs, and property-use records;

17. Clarify that nothing in the May 1 order, turnover stipulation, or related orders grants any release, immunity, indemnity, waiver, Barton protection, or pre-approval of conduct by Trustee Gladstone, Jeff Wiemann, SDHS, Humane Society, security, volunteers, agents, contractors, or third parties;

18. Preserve Debtor's claims, counterclaims, objections, surcharge rights, accounting rights, disgorgement rights, avoidance or recovery rights, personal-property rights, animal-ownership objections, due-process objections, appellate rights, and all remedies against any responsible party;

19. Set an emergency evidentiary hearing on the earliest available date and permit appearance by Zoom or other remote means for counsel and necessary declarants; and

20. Grant such other and further relief as the Court deems just and proper.

VI. CONCLUSION

This record presents an emergency requiring immediate Court supervision.

The first issue is due process. Debtor's reliable mailing channel was allegedly redirected to the Trustee's office while inconsistent addresses were used and major bankruptcy, adversary, turnover, possession, funding, and sale-related proceedings moved forward.

The second issue is fiduciary funding. The Trustee sought or controlled funds represented for preservation and animal care, yet Debtor contends the operators received no money for daily animal needs while estate money funded professionals, consultants, security, litigation, and property control.

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

The third issue is turnover. The May 1 order was entered on an incomplete veterinary record, without meaningful access to phones, counsel, records, and evidence, and without animal-by-animal ownership review.

The fourth issue is payoff. Debtor seeks payoff transparency to preserve the real property, but the Trustee conditioned payoff information on vacating or removal while continuing sale and carve-out pressure.

The fifth issue is possession control. The Trustee cannot rely on a 60-day turnover, termination, or vacate theory to remove the sanctuary operators while allegedly allowing a new tenant, occupant, licensee, or third-party user to occupy, use, or benefit from the same property without Court approval and disclosure.

The Court should remove Trustee Gladstone for cause or, at minimum, immediately suspend or restrict her authority, appoint a neutral fiduciary or examiner, require funding and payoff disclosure, require animal and third-party-use accounting, preserve animals and evidence, restrict further third-party use, and set an emergency evidentiary hearing.

DATED: June 23, 2026

Respectfully submitted,

LAW OFFICES OF NISSAN THOMAS

By: _____

Nissan Thomas

Attorney for Debtor

Villa Chardonnay Horses With Wings, Inc.

**EMERGENCY MOTION TO REMOVE CHAPTER 11 TRUSTEE**

# EXHIBIT A

 Outlook

## Re: [EXTERNAL] FW: Checking In – Can We Help?

| | |
|---|---|
| **From** | Monika Kerber <monika@villachardonnay.org> |
| **Date** | Tue 10/14/2025 7:39 PM |
| **To** | Maurice, Vaughn <Vaughn.Maurice@sdcounty.ca.gov>; Mercedes Flores <mercedes@villachardonnay.org> |

Vaughn,

Thank you so much for reaching out and for your concern regarding the animals. We truly appreciate your kindness and willingness to help.

There will be no need for assistance. Please rest assured that we are here for the animals and will always do what's best for them.

Thank you again for your compassion and understanding.

Warm regards,



Get Outlook for iOS

**From:** Maurice, Vaughn <Vaughn.Maurice@sdcounty.ca.gov>
**Sent:** Tuesday, October 14, 2025 6:20:14 PM
**To:** Monika Kerber <monika@villachardonnay.org>; Mercedes Flores <mercedes@villachardonnay.org>
**Subject:** FW: [EXTERNAL] FW: Checking In – Can We Help?

Hello Monika,

We received notice that you might be in need of assistance from Animal Services. I wanted to check in to see if our help is needed based on the message below.

Best regards,

Vaughn



**Vaughn R. Maurice**, Director
County of San Diego Animal Services

**Adoptions Tuesday – Sunday 9:30am – 4:30pm**

*South Shelter*
5821 Sweetwater Road, Bonita, CA
*North Shelter*
2481 Palomar Airport Road, Carlsbad, CA

---

**From:** Laura Koivola <lkoivola@humaneworld.org>
**Sent:** Tuesday, October 14, 2025 6:06 PM
**To:** Maurice, Vaughn <Vaughn.Maurice@sdcounty.ca.gov>; Strong, Andrew <Andrew.Strongg@sdcounty.ca.gov>
**Subject:** [External] RE: [EXTERNAL] FW: Checking In – Can We Help?

Good evening both,

I wanted to follow up here briefly to ensure you are aware of the foreclosure auction of the Villa Chardonnay property in Julian set to take place tomorrow morning at 10am. It is our understanding, through federal bankruptcy filings, that there are approximately 700 animals, or more, currently located there. It is also our understanding that, if the animals are not removed voluntarily, SDDAS may become responsible for their removal. We recognize that a removal of this magnitude would require extensive logistical planning and resources.

If this scenario is a possibility, please feel free to reach out to us if there is anything we might be able to do to support you.

Respectfully,

**Laura Koivula**
Director, Animal Crimes and Investigations
Animal Rescue Team
C 202-839-2409

---

**From:** Laura Koivula
**Sent:** Monday, September 8, 2025 2:51 PM
**To:** Maurice, Vaughn <Vaughn.Maurice@sdcounty.ca.gov>; Shalimar Oliver <soliver@humaneworld.org>; Strong, Andrew <Andrew.Strong@sdcounty.ca.gov>; Nicole Paquette <npaquette@humaneworld.org>; Kassi Bennett <kbennett@humaneworld.org>; Borrelli, Rachael <Rachael.Borrelli@sdcounty.ca.gov>
**Cc:** Adam Parascandola <aparascandola@humaneworld.org>; Jessica Johnson <jjohnson@humaneworld.org>
**Subject:** RE: [EXTERNAL] FW: Checking In – Can We Help?

Good Afternoon,

Please excuse my delay as I was on PTO and then traveling for a case.

Thank you for clarifying your position here, Mr. Maurice.

