Leslie T. Gladstone, Esq. (SBN 144615)
Christin A. Batt, Esq. (SBN 222584)
Hilda M. Montes de Oca, Esq. (SBN 287605)
FINANCIAL LAW GROUP
5656 La Jolla Blvd.
La Jolla, CA 92037
Telephone: (858) 454-9887
Facsimile: (858) 454-9596
E-mail: HildaM@flgsd.com

Attorneys for Leslie T. Gladstone, Chapter 11 Trustee

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| In re:<br><br>VILLA CHARDONNAY HORSES WITH WINGS, INC.,<br><br>Debtor. | Case No.: 25-04245-JBM11<br><br>**DECLARATION OF LESLIE T. GLADSTONE IN SUPPORT OF OPPOSITION TO MOTION TO REMOVE TRUSTEE**<br><br>Date: August 26, 2026<br>Time: 10:00 a.m.<br>Dept. Two (2)<br>Honorable J. Barrett Marum |

I, LESLIE T. GLADSTONE, declare:

1.      I am the chapter 11 trustee for the bankruptcy estate (the "**Estate**") of Villa Chardonnay Horses with Wings, Inc. ("**Villa Chardonnay**" or "**Debtor**"). I make this declaration in connection with Trustee's Opposition ("**Trustee's Opposition**") to Motion to Remove Chapter 11 Trustee; to Stay, Vacate or Modify Turnover Orders; for Preservation Order; and for Emergency Evidentiary Hearing filed by Nissan Thomas purportedly on behalf of Debtor ("**Debtor's Motion to Remove Trustee**"). All the information contained herein

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

is within my personal knowledge, except for those matters alleged on information and belief and as to those matters I believe them to be true.

2. According to documents on file in this case, on October 14, 2025, Debtor filed a voluntary chapter 11 petition under the U.S. Bankruptcy Code (the "**Case**").

3. According to documents on file in this case, on January 23, 2026, senior secured creditors River Falls, LLC, Private Mortgage Lending, Inc., and the Armbrust Trust filed an Emergency Motion to Appoint Chapter 11 Trustee. On January 29, 2026, the Court entered its Order Conditionally Appointing Chapter 11 Trustee (the "**Appointment Order**") (Docket No 84).

4. Thereafter, also on January 29, 2026, the United States Trustee filed its Application for Approval of Leslie Gladstone as Chapter 11 Trustee (Docket No 88) and the Court confirmed the appointment of Gladstone as Trustee (Docket No 89) (the "**Order Confirming Appointment**").

5. I have an undergraduate degree from Simon Fraser University in British Columbia, Canada and a juris doctor degree from Pepperdine University School of Law. I was admitted to the State Bar of California and the Central and Southern Districts of California in 1989 and have remained in good standing since that time.

6. I practiced law at the firm of Gray, Cary, Ames & Frye (which later became Gray, Cary, Ware & Freidenrich) from 1989-1993 and then again from 1995-1998, specializing in the representation of bankruptcy trustees, creditor rights, corporate reorganization and commercial litigation. During the two year gap of 1993-1995, I owned and operated separate businesses.

7. In 1998, I was appointed as a member of the Southern District of California Chapter 7 Panel of Trustees and have remained in good standing as a member of this panel at all times since then. I also have been appointed or retained in several cases as a chapter 11 trustee, examiner, expert witness, assignee for

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

benefit of creditors, special master, receiver, chief restructuring officer, liquidating trustee and disbursing agent.

8. Also in 1998, I formed Financial Law Group ("**FLG**"), a law firm currently comprised of four attorneys and three paralegals specializing in representation of trustees, secured and unsecured creditors and other parties in interest in bankruptcy proceedings and commercial litigation in state and federal court.

9. In my 28 years of being a court-appointed bankruptcy trustee/receiver/assignee, I have operated many types of businesses and administered a multitude of different types of assets in a total of over 25,000 bankruptcy cases.

10. I am the past president of the National Association of Bankruptcy Trustees, am the current chair of the International Committee for the National Association of Bankruptcy Trustees, am a committee member for the Southern California chapter of Turnaround Management Association as well as the International Committee for the National Association of Federal Equity Receivers. I am also a member of a delegation that participates in the promulgation of insolvency laws at the United Nations and for the past three years I have participated in colloquiums and formal sessions dedicated to formulation of international insolvency laws in Vienna, Austria and in New York City. I am a frequent speaker on all aspects of bankruptcy law throughout the country.