Mr. Strong, I am sorry that I wasn't able to make the recent call you had with our case manager, Shalimar Oliver and the vice president of our team, Adam Parascandola. I was happy to hear that it went well and that your office may be interested in pursuing a relationship whereby we may be able to assist DAS in large scale responses.

Should SDDAS be in a position to need assistance for a large-scale cruelty or disaster response, please feel free to reach out to me here and we would be happy to pick that conversation back up.

Very Sincerely,

**Laura Koivula**

Director, Animal Crimes and Investigations

Animal Rescue Team

C 202-839-2409

---

**From:** Maurice, Vaughn <Vaughn.Maurice@sdcounty.ca.gov>
**Sent:** Saturday, August 16, 2025 2:11 PM
**To:** Shalimar Oliver <soliver@humaneworld.org>; Strong, Andrew <Andrew.Strong@sdcounty.ca.gov>; Nicole Paquette <npaquette@humaneworld.org>; Laura Koivula <lkoivula@humaneworld.org>; Kassi Bennett <kbennett@humaneworld.org>; Borrelli, Rachael <Rachael.Borrelli@sdcounty.ca.gov>
**Subject:** [EXTERNAL] FW: Checking In – Can We Help?

Hello Shalimar,

I'm a little unclear why your concerns were elevated beyond the Department of Animal Services to my supervisor at the County, as I've been replying to address your questions directly. San Diego County is well aware of the concerns raised about both Villa Chardonnay (VC) and the Artesian Road properties.

When I first joined DAS nearly a year ago, I met with several key advocates, including Audrey Reynolds, Celine Myers, and Annette Ledda. Wanting to ensure DAS was prepared should large-scale impounds become necessary—potentially 200 horses and hundreds of cats—I reached out to HSUS. Nicole Paquette connected me with Laura Koivula and Kassi Bennett, who were both helpful resources in these closed cases.

Shortly after joining DAS, two of our experienced officers inspected Villa Chardonnay and observed no problems. Around the same time, Audrey Reynolds learned of a court order allowing another individual onto the property. At her recommendation, DAS hired her colleague, Annette Ledda, as an "equine expert" to go along on this property visit. Ten days after her visit, Annette submitted a report alleging that numerous horses were in body condition scores of 1–2 and "actively dying." (That she waited 10 days seemed odd.) We forwarded her report to the District Attorney for review. However, after the DA compared the report with sheriff body camera footage from the same visit, the DA found her claims unsupported—the video showed the horses were only briefly mentioned and suggested the video reflected more of a personal grievance than accurate documentation or animals in distress.

The County later convened a meeting with these "advocates," during which they pressed for action to shut down VC and arrest its owner. It is worth noting that Audrey Reynolds has raised concerns about VC for years. In a previous case, equine veterinarian Dr. Catlin Manring inspected the property and found no issues. And our officers have never found issues with the animals.

Reynolds and her associates made further claims, including zoning violations, illegal donations, and misuse of PPP funds. Each allegation was investigated and found to be unsubstantiated. In fact, zoning officials had previously advised Reynolds there were no violations, yet she repeated the same complaint. They also claimed foreclosure was imminent, which was not the case. Meanwhile, Annette submitted invoices for work not performed. During our review, we also learned that Celine Myers won a $170,000 judgment against VC's owner, but because the property is a primary residence, she would only recover funds if VC were sold.

By December 2024, with no credible evidence of abuse or neglect, DAS closed the investigation. Since 2022, VC has faced financial challenges as a nonprofit, but they continue to meet obligations and remain operational. The owner, Monika Kerber, has been cooperative and transparent. By contrast, Audrey Reynolds and Annette Ledda

Case 25-04245-JBM11    Filed 06/25/26    Entered 06/25/26 12:05:59    Doc 201    Pg. 27 of 64

have been caught in multiple misrepresentations, and Celine Myers has a financial interest tied to the property's potential sale.

At this time, **we have no evidence of animal neglect or abuse at Villa Chardonnay. Without credible evidence, DAS cannot obtain a warrant or take enforcement action. Financial instability alone is not grounds for seizure.** We have offered assistance to the organization, but they have indicated it is not needed. The email below is from the owner of Villa Chardonnay.

Vaughn



**Vaughn R. Maurice**, Director
County of San Diego Animal Services

**Adoptions Tuesday – Sunday 9:30am – 4:30pm**

*South Shelter*
5821 Sweetwater Road, Bonita, CA
*North Shelter*
2481 Palomar Airport Road, Carlsbad, CA

---

**From:** Monika Kerber <monika@villachardonnay.org>
**Sent:** Friday, August 15, 2025 5:53 PM
**To:** Borrelli, Rachael <Rachael.Borrelli@sdcounty.ca.gov>
**Subject:** [External] Re: Checking In – Can We Help?

Hello Rachel:

Thank you for your kind email,  we appreciate it very much.

Of course, we know who brought you the gossip. All is good, I left you a message on your phone.

We just have to pay our balloon payment, that's all but we are good.

Have a beautiful weekend!

Warm Regards,

Monika Kerber

Sent via the Samsung Galaxy Z Fold4, an AT&T 5G smartphone
Get Outlook for Android

---

**From:** Borrelli, Rachael <Rachael.Borrelli@sdcounty.ca.gov>
**Sent:** Friday, August 15, 2025 4:58:49 PM
**To:** Monika Kerber <monika@villachardonnay.org>
**Subject:** Checking In – Can We Help?

Hi Monika,

We've heard that you might be going through a difficult time, and we just wanted to check in. Do you need any help with your animals? We're happy to support however we can.

Let us know.

# EXHIBIT B

**From:** Leslie Gladstone leslieg@flgsd.com

**To:** Monika Kerber monika@villachardonnay.org

**Cc:** Michael Totaro mtotaro@aol.com, Jeff Wiemann jeff.wiemann@cox.net, Paul Buie pbuie@thinkonyx.com

**Date:** Mon, Feb 23, 2026, 8:17 AM

Jeff Wiemann and Paul Buie will be visiting the property tomorrow. Jeff to provide you with some notices and to follow up on missing volunteer forms and for follow up on status of relocation for the animals (you requested three weeks to do so and we are one week in). Paul to view the property to plan for sale (Paul may also be bringing others with him). I believe their expected arrival time is 10:00 am. I have included their contact information if needed.