**Appointment to this Case**

11. Prior to my appointment, I reviewed the bankruptcy schedules and case docket for Villa Chardonnay as well as the schedules for its principal officer Monika Kerber Perez ("**Kerber**"). I also reviewed corporate records for Villa Chardonnay indicating that Kerber and Mercedes Flores ("**Flores**") were the officers for Villa Chardonnay. Based on this review, I determined that I was disinterested, as that term is defined in the Bankruptcy Code. To the best of my

understanding and belief, I reviewed all potential conflicts of interest and I completed a declaration stating that there were none in the Case. (See Docket No 88; Attachment #1).

12. From this review, I learned that Villa Chardonnay owns approximately 42 acres of land in Julian, California located at 4554 and 4430 Boulder Creek Road, Julian, California (the "**Property**").

13. I further reviewed the Grant Deed for the Property, showing ownership of the Property held by Villa Chardonnay.

14. I further learned that the Property was being used to operate an animal sanctuary, allegedly for aging and disabled animals, and that there were approximately 600-700 animals on the Property at the time of the chapter 11 bankruptcy filing (the "**Animals**").

15. In the Appointment Order, the Court states as follows: "The Chapter 11 trustee will have the full powers of a Chapter 11 trustee, including discretion to determine what is in the best interests of the bankruptcy estate, regardless of the terms in the probationary registration." (Docket No 84, p. 2).

**<u>Employment of Professionals and Fee Applications</u>**

16. On February 9, 2026, I caused to be filed an application to employ FLG as my attorneys for the Case (the "**FLG Employment Application**"). A true and correct copy of the FLG Employment Application is docket number of 104 of the Case. The FLG Employment Application clearly states that FLG is disinterested, as that term is defined in the Bankruptcy Code (See Declaration of Disinterest, Attachment #1). The Court approved the FLG Employment Application on February 11, 2026 (Docket No 108), stating specifically "the Court being satisfied that said attorneys hold and represent no interest adverse to the individual creditors herein, Villa Chardonnay Horses with Wings, Inc ("Debtor") or the estate of Debtor and that the employment of said attorneys is necessary for

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

the Trustee to employ attorneys skilled in bankruptcy law and that Financial Law Group is such a firm, and that Financial Law Group represents no adverse interest which would prohibit or impair the employment of the firm and that the employment of Financial Law Group is in the best interest of this estate. .. ." See id at page 2.

17.     I have retained FLG on many occasions in other cases in which I am appointed trustee, always with full disclosure of the fact that I am FLG's founder and owner.

18.     On February 18, 2026, I caused to be filed a Motion to Approve Trustee's Employment of Jeff Wiemann as Non-Profit Consultant in the Case (Docket No 121) (the "**Wiemann Employment Motion**").  On March 12, 2026, the Court granted the Wiemann Employment Motion in its entirety.

19.     Also in February 2026, I initiated discussions with Paul Buie of Onyx Asset Advisors as to assisting me with possible sale of the Property.  I have worked with Mr. Buie in a previous complicated case and have found his work to be extremely competent.  I am also aware of his excellent reputation in other cases and from our involvement in Turnaround Management Association.  Neither I or FLG ever receive any personal benefit or compensation, in the Case or in any other case, as a result of employing Mr. Buie or Onyx Asset Advisors.

20.     Ultimately, I decided that Onyx Asset Advisors was not the best fit for the Case.  I am currently negotiating a listing agreement with Geffen Real Estate ("**Geffen**") and expect to have an Application to Employ Geffen on file with the Court shortly.

21.     On May 18, 2026, I caused to be filed First Interim Fee Applications for FLG, Wiemann and the Estate's accountants Bachecki, Crom & Co, LLP ("Bachecki") (the "**Fee Applications**").  The Fee Applications were noticed to all creditors and everyone requesting special notice in the Case on May 18, 2026.

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

22.    The unopposed Bachecki Fee Application and Wiemann Fee Application were granted by separate orders on June 22, 2026 (Docket Nos 198 and 199).

23.    Opposition and Objection to the FLG Fee Application was filed by attorney Nissan Thomas, purportedly on behalf of Debtor, on June 2, 2026 (the "**FLG Fee Opposition**").  Kerber submitted a sworn declaration in support of the FLG Fee Opposition.  No other opposition was filed.