I also intend to have a locksmith come to change/add locks on the guest house so that it remains vacant. Please ensure that no one is using that space for any reason.

Thank you. Leslie Gladstone



**LESLIE T. GLADSTONE, Esq.**
5656 La Jolla Blvd., La Jolla, CA 92037
Direct: (858) 294-0220    Main: (858) 454-9887
LeslieG@flgsd.com    **FLGSD.com**

STATEMENT OF CONFIDENTIALITY:

The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please reply to the sender immediately to notify us of the error and destroy all copies of this message and any attachments. Thank you for your cooperation.

# EXHIBIT C

From:   Leslie Gladstone leslieg@flgsd.com

To:   Monika Kerber monika@villachardonnay.org

Date:   Tue, Mar 3, 2026, 8:01PM

I am receiving Mercedes' personal mail. May I have her email address and mailing address please?

LESLIE T. GLADSTONE
leslieg@flgsd.com
Direct (858) 294-0220

# EXHIBIT D

Page 1 of 14

**Overall Summary:**

Housing: Some of the fencing is in disrepair. Stalls in main barn for special needs horses lack clean bedding and ventilation. Pens are small for those horses with limited ability to move and no access to sunlight.

Feed: everyone had adequate feed and water. Feed stores are low as feed is purchased daily.

All horses are due for farrier work and most horses that were closely examined are due for dental work.

Welfare assessment and priority: The most prominent welfare concern is Horse 2 as she was found down, unable to stand without assistance and had likely been down for several hours based on the marks found on the ground. When standing the mare was immediately interested in feed which had not been accessible to her when down and ate ravenously. She has a poor body condition and severely limited mobility.

Following welfare concerns include: Mickey, Surprise, Bambi. These horses all have significant musculoskeletal pain that is limiting their mobility and affecting quality of life.

The remainder of horses housed in the upper barn should be evaluated based on notes listed on each horses page.

Adoptability goes beyond our ability to fully assess given the limited time with each animal, but those described in the upper barn, along with horses that are blind/missing vision in one eye, have significant arthritis or other causes of lameness will provide the most challenges as they will require special homes that can afford the cost of veterinary care and management of their conditions.

The general impression of the livestock are as follows:

- The blind bull appears healthy and engaged and over the fence comfortable/curious about people.
- Most of the chickens/roosters are adoptable but some may require further evaluation. The rooster documented in the photograph was in poor body condition and had evidence of recent and repeated trauma from the other roosters and should be separated.  Some of the chickens had notable feather loss and seemed underweight which may be due to stress from the enclosure/roosters they are kept with, parasites, ect.  Further evaluation may be required if an environmental change doesn't improve their appearance.
- The goats are generally in good shape, most were curious and appeared hand raised and in decedent condition.   The exception was (possible boar cross with light coat and brown spot on left eye) with a significant musculoskeletal deformity/degeneration

Page 2 of 14

in the both forelimbs causing it to typically walk on its carpi.  This animal is not in poor body condition but will require special needs and they is questions on the degree of suffering the animal may be in not able/willing to ambulate normally on the limbs. (13 in total)

- Pigs: There were 3 pot belly pigs.  They all need tusk trims and diets.  The lighter color one has sores on the tips of its ears which may be squamous cell carcinoma or some sort of ulcerative lesion.  There is one black one with more white on its face that is so obese folds of skin are covering over its eyes limiting its vision or possibly blinding it (diet or surgical revision of the brow typically required).
- Geese/Ducks/Turkeys/Peacocks:  These animals were only observed from outside the pens.  None of the animals appeared visually to be in poor condition, although the enclosures were small (especially for the peacocks).
- Alpacas were not tame enough to approach, therefore difficult to assess, coats were overgrown and need sheering.

# EXHIBIT E

**LOPE EQUINE INC**
1660 Lotus Ln
El Cajon, California 92021

**Fax**

| **Invoice:** | 291111 | **4/29/2026** |
|---|---|---|
| | | **Unpaid** |

**Provider**
Max Wilcox

Bill To:

Monika Kerber
4554 Boulder Creek Road
Julian, California 92036

| Date | Subject | Description | Qty | Price | Disc | Tax | Amount |
|---|---|---|---|---|---|---|---|
| 4/29/2026 | Cricket | General Exam | 1.00 | $220.00 | 0.00 | | $220.00 |
| 4/29/2026 | | Farm Call Per Mile | 40.00 | $6.00 | 0.00 | | $240.00 |
| 4/29/2026 | Molly | General Exam | 1.00 | $220.00 | 0.00 | | $220.00 |
| 4/29/2026 | | Farrier Services | 1.00 | $60.00 | 0.00 | | $60.00 |
| 4/29/2026 | Barbina | General Exam | 1.00 | $220.00 | 0.00 | | $220.00 |
| 4/29/2026 | | Half Bandage | 1.00 | $40.00 | 0.00 | | $40.00 |
| 4/29/2026 | | SSD Tub | 1.00 | $80.00 | 0.00 | | $80.00 |
| 4/29/2026 | | Elastikon 4" Roll | 3.00 | $30.00 | 0.00 | | $90.00 |
| 4/29/2026 | RX | Previcox 227 mg  180 count | 1.00 | $900.00 | 0.00 | | $900.00 |

| | |
|---|---|
| **Subtotal** | $2,070.00 |
| **Freight** | |
| **Tax** | $0.00 |
| **Total** | **$2,070.00** |

Payment is due at time of service. Balances unpaid after 30 days are subject to a monthly service charge of 1.5% or $5.00 whichever is greater.