24.    The FLG Fee Application was granted in full on June 17, 2026 (the "**FLG Fee Application Order**").  The Court's ruling in the FLG Fee Application Order is instructive as to many of the points made in the Motion to Remove Trustee.  First, the Court questioned the standing of the "dispossessed Debtor" to bring the FLG Fee Opposition but, given that the FLG Fee Application was for interim fees, the Court declined to make a ruling on standing.  What the Court did say was that it "could not disagree more with [the Debtor's] implication that FLG's fees with respect to the animals' turnover to SDHS did not benefit the estate. . . It is clear to the Court that the Trustee reasonably cooperated with SDHS when it served the warrant and to coordinate SDHS' next steps."

25.    The Court further noted as follows:  "The Court is satisfied that FLG's fees overall were reasonable, necessary and that they have conferred a benefit upon the estate."

**Mail Forwarding**.

26.    Upon my appointment in this case, I performed many routine tasks; tasks that frequently are involved in corporate cases.  One of these routine tasks is to cause the US Postal service to forward the mail for the Debtor entity.  In this case, I caused the forwarding to be done on February 5, 2026, from the address listed on the bankruptcy petition (PO Box 1000, Julian, California) to my business address of 5656 La Jolla Blvd, La Jolla CA  92037.

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

IN RE VILLA CHARDONNAY HORSES WITH WINGS       6       GLADSTONE DECLARATION
CASE NO. 25-04245-JBM11

27.     From my review of the case docket and the corporate records of the Debtor entity, I learned that Kerber and Flores were the corporate officers of the Debtor prior to my appointment.   I further learned that Kerber and Flores were living at the main house (the "**Main House**") on the Property.

28.     Based on my experience in other cases, upon learning that Kerber and Flores were receiving personal mail at the business address for the Debtor, I cautioned Kerber and Flores that they should immediately obtain a separate mailing address for their personal mail.  This is because, although I only requested a forwarding of mail addressed to Villa Chardonnay, at times (in my experience), the Post office may forward all mail from the corporate address.

29.     Indeed, I did receive several items of mail addressed to Flores and/or Kerber.  I personally delivered this mail to the Main House, as close as reasonably possible to when received.  When I delivered this mail, I again admonished Kerber and Flores to obtain a separate mailing address.  I also confirmed this requirement in writing on at least one occasion.

30.     To my knowledge, no separate mailing address was ever obtained by Kerber or Flores.  Instead, and incredibly, it appears that Kerber and/or Flores at some point caused the forwarding of the mail for Villa Chardonnay to be canceled such that the Estate was no longer receiving any Villa Chardonnay mail.  This was without my permission.  In fact, I did not even receive notice that the mail had been redirected until June 9, 2026 when Perez and Flores simply included in emails to me that the mail forwarding issue "has now been corrected".  At no time has either Perez or Flores provided me with any of the redirected mail of Villa Chardonnay.

31.     It is crucial that I obtain the mail of Villa Chardonnay in order to successfully operate the Case.  Without the mail forward, many of the ongoing bills for the Property may be lost, as well as communications from creditors, government officials or emergency responders.  Especially since Perez and Flores

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

are not providing me any information and are at this point entirely uncooperative, the situation that they have caused regarding the mail is entirely untenable and violates the automatic stay by exercising control over assets belonging to the Estate.

32.     In addition to the foregoing, the Court has specifically found that Kerber and Flores received adequate notice of all proceedings in the Bankruptcy Case and the Adversary Proceeding.

33.     Admittingly, service in the Case and in the Adversary Proceeding has been problematic because neither Kerber nor Flores ever obtained their own mailing address as instructed by me on numerous occasions.

34.     Consequently, in addition to personal service of many key matters, I routinely copied Kerber and Flores with copies of all pleadings to their personal emails.  We also mailed multiple items to either the 4554 Boulder Creek Road and/or the 4430 Boulder Creek Road addresses and both Kerber and her attorney are listed as electronic notice recipients.

35.     Significantly, neither Kerber nor Flores have ever alleged that they did not get *actual* notice of every significant pleading in the Bankruptcy Case and Adversary Proceeding.  Moreover, each has taken an active part at all stages of these proceedings and on many occasions, Kerber and Flores actively evaded service, such that, on one occasion, the documents had to be placed on the windshield of the Kerber/Flores vehicle as they were driving out of the garage at the Property.