# EXHIBIT F

## *Perris Valley Veterinary Clinic*

2560 North Perris Boulevard F-8
Perris, CA  92571
951-657-8389

| | | |
|---|---|---|
| **FOR:** Keller Monika<br>4554 Boulder Creek Rd<br>,  92306<br>(951) 234-9793 | **Printed:**<br>**Date:**<br>**Account:**<br>**Invoice:** | 04-30-26 at 1:37p<br>04-30-26<br>30599<br>156544 |

| Date | For | Qty | Description | Price | |
|---|---|---|---|---|---|
| 04-30-26 | Annie | 1 | Office Visit - Additional Pet | 40.00 | ** |
| 04-30-26 | | 1 | IV CATH | 55.00 | |
| 04-30-26 | | 1 | Euthanasia 0-25 lbs | 100.00 | |
| 04-30-26 | | 1 | Body Return & Release | 0.00 | |
| 04-30-26 | Mama Kitty | 1 | Office Visit - Additional Pet | 40.00 | ** |
| 04-30-26 | | 1 | Convenia Injection 80mg/ml | 125.00 | |
| 04-30-26 | | 1 | Viralys Gel #33763 | 40.00 | ** |
| 04-30-26 | | 1 | Doxycycline 50mg #33762 | 40.00 | |
| 04-30-26 | Jerry | 1 | Proparicaine | 50.00 | ** |
| 04-30-26 | | 1 | Office Visit | 60.00 | ** |
| 04-30-26 | | 1 | Fluorecin Eye Stain | 45.00 | |
| 04-30-26 | | 1 | Doxycycline 25mg/5ml Susp #33761 | 40.00 | |
| 04-30-26 | | 1 | Neo Poly Dex Ointment #33764 | 40.00 | |
| 04-30-26 | Bubba | 1 | Office Visit - Additional Pet | 40.00 | ** |
| 04-30-26 | | 1 | Convenia Injection 80mg/ml | 125.00 | |
| 04-30-26 | | 1 | Clip/Clean | 30.00 | ** |

| Old balance | Charges | Payments | Discount | New balance |
|---|---|---|---|---|
| 0.00 | 870.00 | 0.00 | 290.00 ** | 580.00 |

Your invoice total reflects our **Clients** discount.

| Patient | Total charges |
|---|---|
| Annie | 155.00 |
| Mama Kitty | 175.00 |
| Jerry | 125.00 |
| Bubba | 125.00 |

## *Doctor's Instructions*

Office Visit

# EXHIBIT G

From: MONIKA KERBER kerbermk@yahoo.com
Subject: Fw: Fwd: Important Notice Regarding Equine Strangles Exposure
Date: Jun 10, 2026 at 7:18:55 PM
To: Mercedes Flores mercedesflores@me.com

Yahoo Mail: Search, Organize, Conquer

----- Forwarded Message -----
**From:** "Shirley Puga" <nationalequine@gmail.com>
**To:** "kerbermk@yahoo.com" <kerbermk@yahoo.com>
**Sent:** Wed, Jun 10, 2026 at 3:11 PM
**Subject:** Fwd: Important Notice Regarding Equine Strangles Exposure

---------- Forwarded message ---------
From: **Julian Horses** <Horses@sdhumane.org>
Date: Sun, Jun 7, 2026, 11:55 AM
Subject: Important Notice Regarding Equine Strangles Exposure
To: Julian Horses <Horses@sdhumane.org>

Dear Horse Adopters and Prospective Adopters,

We are writing to inform you that several horses recently transported from our facility have tested positive for equine strangles (Streptococcus equi subsp. equi), a highly contagious equine respiratory disease. While many horses recover without complication, an important feature of strangles is that some horses may become subclinical carriers. This means they may appear healthy and show no obvious clinical signs, yet still harbor and intermittently shed the bacteria.

Because carrier horses often show no outward signs of illness, transport to a new property may be followed days or even weeks later by the onset of disease in the transported horse or in other horses that have been in contact with it. For this reason, we strongly recommend that all recently adopted horses, as well as any horses currently being considered for adoption, be managed using appropriate biosecurity precautions.

**Recommended Precautions**

- Quarantine all new arrivals for a minimum of 3 weeks, regardless of whether they appear healthy.
- Monitor rectal temperatures daily and watch for nasal discharge, swollen lymph nodes, cough, lethargy, or reduced appetite.
- Avoid nose-to-nose contact with resident horses, and do not share water buckets, feed tubs, tack, grooming equipment, or trailers during the quarantine period.
- If your horse develops any signs consistent with strangles, contact your veterinarian immediately and maintain isolation.

**Carrier Testing**

Current veterinary consensus recommends evaluation for carrier status through endoscopic examination of the guttural pouches combined with guttural pouch lavage and PCR testing. This is considered the most effective method for identifying horses that may continue to harbor S. equi after apparent recovery.

If your veterinarian is assessing a horse for carrier status, we encourage discussion of guttural pouch endoscopy and lavage rather than relying solely on nasal swabs.

**Vaccination Considerations**

Vaccination decisions should be made in consultation with your veterinarian. Horses that have been exposed to or recovered from strangles may already have elevated antibody levels.

The ACVIM consensus recommendations advise caution when vaccinating horses within the first year following infection or exposure. In many cases, veterinarians may recommend:

- SeM antibody testing before vaccination to assess antibody levels and the potential risk of adverse immune reactions.
- Delaying vaccination for approximately one year after confirmed infection or significant exposure, depending on the horse's history and test results.

Your veterinarian can help determine whether SeM serology and vaccination are appropriate for your individual horse.

We understand that this notification may be concerning. Our goal is to provide complete transparency and to help protect both your horse and the broader equine

community. We are committed to working with adopters and veterinarians to ensure appropriate testing, monitoring, and follow-up as additional information becomes available.

If you have questions regarding a specific horse, please contact us for further consultation at horses@sdhumane.org.