36.     Also, each of these arguments were already made in Flores's Emergency Motion to Strike, Vacate, Stay or Limit Relief Based on Defective Proofs of Service, Inaccurate Address Filings, Mail Interference and Lack of Meaningful Notice (the "**Motion to Strike**") filed by Flores on June 17, 2026.

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

IN RE VILLA CHARDONNAY HORSES WITH WINGS          8                    GLADSTONE DECLARATION
CASE NO. 25-04245-JBM11

37. In my opposition to the Motion to Strike and accompanying Declaration, I detailed each of the service efforts and the meaningful participation of Flores in the Adversary Proceeding.

38. The Court also detailed my efforts to provide notice to Flores and the meaningful participation of Flores in the Adversary Proceeding and denied the Motion to Strike on June 23, 2026.

**Operations/Animal Seizure/Undisclosed Employees**.

39. On January 30, 2026, the day after my appointment, I met with Kerber at the Property in order to understand any urgent matters and to adequately plan for my operations. During that visit, Kerber gave me a tour of the Property but would not consent to my viewing of the Main House where apparently the records of Villa Chardonnay were located. Kerber informed me that she and Flores live at the Main House, although they do not have a lease and do not pay any rent for their occupancy. We also discussed Kerber's supposed plan for the Property and that she intended to pay all of the claims in the Case within 1-3 weeks.

40. To be respectful of their living space, I arranged a second meeting which included Totaro and my consultant Wiemann. At that second meeting on February 6, 2026, I was permitted entry to the Main House, containing the "business office" of Villa Chardonnay.

41. Alarmingly, Kerber informed Wiemann and me during the meeting that Kerber and Flores recently had shredded the vast majority of Villa Chardonnay's records because they were kept in garbage bags and there was "just too much paper."

42. The only business records I was able to recover during that visit were the feed and supply receipts since my appointment date, which I had specifically mandated to be provided daily (they were not provided daily, as requested, but a small stack of them was waiting for me at this meeting).

FINANCIAL LAW GROUP 5656 La Jolla Boulevard La Jolla, California 92037

43.    Notwithstanding the extreme deficiency of business records, in my early operations of this case, I allowed Kerber and Flores to continue to care for and feed the animals, based primarily on Kerber's representation that she needed only a maximum of three weeks to come up with sufficient funds to pay all of the creditors in the Case.

44.    When this funding did not come to pass, I still cooperated with Kerber and Flores but informed them that I would need to follow "parallel paths" of administration.  In other words, I would continue to allow them to care for the animals and to work towards this supposed funding for the creditors but would also need to take steps towards relocating the animals and selling the Property.

45.    During this time, I continued to communicate with Kerber and Flores via text and email on a daily basis as to their caring and feeding of the Animals and I obtained daily receipts as to the number of volunteers on the Property and the feed/supply receipts from donors.

46.    I also began speaking with various non-profit agencies and shelter organizations about the Animals.  I arranged for a veterinary team to examine various of the Animals, in order to gauge exactly what would be required to re-house the several animal species on the Property.

47.    I also continued to monitor the condition and activities at the Property, by direct visits of me and/or Wiemann, to verify that the daily reports of animals and operations were accurate.

48.    On two separate occasions during this initial time, I and/or Wiemann observed at least ten dogs in the area just outside of the Main House, despite Kerber having promised me that she was not housing any dogs on the Property. This was an important factor because dogs in that magnitude must have adequate shelters (there were none visible) and also dogs were excluded from coverage on the liability insurance for Villa Chardonnay.

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla. California 92037

49. On another occasion, there were at least ten cats in the master bedroom, the toilet was clogged with human feces and there was evidence of multiple cat feces in the bathtub.

50. San Diego Humane Society ("**SDHS**") was one of the shelter organizations that I began speaking with in April, 2026. Initially, SDHS was potentially interested in receiving approximately 100 of the cats on the Property and so arrangements were made for SDHS to visit the cattery.

51. Jace Huggins ("**Huggins**") was the primary officer attending this initial visit and based on his review, he then also requested to view all of the Animals on site.

52. Around this same time, the vet reports came in from the veterinary team examinations.

53. The results of the SDHS inspections and vet reports were alarming; many of the Animals were determined to be receiving inadequate care. As a result of its own inspections and review of the vet reports, SDHS informed me on April 28, 2026, that its intention was to obtain a warrant to seize all of the Animals on site. (the "**Seizure**").