Sincerely,

San Diego Humane Society

**HORSES** | **JULIAN RESCUE** | Emergency Response
Cell: 619-871-8106
San Diego Humane Society I sdhumane.org I 619-299-7012
5500 Gaines St., San Diego CA 92110
Regular Hours: 8am to 5pm / 7 days a week

*Reference*

*1. A.G. Boyle, J.F. Timoney, J.R. Newton, M.T. Hines, A.S. Waller, B.R. Buchanan, Streptococcus equi Infections in Horses: Guidelines for Treatment, Control, and Prevention of Strangles—Revised Consensus Statement, Journal of Veterinary Internal Medicine, Volume 32, Issue 2, March-April*

# EXHIBIT H

BA20250698449



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**STATEMENT OF INFORMATION
CA NONPROFIT CORPORATION**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

For Office Use Only

**-FILED-**

File No.: BA20250698449

Date Filed: 4/2/2025

B3575-5568  04/02/2025  3:34  PM  Received  by  California  Secretary  of  State

| Entity Details | |
|---|---|
| Corporation Name | VILLA CHARDONNAY-HORSES WITH WINGS |
| Entity No. | 3119436 |
| Formed In | CALIFORNIA |

| Street Address of California Principal Office of Corporation | |
|---|---|
| Street Address of California Office | 4554 BOULDER CREEK ROAD<br>JULIAN, CA 92036 |

| Mailing Address of Corporation | |
|---|---|
| Mailing Address | PO BOX 1000<br>JULIAN, CA 92036 |
| Attention | |

Officers

| Officer Name | Officer Address | Position(s) |
|---|---|---|
| MERCEDES FLORES | PO BOX 1000<br>JULIAN, CA 92036 | Secretary |
| MONIKA KERBER | PO BOX 1000<br>JULIAN, CA 92036 | Chief Executive Officer |
| ⊞ Lauro Magno De La Garza | PO BOX 1000<br>4554 BOULDER CREEK RD<br>JULIAN, CA 92036 | Chief Financial Officer |

☒  The entity's bylaws allow the CEO (President) to be the Secretary or CFO (Treasurer).

Additional Officers

| Officer Name | Officer Address | Position | Stated Position |
|---|---|---|---|
| None Entered | | | |

| Agent for Service of Process | |
|---|---|
| Agent Name | MERCEDES FLORES |
| Agent Address | 4554 BOULDER CREEK RD<br>JULIAN, CA 92036 |

| Email Notifications | |
|---|---|
| Opt-in Email Notifications | Yes, I opt-in to receive entity notifications via email. |

Electronic Signature

☒  By signing, I affirm that the information herein is true and correct and that I am authorized by California law to sign.

*MERCEDES FLORES, Secretary*

Signature

*04/02/2025*

Date

# EXHIBIT I

Fill in this information to identify the case:

United States Bankruptcy Court for the:

_____
**Southern District of California**

Case number (if known): _____    Chapter __11__    ☐ Check if this is an
                                                                    amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy                04/25

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | |
|---|---|---|
| 1. Debtor's name | Villa Chardonnay Horses With Wings, Inc. | |
| 2. All other names debtor used in the last 8 years<br><br>Include any assumed names, trade names, and *doing business as names* | | |
| 3. Debtor's federal Employer Identification Number (EIN) | 2 7 – 0 6 6 6 6 2 4 | |

4. Debtor's address

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| | Po Box 1000 |
| **4554 Boulder Creek Rd** | **Julian, CA 92036-1000** |
| Number        Street | Number        Street |
| **Julian, CA 92036** | City            State    ZIP Code |
| City            State    ZIP Code | |
| | Location of principal assets, if different from principal place of business |
| **San Diego** | |
| County | Number        Street |
| | City            State    ZIP Code |

5. Debtor's website (URL)    www.villachardonnay.org

6. Type of debtor

☐ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☑ Other. Specify:    **Non-Profit**

# EXHIBIT J



**UNITED STATES POSTAL SERVICE**

600 Lincoln Ave
Pasadena CA 91109-5601



## OFFICIAL CHANGE-OF-ADDRESS VALIDATION

The Postal Service has received a Change-of-Address order asking us to forward mail from this address for **VILLA CHARDONNAY HORSES WITH WINGS**. For security reasons, your new address is not included in this correspondence.

The Postal Service utilizes two-factor authentication to verify Change-of-Address requests. The purpose of this notification is to provide an additional opportunity to confirm this request to forward mail is correct.

If you are not **VILLA CHARDONNAY HORSES WITH WINGS** no further action is

If the person listed did not ask the Postal Service to forward their mail, please dispute this Change-of-Address:

- Visit managemymove.usps.com/mgoc/disputes and enter this key:
  **2500551818457**
- OR call 1-800-ASK-USPS (1-800-275-8777)

It is important that we work together to ensure proper mail delivery. Please notify your correspondents of your new address. If you are the current resident, and you continue to receive mail for the person above, please return the mail to your Post Office.

If you do not speak English, or do not understand this notice, please take it with you to your local Post Office for assistance.
Si usted no habla Ingles o no camprende esta carta, favor de llevar esta carta a su oficina local de correo para ayuda.

---

First-Class Mail
Postage & Fees
**PAID**
USPS
Permit No. G–10

The Postal Service has received a Change-of-Address order asking us to forward mail *from* the following address for:



\*\*\*\*\*\*\*\*AUTO\*\*ALL FOR AADC 920

1042  00000004   00011693   T   000012   00000025

**CURRENT RESIDENT OR**

VILLA CHARDONNAY HORSES WITH WINGS
PO BOX 1000
JULIAN CA 92036-1000

As required by law, the Postal Service does not provide customer names or addresses to third parties.





MVL-062026

# EXHIBIT K



☐ Found in iCloud Inbox

**Sandra Young**                                    3/4/26
To: Mercedes  Cc: Leslie >

# IRS Correspondence

March 4, 2026

Ms. Flores,

Please find the attached correspondence which was forwarded to our office.

Sincerely,
Sandy Young
Paralegal

**FINANCIAL** LAW GROUP

**SANDY YOUNG**
Paralegal
5656 La Jolla Blvd., La Jolla, CA 92037
Direct: (858) 294-0218    Main: (858) 454-9887
SandraY@flgsd.com
**FLGSD.com**

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please reply to the sender immediately to notify us of the error and destroy all copies of this message and any attachments. Thank you for your cooperation.