54. On April 30, 2026, the California Superior Court (the "State Court") issued a warrant (the "**Warrant**") ordering the Seizure of the Animals, the Honorable Judge Polly Shamoon, presiding. I was notified that the Warrant had been issued and was provided a copy to review during the Seizure. A copy of the Warrant issued by the State Court is attached as Exhibit A and incorporated herein

55. Upon issuance of the Warrant, I filed a request for an emergency hearing with the Court on May 1, 2026 to approve a stipulation with SDHS (the "**SDHS Stipulation**") granting SDHS some requested assurances as to the animals being property of the estate and that relief from stay to carry out the Seizure was approved. The Court held a hearing on May 1 2026 at 3:00 pm and the SDHS Stipulation was approved in its entirety.

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

IN RE VILLA CHARDONNAY HORSES WITH WINGS    11    GLADSTONE DECLARATION
CASE NO. 25-04245-JBM11

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

56. The Seizure occurred on May 1, 2026.

57. At the time of the Seizure, there were approximately 30 dogs and 14 cats located inside the Main House.

58. In the exercise of my business judgment, I cooperated and continue to cooperate fully with the Warrant and Seizure and the continued involvement of SDHS with the Animals.

59. During the Seizure, two men visited the Property who claimed they were landscape employees of Villa Chardonnay. The two gentlemen admitted that they were not legal to work in the United States. I advised them that I could not allow them to work and that they needed to leave. Upon Kerber's confirmation, I allowed them to pick up some of their landscape tools which they had left on the Property two days previous when they were working there. At no time have any records been provided to me as to employee files. Kerber at all times vehemently insisted to me that Villa Chardonnay never had employees and that she had never allowed anyone to work illegally on the Property.

60. On an earlier occasion, I also observed what appeared to be Kerber and Flores providing accommodation to employees in the guest house. When I visited the guest house, one of the rooms appeared to have had someone recently sleeping there. Consequently, on February 24, 2026, on a visit when the guest house was empty, I caused the locks to be changed to ensure there were no further security transgressions.

**Eviction Notice**.

61. Contemporaneous with setting up the initial vet examinations and inspections and due to the failure of Kerber's alleged funding scheme, I began the process of eviction for Kerber and Flores. On February 24, 2026, I effectuated personal service on Kerber and Flores and posting on the Main House of my termination of any tenancy rights of Kerber, Flores and any other occupants of the Main House (the "**Termination Notice**").

62.     The Termination Notice provided Kerber and Flores with sixty days notice of termination commencing on February 24, 2026 and concluding on April 24, 2026.

63.     The Termination Notice allowed the time period to commence for eviction while still allowing for the Estate to cooperate with Kerber and Flores if they were able to accomplish the funding that they continued to maintain was imminent.

64.     Unfortunately, the funding promised by Kerber and Flores never came to pass and when it became clear to me that Kerber and Flores were just stalling for time and that they were not going to cooperate with voluntarily vacating the Property, I filed the Complaint for (1) Turnover of Real Property of the Estate and (2) Issuance of Writ of Execution for Possession of Real Property on April 6, 2026 (the "**Turnover Complaint**").

65.     In addition, during this time, Kerber had ceased using the DIP account for deposits and expenses.  Instead, they had donors provide feed donations by gift cards, donations in kind, and likely undisclosed cash donations. Other than the funds received from the post-petition financing and one trust estate distribution, there were no ongoing funds being deposited into the DIP account or my estate account.  It became increasingly clear to me that there was no other option for this case other than to relocate the animals and sell the Property, in order to provide some benefit to the creditors of the Estate.

**Turnover Complaint, TRO and Preliminary Injunction**.

66.     As stated above, I caused to be filed the Turnover Complaint against Kerber and Flores on April 6, 2026.  The Turnover Complaint was personally served on Kerber and Flores on April 8, 2026.

67.     Kerber answered the Turnover Complaint on May 5, 2026 (the "**Kerber Answer**").

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

IN RE VILLA CHARDONNAY HORSES WITH WINGS        13        GLADSTONE DECLARATION
CASE NO. 25-04245-JBM11

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

68.     Flores initially defaulted the Turnover Complaint, but the Court granted her Motion to Vacate the Default on June 12, 2026.  Flores then filed her answer on June 17, 2026 (the "**Flores Answer**").