IRS Correspondence.pdf ━    ✕

☐ 1 of 18

**Department of the Treasury
Internal Revenue Service
Small Business / Self-Employed**
1 CIVIC CENTER DRIVE
SAN MARCOS, CA 92069-2918

MERCEDES FLORES
PO BOX 1000
JULIAN, CA 92036-1000009

**Why you're receiving this letter**
My name is Revenue Officer D. ESC

# EXHIBIT L

# Notice of Unfounded Allegation and Improper Escalation

From: Monika Kerber monika@villachardonnay.org

To: Maurice, Vaughn vaughn.maurice@sdcounty.ca.gov

Date: Wed, Jan 28, 2026, 4:01PM

Downed horse at Villa Chardonnay.jpg 700 KB

Dear Vaughn,

I attempted to reach you by phone earlier this morning and left a voicemail; I am following up in writing to ensure this information is properly documented.

We wanted to formally document our concern regarding a recent allegation relayed to us through the U.S. Trustee's Office asserting that a horse at Villa Chardonnay was "down for three days," that care was not being provided, and that access was denied.

As you know from your prior involvement and direct familiarity with this property, this allegation is not valid and mirrors the same pattern of unfounded claims that have been raised repeatedly over the years and determined to be unsupported.

Based on the information conveyed to us, the claim appears to rely on a single observation captured via third-party drone imagery. A horse lying down at a moment in time is normal behavior and does not indicate distress or neglect, and there has been no instance of a horse being down continuously for multiple days. The animal referenced is visible from the public roadway.

For clarity, we have attached the same image that was forwarded to the Trustee, solely to identify the basis of the allegation being circulated, not as evidence of animal condition or welfare.

What is particularly concerning is that this allegation appears to have been elevated outside of the usual DAS channels. To our knowledge, we were not contacted by your office regarding this matter prior to its escalation, which suggests the information may have been routed around established processes rather than evaluated through them.

As you are well aware, reliance on unverified third-party drone imagery raises serious reliability and privacy concerns and is not an appropriate basis for animal welfare determinations without independent, lawful verification. Given the extensive prior DAS involvement at this property—including significant on-site time with no findings—continued escalation of re-packaged claims based on speculative observations is troubling.

This manner of allegation is also consistent with prior conduct we are aware of, in which similar drone-based claims have been raised against other properties without substantiation. At this point, these reports can no longer reasonably be viewed as good-faith welfare concerns.

1 / 2

We are bringing this to your attention because of your familiarity with the facts and your prior diligence in addressing these matters appropriately. We trust this will be viewed in that context.

Sincerely,



This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. You cannot use or forward any attachments in the email. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. Villa Chardonnay Horses with Wings, Inc. www.villachardonnay.org

# EXHIBIT M



Jace ›
Text        SMS
Mon, Apr 27 at 5:47 PM

This is Jace with the humane society. My email is jhuggins@sdhumane.org

Mon, Apr 27 at 7:45 PM



Here is Cassie Hamilton veterinarian of animal control. I sent video to Jeff. I stated on video the date and that it was the SIXTH visit from animal control.



# EXHIBIT N

Case 25-04245-JBM11   Filed 06/25/26   Entered 06/25/26 12:05:59   Doc 201   Pg. 57 of 64

# Background Event Chronology

Event Number: E10699153



| Date | Time | Term | Operator | Action |
|---|---|---|---|---|
| 06/06/26 | 16:50:41 | nrr | 107882 | EVENT CREATED: [LOCATION] 4554 BOULDER CREEK RD [AREA] JUL [XST] EAGLE PEAK RD / PINE HILLS RD ██████ ██████ [SOURCE] ADMIN ██████ , TBPAGE: 1155 , TBGRID: G4<br>Agency= SHERIFF   Dispatch Group: RURD   Beat: 82R , Status= A   Priority: 4 0 ,   Hold Type= 0 ,   Current= F ,   Open Current= F   Event:  422 - CRIMINAL THREATS [4]<br>SUPP INFO CREATED: PERSO: Name: ██████ Race: W Sex: F Height: 505 Hair: BLK<br>Age: 48 ,Purpose= C |
| 06/06/26 | 16:50:41 | if02 | 107882 | COMMENT ADDED: ** PER search completed at 06/06/26 16:50:41 |
| 06/06/26 | 16:50:41 | nrr | 107882 | RP WAS MADE AWARE OF THREATS VIA FACEBOOK - ██████ ARE ON SCENE CURRENTLY SHELTERING IN PLACE ...<br>THE LOC IS A 40 ACRE PROP AND THE FEM THAT MADE THE THREAT ██████<br>██████ .... SHE SHOULD BE ████ IN THE HOUSE .... ██████ ARE ON THE TAIL END OF<br>THE PROPERTY AND A SECURITY GUARD IS AT THE FRONT GATE<br>FEM IS IN THE PROCESS OF ██████ ... ██████ HORSES ON 5.1<br>UNK HBD/115/WPNS<br>THERE IS A BACK GATE TO ACCESS - RP WILL LET DEP IN THAT WAY - 4700 - 4702 BOULDER CREEK RD IS ADDRESS FOR THE BACK GATE<br>NFD |
| 06/06/26 | 16:50:42 | if02 | 107882 | COMMENT ADDED: ** LOI search completed at 06/06/26 16:50:42 |
| 06/06/26 | 16:51:20 | rurd | 106090 | [UNIT]  82R1  DP ,  Location= 4554 BOULDER CREEK RD JUL ,   105137 |
| 06/06/26 | 16:51:22 | rurd | 106090 | [UNIT]  82R3  DP ,  Location= 4554 BOULDER CREEK RD JUL ,   100298 |
| 06/06/26 | 16:52:37 | rurd | 106090 | [UNIT]  82R3  ER ,  Location= 4554 BOULDER CREEK RD JUL ,   100298 |