69.     After the Seizure, SDHS was permitted daily access to the Property, tending to various animals that were not well enough for transport, making arrangements with prior owners desiring to re-acquire their animals and coordinating temporary or permanent housing for the animals now in their care (the "**SDHS Operations**").  The SDHS Operations required daily dispatch of various volunteers and officers to the Property, tending to and arranging vet care and safe transport for those of the Animals that remained through and including July 15, 2026.

70.     Multiple reports were provided to me by SDHS alleging interference by Kerber and Flores with the SDHS Operations.

71.     As a result of this interference, I caused to be filed the *Emergency Application of Chapter 11 Trustee for Temporary Restraining Order and Issuance of Order to Show Cause Why Preliminary Injunction Should Not Issue Against Defendants to Prevent Dissipation or Destruction of Estate Assets, and Related Orders*, (the "**TRO Application**," Adv. ECF No. 13) which was served on May 8, 2026.  On May 11, 2026, the Court held an emergency hearing on the TRO Application, and it was granted in its entirety.  The order on the TRO Application (the "**TRO Order**") was personally delivered to Kerber and Flores and also served by electronic mail on May 13, 2026.

72.     Thereafter, the Court held a hearing (after shortening time) on Trustee's *Motion (1) To Compel Turnover of Property of the Estate; (2) for Writ of Execution to Compel Defendants to Vacate Property, with Assistance of U.S. Marshals; and (3) to Advance the Trial on the Merits and Consolidate with the Preliminary Injunction Hearing* (the "**Consolidation Motion**") on May 21, 2026. The Court ordered consolidation of the preliminary injunction hearing with the

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037

trial and issued the preliminary injunction (the "**Preliminary Injunction Order**"). The Preliminary Injunction Order was served by the Court on Kerber and Flores on May 27, 2026.

**Status of the Main House and Property**.

73.     On May 26, 2026, I visited the Main House with my proposed broker and their contractors.  My inspection of the Property was initially thwarted when Kerber and Flores served me with a document that appeared to be a temporary restraining order and then called the Sheriff alleging that they had a temporary restraining order against me.  The Sheriff came to the Main House and questioned me on my right to be there and whether I was in violation of this supposed order.  A further look at the alleged document, however, revealed that it was not a restraining order and in fact was not an order at all.  As such, the Sheriff told me I could proceed.

74.     I found the Main House to again be in severe disrepair.  Although it was apparent that Kerber and Flores had done a lot of tidying since my last visit to the Main House, the smell of animals remained pungent, and the Main House continued to be in a dilapidated state.

75.     I also continued to receive complaints from SDHS as to interference by Kerber and Flores.  I am informed and believe that several vets and volunteers have declined to return to service at the Property, given the curses and other actions performed by Flores.  Also, on several occasions, I received reports that there were shut offs to the water system in certain areas of the Property that were not caused by SDHS.  These water shut offs jeopardized the Animals in that region of the Property.  On another occasion, I received a report that a person dressed in black was observed near a water shut off valve at the Property.

76.     In my professional opinion, occupation of the Main House by Perez and Flores was severely detrimental to the Estate, SDHS and the Animals.  Their

IN RE VILLA CHARDONNAY HORSES WITH WINGS        15                    GLADSTONE DECLARATION
CASE NO. 25-04245-JBM11

occupation provided absolutely no benefit to the Estate and, at a minimum caused further disrepair and neglect to the Estate's assets and further expenses involved in the Kerber and Flores eviction.

77.    The only property of the Estate with any value is the Property, which has a value of between $2.5 million and $3.6 million.  A review of the Schedules shows that Debtor acknowledges secured claims totaling at least $6,627,811.66. [ECF No. 1, p. 8]  It is clear that Debtor is hopelessly insolvent and there will be no surplus in this Estate.  Indeed, there would be no value at all for the creditors of the Estate but for my work negotiating carve outs with secured creditors to maximize the likelihood of a meaningful distribution to undersecured and unsecured creditors.

78.    In my business judgment, sale of the Property is in the best interests of the Estate and the only way to provide a distribution to creditors in the Case.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 5, 2026, at La Jolla, California.

    /s/ Leslie T. Gladstone    
Leslie T. Gladstone

FINANCIAL LAW GROUP
5656 La Jolla Boulevard
La Jolla, California 92037