6/12/2026 9:41:35 AM

| Date | Time | Term | Operator | Action |
|------|------|------|----------|--------|
| | | | | [UNIT]  82R1  ER ,   Location= 4554 BOULDER CREEK RD JUL ,   105137 |
| 06/06/26 | 17:15:29 | rurd | 106090 | [UNIT]  82R1  ON ,   Location= 4554 BOULDER CREEK RD JUL ,   105137 |
| | | | | [UNIT]  82R3  ON ,   Location= 4554 BOULDER CREEK RD JUL ,   100298 |
| 06/06/26 | 17:25:29 | rurd | 106090 | [UNIT]  82R3  A ,   Location= 4554 BOULDER CREEK RD JUL ,   100298 |
| | | | | [UNIT]  82R1  A ,   Location= 4554 BOULDER CREEK RD JUL ,   105137 |
| 06/06/26 | 17:27:22 | rurd | 106090 | [UNIT]  82R1  UC ,   C4 - Alarm Timer Extended: 20 ,   Location= 4554 BOULDER CREEK RD JUL ,   105137 |
| | | | | COMMENT ADDED: C4 - Alarm Timer Extended: 20 |
| 06/06/26 | 17:27:23 | rurd | 106090 | [UNIT]  82R3  UC ,   Alarm Timer Extended: 0 ,   Location= 4554 BOULDER CREEK RD JUL ,   100298 |
| | | | | COMMENT ADDED: Alarm Timer Extended: 0 |
| 06/06/26 | 17:33:57 | $82R1 | 105137 | COMMENT ADDED: ▮▮▮▮▮▮▮▮▮▮▮▮ |
| 06/06/26 | 17:34:45 | $82R1 | 105137 | COMMENT ADDED: ▮▮▮▮▮▮▮▮▮▮▮▮ |
| 06/06/26 | 17:37:13 | rurd | 106090 | COMMENT ADDED: 82R1 -- ▮▮▮▮▮▮ |
| 06/06/26 | 17:37:14 | rurd | 106090 | [UNIT]  82R1  EC ,   82R1 -- ▮▮▮▮▮▮ ,  Location= 4554 BOULDER CREEK RD JUL ,   105137 |
| 06/06/26 | 17:44:39 | $82R1 | 105137 | COMMENT ADDED: ▮▮▮▮▮▮ . |
| 06/06/26 | 17:46:19 | $82R1 | 105137 | Agency= SHERIFF   Dispatch Group: RURD   Beat: 82R ,   Status=A  Priority: 4 0 ,   Hold Type= 0   Primary Unit: 82R1   Primary ID: 105137 ,   Current= F ,   Open Current= F |
| | | | | Event:  422 - CRIMINAL THREATS [4] |
| | | | | [UNIT]  82R1  AM ,  ▮▮▮▮▮▮▮▮▮ ,   105137 |
| | | | | [DISPO]  UF |
| | | | | COMMENT ADDED: ▮▮▮▮▮▮▮ |
| 06/06/26 | 17:50:46 | $82R3 | 100298 | Agency= SHERIFF   Dispatch Group: RURD   Beat: 82R ,   Status= A  Priority: 4 0 ,   Hold Type= 0   Primary Unit: 82R1   Primary ID: 105137 ,   Current= T ,   Open Current= F |
| | | | | Event:  422 - CRIMINAL THREATS [4] |
| | | | | [UNIT]  82R3  AM ,   100298 |
| 06/07/26 | 09:04:50 | rurd | 105428 | CROSS REFERENCED TO EVENT= E10700095 |
| | | | | COMMENT ADDED: ** Cross Referenced to Event # E10700095 at: 06/07/26 09:04:50 |
| | | | | ** >>>> by: SUMMER BERNARD on terminal: rurd |

# EXHIBIT O

From: Leslie Gladstone leslieg@flgsd.com

Subject: Re: FORMAL 24-HOUR DEMAND AND NOTICE OF UST OVERSIGHT ISSUE: Payoff Information Being Withheld Before June 29 Carve-Out/Sale Matter

Date: June 23, 2026 at 12:08:39 AM

To: Mercedes Flores mercedesflores@me.com

Cc: Haeji.Hong@usdoj.gov Haeji.Hong@usdoj.gov, Monika monika@villachardonnay.org, Thomas Nissan info@nissanthomaslaw.com

---

Adding Mr Thomas as cc since you have included Ms Perez

## LESLIE T. GLADSTONE
## leslieg@flgsd.com
## Direct (858) 294-0220

> On Jun 23, 2026, at 9:06 AM, Leslie Gladstone <leslieg@flgsd.com> wrote:
>
> Ms. Flores,
> I am not in possession of the information you seek and do not understand the urgency you claim.
>
> Once you and Monika have vacated the property, the property will be deeply cleaned and repaired so that it may be listed for sale. At that point in time, a motion will be filed to apprise all creditors and parties in interest of relevant information in connection therewith and the terms for purchase the property will be contained therein as will the information on the various liens against the property.
>
> Please advise immediately as to whether you will be voluntarily moving off the property or whether you intend to require the marshal to remove you. It is only after this step is accomplished that any payoffs would be provided for the sale.
>
> Thank you.
>
> ## LESLIE T. GLADSTONE

leslieg@flgsd.com

Direct (858) 294-0220

On Jun 22, 2026, at 9:40 PM, Mercedes Flores <mercedesflores@me.com> wrote:

Dear Ms. Gladstone and Ms. Hong:

This is a formal 24-hour demand and notice of an immediate U.S. Trustee oversight issue.

Complete payoff information and escrow instructions are being requested so that secured liens may be satisfied through escrow, estate property may be preserved, and unnecessary sale, carve-out, eviction, liquidation, turnover, transfer, or further estate harm may be avoided.

Escrow is open for the purpose of payoff. A payoff path exists. The estate should not be forced toward sale, carve-out, or liquidation while the Trustee withholds, delays, controls, or refuses to provide the very payoff information necessary to avoid that outcome.

I write as Mercedes Flores, Secretary/officer of Villa Chardonnay Horses With Wings, Inc., agent/service contact, custodian and affected individual, defendant in the related adversary proceeding, and party in interest. I am not writing as counsel for the Debtor. I am requesting estate-administration information in my capacity as an officer and party in interest.

This request is especially urgent because a carve-out/sale-related matter is pending for June 29, 2026. The timing matters. If payoff information is withheld now, the withholding itself may manufacture the claimed need for the carve-out/sale-related relief. That would be unacceptable and prejudicial.

This should not require emergency motion practice. Payoff information is basic estate-administration information. If the Trustee contends that parties in interest must file an emergency motion simply to obtain lien payoff figures, per-diem interest, escrow instructions, and the amounts the Trustee claims must be paid, then please state that position in writing and identify the legal authority for it.

The statutory basis is clear.

Under 11 U.S.C. § 704(a)(7), unless the Court orders otherwise, a trustee must furnish information concerning the estate and the estate's administration as

requested by a party in interest. Payoff figures, lien balances, per-diem interest, escrow instructions, secured-creditor contact information, and trustee-claimed charges are estate-administration information. This is not optional courtesy information. It is information necessary to preserve estate property. (U.S. Code)

Under 11 U.S.C. § 1106(a)(1), a Chapter 11 trustee must perform specified duties of a trustee, including the incorporated duty under § 704(a)(7). (US Code)

Under 11 U.S.C. § 1109(b), parties in interest may raise and appear and be heard on any issue in a Chapter 11 case. That includes payoff, lien satisfaction, estate preservation, carve-out issues, sale alternatives, accounting, and trustee conduct. (Legal Information Institute)

Under 28 U.S.C. § 586, the U.S. Trustee has statutory duties concerning Chapter 11 case administration and trustee oversight. The U.S. Trustee's Office is therefore being placed on notice that a trustee under its oversight is being asked to provide basic estate-administration payoff information necessary to preserve property before a pending carve-out/sale-related deadline or hearing. (Legal Information Institute)

The constitutional issue is equally clear. The Fifth Amendment protects against deprivation of property without due process of law. California Constitution Article I, section 7 also protects against deprivation of property without due process. Due process requires a meaningful opportunity to protect property interests before they are lost. A "meaningful opportunity" does not exist if the Trustee controls the sale/carve-out process while withholding the payoff information necessary to satisfy liens and preserve the property.

Please provide, within 24 hours of this email, all of the following:

1. The complete payoff amount for each secured lienholder;
2. The current principal, interest, default interest, late fees, legal fees, trustee-claimed amounts, and per-diem interest for each lien;
3. The name, address, email, and telephone number for each secured creditor or creditor's counsel authorized to issue payoff demands;
4. Written escrow, title, wire, and payment instructions for each payoff;
5. Any amount the Trustee contends must be paid to the estate or through the Trustee before payoff can occur;
6. The legal basis for any position that payoff funds must be routed through the Trustee rather than through escrow/title directly to secured lienholders;
7. A complete accounting of all trustee fees, professional fees, consultant fees, security fees, animal-transfer charges, administrative expenses, and any other charges the Trustee contends must be paid;
8. All communications with secured creditors, escrow, title, brokers, lenders, consultants, sale professionals, or other third parties concerning payoff, sale,

foreclosure, liquidation, carve-out, refusal to issue payoff information, or any instruction that payoff communications be routed only through the Trustee.

Please also confirm, in writing, that the Trustee has not instructed and will not instruct secured creditors, escrow, title, lenders, brokers, consultants, or any other party to withhold payoff information, delay payoff information, refuse to communicate with escrow/title, or route all payoff communications exclusively through the Trustee unless the Trustee identifies the specific Bankruptcy Code provision, Court order, or other legal authority authorizing that restriction.

If the Trustee refuses, delays, conditions, or obstructs disclosure of payoff information, please state that refusal in writing. Silence, delay, or refusal will be treated as evidence that the Trustee is obstructing estate preservation, impairing due process, and forcing a sale/carve-out pathway that payoff efforts are intended to avoid.

The Trustee cannot use control over estate information to create the appearance that sale, carve-out, liquidation, or further control is necessary. If secured liens can be paid through escrow, then withholding payoff information is not neutral administration. It is interference with the preservation of estate property.

The U.S. Trustee's Office is respectfully requested to act immediately. This is not an issue that should require parties in interest to run to court for basic payoff information. If the U.S. Trustee's Office does not require prompt disclosure, then affected parties will place this issue before the Bankruptcy Court and, if necessary, seek further supervisory, appellate, constitutional, and administrative review.

If complete payoff information and escrow instructions are not provided within 24 hours, affected parties reserve all rights to seek emergency relief, including but not limited to:

1. An order compelling immediate disclosure of payoff information;
2. An order authorizing direct escrow/title communications with secured lienholders;
3. An order authorizing payoff through escrow/title without unnecessary Trustee interference;
4. A stay or continuance of the June 29, 2026 carve-out/sale-related matter;
5. A stay of sale, eviction, turnover, liquidation, transfer, or property-control activity pending payoff disclosure and hearing;
6. A complete accounting of estate funds, trustee fees, professional fees, security charges, consultant charges, animal-transfer charges, and administrative expenses;

7. An order to show cause regarding obstruction of estate preservation and withholding of estate-administration information;

8. Surcharge or other appropriate relief for estate harm caused by delay, obstruction, or unnecessary administrative expense;

9. Trustee removal for cause under 11 U.S.C. § 324(a);

10. Review by appropriate U.S. Trustee Program supervisory personnel;

11. Any other relief necessary to protect due process, estate property, parties in interest, and the integrity of the bankruptcy process.

To be clear: the issue is not whether parties may ultimately need Court approval for certain relief. The issue is that payoff information itself should not be withheld, delayed, or used as leverage. The Trustee has a statutory duty to furnish estate-administration information requested by parties in interest unless the Court orders otherwise.

Nothing in this correspondence waives any rights, remedies, claims, defenses, objections, constitutional rights, due process objections, appellate rights, rights as a party in interest, rights as an officer/Secretary of Villa Chardonnay Horses With Wings, Inc., rights in the related adversary proceeding, rights concerning notice/service defects, or rights to seek emergency relief from the Bankruptcy Court.

Please provide the requested payoff information and escrow instructions within 24 hours.

Respectfully,

Mercedes Flores
Secretary/officer, Villa Chardonnay Horses With Wings, Inc.
Agent/service contact
Custodian and affected individual
Defendant in related adversary proceeding
Party in interest