Leslie T. Gladstone, Esq.  (SBN 144615)
Christin A. Batt, Esq.  (SBN 222584)
Hilda M. Montes de Oca, Esq. (SBN 287605)
FINANCIAL LAW GROUP
5656 La Jolla Blvd.
La Jolla, CA 92037
Telephone:  (858) 454-9887
Facsimile:  (858) 454-9596
E-mail:  HildaM@flgsd.com

Attorneys for Leslie T. Gladstone, Chapter 11 Trustee

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>VILLA CHARDONNAY HORSES WITH WINGS, INC.,<br><br><br>Debtor. | Case No.:  25-04245-JBM11<br><br>**NOTICE OF ERRATA TO DECLARATION OF LESLIE T. GLADSTONE IN SUPPORT OF OPPOSITION TO MOTION TO REMOVE TRUSTEE**<br><br>Date:  August 26, 2026<br>Time:  10:00 a.m.<br>Dept.        Two (2)<br>Honorable J. Barrett Marum |

TO THE COURT AND ALL INTERESTED PARTIES:

PLEASE TAKE NOTICE that Leslie T. Gladstone, chapter 7 trustee (the "**Trustee**"), hereby files this notice of errata to the Declaration of Leslie T. Gladstone in Support of Opposition to Motion to Remove Trustee (the "**Declaration**") to include Exhibit "A" that was, in error, omitted from the filing of the Declaration with

1        IN RE VILLA CHARDONNAY HORSES WITH WINGS, INC. , CASE NO. 25-04245-JBM11
NOTICE OF ERRATA TO DECLARATION OF LESLIE T. GLADSTONE IN SUPPORT OF OPPOSITION TO MOTION TO
REMOVE TRUSTEE

the Court on August 5, 2026 (ECF No. 255-1). See Exhibit "A" attached hereto and herein incorporated by reference.

Respectfully submitted,

Dated:  August 5, 2026                         FINANCIAL LAW GROUP


By:   /s/ Hilda Montes de Oca
       Hilda Montes de Oca, Esq.
       Attorneys for Leslie T. Gladstone,
       Trustee

2          IN RE VILLA CHARDONNAY HORSES WITH WINGS, INC. , CASE NO. 25-04245-JBM11
NOTICE OF ERRATA TO DECLARATION OF LESLIE T. GLADSTONE IN SUPPORT OF OPPOSITION TO MOTION TO
REMOVE TRUSTEE

# Exhibit A

# Exhibit A

Docusign Envelope ID: C8CDA194-2C37-65A4-8175-B46BF70CE9DB

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

## COUNTY OF SAN DIEGO

### AFFIDAVIT FOR SEARCH WARRANT

### No. 2604301040-OTH-PHS-US-USW

I, **Jace Huggins**, a law enforcement officer/agent or otherwise qualified affiant employed by **San Diego Humane Society** do on oath make complaint, say and depose the following on **04/30/2026** that I have substantial probable cause to believe and I do believe that I have cause to search:

### WARRANT REQUEST

### LOCATION, PROPERTY, AND/OR PERSON[S] TO BE SEARCHED

With the assistance San Diego Sheriff's Department, San Diego County Department of Animal Services, California Licensed Veterinarians including sheltering and private vets, field and staff teams from local shelters, the Large Animal Group CART (Community Animal Response Team), all individuals to be identified and listed in the investigative report.

A. The premises and all parts therein, including all rooms, attics, basements, cellars, crawl spaces, safes, mail receptacles, storage areas, refrigerators, freezers, containers, surrounding grounds, pastures, animal yards, trash containers, barns, garages and outbuildings assigned to, or part of the residence and property located at 4554 Boulder Creek Road, 0 Eagle Peak Rd. and 4430 Boulder Creek Rd., Julian, CA 92036 ("Villa Chardonnay Horses With Wings, INC.") dwelling and land currently occupied by Monika Kerber and Mercedes Flores. The property to be searched is three rural parcels consisting of approximately forty (40) acres, located in the County of San Diego, State of California, and commonly accessed via Boulder Creek Road. Ownership of all

Exhibit A
2 of 25

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

three parcels has been confirmed as "Villa Chardonnay Horses With Wings, INC." via the county assessor website. The property is entered through a large gate situated along Boulder Creek Road, which provides primary access to the parcel. There are two additional gate access points, one approximately .25 miles south from the first main entrance and the other at the Northwest back end of the property which opens out to Eagle Peak Rd. The property contains a two-story, single-family residence of approximately 4,706 square feet, which serves as the main dwelling. In addition to the primary residence, the property includes multiple outbuildings, including but not limited to barns, storage structures, sheds, and other auxiliary buildings. The parcel consists of multiple fenced and unfenced pasture areas, corrals, and enclosures used for the housing and containment of animals. The property includes all structures, outbuildings, barns, sheds, trailers, vehicles, containers, and enclosures located within the boundaries of the parcel, as well as any open land, pastures, or areas where animals may be housed, kept, or concealed. This warrant authorizes the search of the entire property, including the main residence, all outbuildings, barns, structures, vehicles, and any areas under the control of the occupants where evidence or animals described in this warrant may be located.

## ITEMS TO BE SEIZED

For the following property, to wit:

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

1.  Any ill, injured, unborn, or deceased animals that are found above ground or underground.

2.  Any and all animals located on the property, including but not limited to horses, cats, dogs, livestock, poultry, and any other domestic or exotic animals.

3.  Any animal exhibiting signs of neglect, malnutrition, dehydration, illness, injury, or lack of veterinary care.

4.  Any deceased animals, carcasses, skeletal remains, or animal parts, whether buried, stored, or otherwise concealed.

5.  Any structures, enclosures, cages, stalls, pens, or fencing used to confine animals that are unsafe, unsanitary, or inadequate.

6.  Any accumulations of feces, urine, waste, trash, or hazardous debris impacting animal health and welfare.

7.  Any food or water sources, including feed, hay, grain, supplements, feeding devices, or watering devices, that are spoiled, contaminated, insufficient, or otherwise inadequate.

8.  Any animal feed, hay, grain, supplements, or other nutritional provisions, whether adequate or inadequate, as evidence of care or neglect.

9.  Any veterinary medications, pharmaceuticals (prescription or non-prescription), syringes, needles, medical equipment, or treatment supplies.

10. Any records or evidence reflecting the administration or lack of administration of veterinary care or medical treatment.

11. Any veterinary records, treatment logs, vaccination records, or medical histories for animals located on the property.

Page **3** of **18 2604301040-OTH-PHS-US-USW**

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

12.    Any breeding records, ownership documents, bills of sale, transfer records, or adoption paperwork.

13.    Any financial records related to the care, acquisition, sale, or maintenance of animals.

14.    Any logs, notes, journals, calendars, or written documentation reflecting animal care practices.

15.    Any computers, tablets, cellular phones, digital storage devices, cameras, or surveillance equipment capable of storing electronic evidence.

16.    Any digital files, including photographs, video recordings, emails, text messages, or social media content depicting animals, their condition, or their care.

17.    Any equipment used in the care, restraint, transport, or handling of animals, including but not limited to halters, leads, cages, crates, trailers, or transport vehicles.

18.    Any tools, implements, or instruments used to inflict harm on animals or facilitate neglect.

19.    Any soil, water, feed, or environmental samples necessary to assess conditions affecting animal health and welfare.

20.    Any hazardous materials, toxins, chemicals, or unsafe structural components impacting the safety and welfare of animals.

21.    Any tags, microchips, branding equipment, or other animal identification tools.

22.    Any documents or items establishing ownership, possession, custody, or control over the animals or property, including utility bills, leases, or correspondence.

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

23.    Authority to photograph, video record, and otherwise document the condition of the animals and property, and to collect forensic evidence related thereto.

24.    All animals contained within the residence.

## AFFIANT'S QUALIFICATIONS

I am the Vice President and Chief of Humane Law Enforcement for the San Diego Humane Society (SDHS). I am a Humane Officer appointed and confirmed by the Superior Court of California, County of San Diego, pursuant to California Corporations Code section 14502. I have more than 27 years of combined experience in veterinary medicine and animal law enforcement. My 14-year career in animal law enforcement includes serving as an Animal Control Officer, Senior Animal Control Officer, Chief of Field Services, and currently Chief of Humane Law Enforcement. During this time, I have personally investigated or overseen no less than 50 animal hoarding cases, including multiple investigations that resulted in criminal charges and convictions.

I spent 12 years in the field of veterinary medicine as a technician and manager. Six (6) years of this tenure were dedicated specifically to Emergency and Critical Veterinary Medicine, including service as an Animal Health Technician III at the University of California, Davis (UC Davis) Small Animal Teaching Hospital Intensive Care Unit (ICU). This experience provides great insight into

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

my position as a Humane Officer as I understand not only the laws related to animal crimes but also have a deep understanding of animal physiology and an ability to recognize illness and injury more readily than someone without my extensive experience.

I serve as the Director of the California Animal Law Enforcement Academy, which is one of only three such academies in the State of California. In this capacity, I oversee the curriculum and instruction for the certification of both Animal Control and Humane Officers from across the state. This academy is approved by CalAnimals (California Animal Welfare State Association) and the California Veterinary Medical Association.

I am the Vice President of the National Animal Care and Control Association (NACA) and serve on the Training Committee for CalAnimals.

I am a California P.O.S.T. Certified Instructor in Principled Policing, specializing in procedural justice, bias awareness, and ethical enforcement standards. As an Instructor for the Humane World For Animals Law Enforcement Training Center, I develop and teach advanced curricula regarding Large-Scale Impounds and Animal Hoarding, Blood Sports, Animal Cruelty Investigations, Report Writing, and Community Oriented Policing.

In addition to the above credentials, I have been requested or selected to speak at both National and International Animal Welfare and Law Enforcement conferences and events. I have taught or presented at more than 50 conferences, academies, or online teaching entities such as Justice Clearinghouse (an online Learning Management System for Law Enforcement Professionals), Maddie's University, NACA, CalAnimals, and Code 3 Associates.

**PROBABLE CAUSE**

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

During the course of my duties, I have obtained the following information through my investigation, including witness statements, personal observations, and my professional training and experience. These findings are based on my direct observations, review of records maintained in the ordinary course of business, and interviews conducted to date. Additionally, I have relied upon my specialized knowledge, training, and experience in animal welfare and veterinary medicine in forming the conclusions set forth herein.

On 04/13/2026, I was made aware of a request for San Diego Humane Society (SDHS) to assist with the vaccination and transport of approximately 350 cats, from a sanctuary called "Villa Chardonnay" (VC), to the Humane Society of North Texas. I was aware of VC from multiple inquires by both advocates in the San Diego Area and prior County Department of Animal Services (DAS) Leadership. I had been advised of concerns related to the sanctuary, specifically that there were neglected and suffering horses on the property. I had never visited the property or initiated an investigation, as DAS had advised they had an open case they were investigating and they were the jurisdictional authority at that time. As of Friday, 04/24/2026, DAS has requested San Diego Humane Law enforcement take over the investigation. I received a large file on the Villa Chardonnay property from DAS which included many welfare calls and concerns for the animals on the property.

During the 04/13/2026 meeting, I inquired as to ownership of the cats, as prior experience had shown me that not every conservatorship case (which this was described to me as) included the animals on the property and I wanted to ensure we had legal authority to remove the cats from the property. I was directed to Shelter PALS attorney Bruce Wagman to help provide the background and aid in getting ownership confirmation as he was working with the Bankruptcy Trustee, Leslie Gladstone. During that time frame I was also advised that there were an estimated 200-250 horses and 70 livestock on the property. The 70 livestock had a plan in place to be transferred to a Central California rescue approved by the Bankruptcy court. Pathway planning for the horses was unclear

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

and we were asked to help with the cats. I was also advised that the owner , Monika Kerber, was set to be evicted, though a date was unclear. While the owner is still reportedly going to be evicted (her primary residence is on the property owned by the non-profit) it is still unclear as to when and there is a possibility that if Kerber locates funds to par creditors she may be allowed to stay on the property.

In the following days I connected with Wagman as well as Jeff Wiemann (the hired contractor for Gladstone that was appointed to assist with on-property oversight and expertise in 501(c)3 bankruptcy). Wagman worked with Gladstone on the matter of ownership and a site visit was set up for me, two veterinarians, Dr. Zarah Hedge, Chief Medical Director, SDHS and Dr. Brie Sarvis, Director of Animal Services for DAS as well as DAS Deputy Director of Animal Services, Kendra King. The site visit was arranged for 04/15/2026. I was advised that we would only be able to see the cats while on site.

On 04/15/2026, I, the Veterinarians and King arrived on scene at 4554 Boulder Creek Road in Julian, California at around 1110 hours. We were met by Wiemann who directed us to the cattery area, which was the only area we were allowed to access that day. Upon walking into the cattery area, I immediately ascertained that the housing area the approximately 350 cats were living in was far too small for that large number of cats. I also noted that there was a woman inside the cattery cleaning, later identified as Kerber. There was an odor, however due to some open windows as well as open air portions of the housing set up and incense that was burning in the cattery, the odor was not, at that time, overwhelming.

As we looked around the cattery, I identified multiple cats that appeared ill or exceptionally underweight. I was able to pet and briefly handle an orange tabby cat that had a Body Condition Score of 1/9. Body Condition Score (BCS) is a widely accepted veterinary/animal welfare tool used to assess an animal's nutritional status and overall health (see Supplemental Attachment A

for Purina Body Score Chart). It is typically measured on a 9-point scale, where: 1 indicates severe emaciation, 4–5 indicates ideal body condition, and 9 indicates obesity.

In animals with low BCS scores (1–2/9), physical findings commonly include visible ribs, spine, and pelvic bones; loss of muscle mass; minimal subcutaneous fat; and, in advanced cases, weakness or systemic compromise.

Based on my training and experience as a Veterinary Technician, including six years in emergency and critical care settings as well as multiple hands on trainings, I have received in evaluating BCS from licensed Veterinarians (most recently in 2025 when I attended the Oregon Animal Control Conference and participated in both Domestic Pet and Equine hands on Body Conditions Scoring classes), I evaluated the orange tabby as well as multiple other cats involved in this matter using these criteria. I identified at least 5 cats that presented with body condition scores consistent with emaciation, including visible skeletal structures, muscle wasting, and poor overall condition. The Veterinarians who attended with me did more hands-on assessments as I was primarily evaluating overall living conditions and speaking with Kerber and Wiemann. In my professional opinion, such BCS findings are not consistent with adequate or minimally acceptable standards of care and are indicative of prolonged inadequate nutrition and/or failure to provide necessary care.

I noted that more than half of the cats were exhibiting signs of mild to moderate upper respiratory infection (URI). This is commonly seen in situations where cats are overcrowded, and disease is able to spread unchecked in the population due to proximity and stress. The veterinarians on site with me confirmed that the cats were suffering from URI symptoms. I noted one kitten, a small gray domestic long hair (DLH) that appeared to be sicker than the other cats. The kitten was holding its back hunched up and appeared to be walking oddly and lethargically. I pointed the kitten out to Monika and Wiemann and advised them that the kitten needed to be seen by a vet immediately. Kerber acknowledged me and confirmed she would get the kitten care. As of the date

Exhibit A
10 of 25

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

of this writing, I have received no confirmation that this kitten received veterinary evaluation or treatment.

While in the cattery, Kerber shared with us that she had two veterinarians helping her with the cats. Both are named Dr. Flores. One works at Julian Pet Clinic and the other at Perris Valley Veterinary Clinic. Kerber stated that all the cats are FelV and FIV tested and she confirms they are negative prior to bringing them into the cattery. Kerber also stated all cats are spayed or neutered at her home by Dr. Flores (she would not specifically say which Dr. Flores).

I later called both Dr. Flores' and received calls back from both who shared they have not been providing on-site sick pet care for any of the cats. Neither vet had a recent record for any cats.

During our site visit, Kerber and Wiemann represented that only two dogs were present on the property. However, records subsequently obtained from Dr. Fores of Perris Valley Veterinary Clinic reflect that approximately 15 dogs were vaccinated for Kerber in early March 2026. The whereabouts of the remaining thirteen dogs are presently unknown. This discrepancy raises concerns regarding the potential transfer or concealment of animals prior to our inspection.

While onsite we also located two confined areas with a Queen (mother cat) and kittens. I asked Kerber if she planned to adopt out the kittens to keep her population down. She shared the following statement in summary:

*I do not do adoptions, I don't know that they will go to good homes. Once they are here, they stay here for life. My volunteers will socialize them as they grow and they will stay here forever.*

Other confined cage areas were scattered throughout the cattery and housed very old, sick, injured, or more aggressive cats. Kerber explained that one confined area housed a paralyzed cat, and others had cats in them that would fight with the general population if let out.

Exhibit A
11 of 25

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

While Villa Chardonnay does claim to be a sanctuary, the idea that one would feel it is better for kittens to grow up in an overcrowded cattery with 350 other cats vs. being adopted out into a new home, is highly concerning and not in line with many of the core values and beliefs most animal welfare professionals hold. Kerber's statement and conduct, like refusal to adopt out animals, active denial of welfare indicators during the visit, and her pattern of continued accumulation of animals despite inadequate resources, space, and veterinary care, are consistent with behavioral patterns I have observed or learned about in other investigations, and they are exploitive in nature.

Based on my experience working over 50 large scale animal investigations as well as my training at conferences and specialized seminars, I have learned of recurring behavior patterns in certain hoarding-type cases, specifically those involving larger populations of animals maintained under the label of a "rescue" or "sanctuary." In my professional experience, these cases often present with specific investigative challenges:

- **Public Representation vs. Actual Condition:** There is often a significant disparity between the public-facing representation of the facility (e.g., social media, fundraising, or "sanctuary" branding) and the actual physical conditions observed during a site inspection.

- **Active Denial of Welfare Indicators:** I have observed that in these specific patterns, the caretaker may demonstrate an active pushback against objective welfare markers—such as low Body Condition Scores (BCS) or unsanitary environments—by re-framing neglect as "specialized care" or "end-of-life sanctuary."

- **Prioritization of Accumulation:** In these patterns, the act of continued intake and animal retention appears to be prioritized over the facility's actual capacity for care and the provision of the Five Freedoms.

By documenting these patterns, I am not providing a psychological diagnosis of the individual, but rather an investigative assessment of how these behaviors directly correlate to the

Page **11** of **18 2604301040-OTH-PHS-US-USW**

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

failure to provide minimally adequate care. In my professional opinion, when a caretaker's focus shifts toward the accumulation of numbers (such as 300+ cats, 200+ horses and 70+ livestock) and away from individual animal welfare, the risk of systemic neglect increases exponentially.

While I was talking to Kerber, two different cats happened to use the litter box. Both cats were observed to have liquid diarrhea, which is not consistent with normal health, based on my training and experience in veterinary medicine and animal welfare. The presence of identical clinical signs in multiple animals indicates that the condition is not isolated to a single animal, but is more likely associated with a shared environmental, infectious, or husbandry-related factor affecting a larger portion of the population. Similar to the large number of cats who had upper respiratory symptoms.

At the end of the visit on 04/15/2026, I asked Wiemann to connect me with the Bankruptcy lawyer, Leslie Gladstone as I had major concerns about the environment and needed to discuss the ownership status so we could move forward with getting the cats care. Wiemann confirmed he would connect us. We had previously texted regarding the inspection date and time, so I was aware he had my contact information. I followed up with Wagman and he advised that he had already requested that Gladstone get the ownership of the cats clarified by the Judge.

Early the following week I had not been contacted by Wiemann or Gladstone. At that time Wagman connected me with the lawyers working on the situation, as well as Trustee Gladstone. Gladstone and I emailed on 04/22/2026 and arranged a call for later that day, I provided Gladstone my direct cell so we could connect. I attempted to call Gladstone later that evening and left a message. Earlier that day Wagman had requested that I be permitted to join the large animal veterinarians that were going to be onsite assessing the livestock and equines on the 04/23/2026. Gladstone denied the request.

On 04/24/2026 I heard both from Gladstone and Grace Wainscoat with Greenfire Law Firm who is representing The Humane Farming Association (HFA) and the veterinarian sent to assess the

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

animals on 04/23/2026 had located a horse on the property in extremely poor condition. The Veterinarian advised the horse needed to be euthanized within 1-3 days which would have been by the end of the day of 04/26/2026 due to being down, as well as being in poor overall condition. Based on my training and experience, a "down horse" (one that cannot stand up) is a critical emergency. Because horses are heavy, their own body weight can crush their muscles and internal organs while also preventing their lungs from expanding properly to breathe. Furthermore, horses must be upright and moving for their digestive systems to function; when a horse is down, their digestion often shuts down (colic), which is extremely painful and frequently fatal. In my professional opinion, a horse that is unable to stand and is not receiving immediate help is suffering and at immediate risk of death. On the morning of 04/26/2026, I contacted Wiemann for confirmation the horse had received care.

I spoke to Gladstone via phone the morning of 04/27/2026 and expressed my concern related to the horse not being provided care when a veterinarian was explicit in their concern. Gladstone eventually agreed to let me back on the property to view the horses that evening.

I and SDHS Sgt Susie Blackburn arrived at Villa Chardonnay and met the Trustee Gladstone and Contractor Wiemann. They provided full access to the property. While on property we counted approximately 150 horses (an exact count is difficult as many of the horses are in large pastures and move around. There are also multiple pasture areas with dense tree cover that make it difficult to determine if horses were present) 50 varying livestock (poultry were also difficult to count an exact number) and the same approximately 350 cats that were present previously.

While on property we noted the following:

1) In the sheltered area adjacent to Boulder Creek Rd there is a down horse named "Cricket" This is the horse the Large Animal Veterinarian, Dr. Laramie Winfield, had advised on 04/23/2026 needed immediate vet care and most likely needed humane euthanasia.

2) A white (possibly gray) horse in the barn had its hoof growing the wrong direction. The only way the horse could balance or move was by walking on the front fetlock (the front of its ankle) with its foot twisted underneath. The horse would almost fall over every time it took a step.

3) About a third of the horse population (if not more) lacked basic hoof husbandry. Even in large pastures, horses rarely travel enough distance over varied terrain to naturally wear their hooves down at the same rate they grow. Without regular trimming, hooves can become overgrown, leading to cracking, splitting, and chipping, which may result in infection or lameness. Many of the horses on the property are lame, some severely.

4) A Pinto horse in the barn with a gash on its front of the left fetlock. It is likely the injury occurred due to the poor and dangerous conditions of the fencing on the property. When asked about the injury, Kerber stated it had just happened that day. However, in a subsequent interview with Dr. Winfield she confirmed the injury had been there on the 4/23/26 The injury appeared dirty and did not seem to have received any care.

5) A white cat in the second cattery that was missing its entire right ear. The area where the ear should have been, appeared moist and to possibly be infected or chronically inflamed. When asked about vet records, Kerber could not provide any or the name of a vet that has seen the cat.

6) The gray kitten I had advised needed vet care on the 4/15/26. The kitten was still walking hunched over and its right eye was now completely swollen shut with what appeared to be purulent discharge.

7) The mother cat with kittens we had seen on 4/15/26 in the second cattery was still in the small cage with the kittens. The mother cat appeared to have severe congestion

Exhibit A
15 of 25

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

and was having difficulty breathing correctly. She had to breathe with an open mouth and was making a snorting sound when ever tried to breathe.

8) An orange domestic medium hair in the first cattery with a wound on its neck. The wound was open and there appeared to be deep pockets within the neck musculature that were hollowed out.

9) A black and white domestic long-hair cat in the first cattery with so much matting on it that the mats appeared to form a shell from its neck to its tail and along it's sides.

10) A black and white domestic short hair in the first cattery that had a BCS of 1/9 with hair loss and an unsteady gait.

11) A white with brown tabby domestic short hair in the first cattery with a grossly swollen right ear. There appeared to be a wound at the back base of the ear and the swelling was along the right side of the face leading to the right eye. The right eye appeared red and inflamed as well as misshapen, possibly from the swelling.

As described from the first visit, most of the cats are unkempt, have matting and upper respiratory concerns all of which are likely secondary from the hoarded conditions and their lack of ability to behave, groom, and live in a typical manner. Many appear to be underweight which could be from underlying health issues or an inability to get to food due to competitive feeding order and limited food resources.

I questioned Kerber about the sick animals in the cattery as well as the horses. When asked about the injuries to the cats and whether they had received medical care, she was unable to provide any specific proof. She did share that they make their own colloidal silver spray on the property by attaching electrodes to silver plates in water and then bottling it. She showed me a bottle of what appeared to be a grayish opaque liquid. Kerber stated she sprays the mixture on all of the cats' injuries. Similarly, when questioned about vet records for the injured horses, Kerber could not

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

provide any information or veterinarian names. She did share that she gives the horses "Bute" which is Phenylbutazone, a widely used prescription non-steroidal anti-inflammatory drug (NSAID) for horses and used to treat pain and inflammation. We were granted access to the side rooms in the barn where the worst condition horses were but were unable to locate any "Bute" amongst a large supply of expired medications, most over the counter. As of this writing, ownership transfer has still not been completed, and proof of veterinary care for the animals in need has not been provided by Kerber. Additionally, on 04/13/26 when the initial meeting occurred, it was estimated that there were 200 hundred horses on property. At last count on 04/26/26 161 horses were counted. This raises concern that some of the horses, possibly sick or injured ones, are being moved off the property. While Trustee Gladstone is overseeing the property – currently Kerber continues to be the primary caregiver and sole person purchasing what food is available, feeding and in charge of getting vet care for all animals on the property.

## OPINIONS AND CONCLUSIONS

Based on my training, education, and experience in humane law enforcement and veterinary medicine, I am familiar with a recurring pattern in which animal rescue or sanctuary operations become animal hoarding situations. In such matters, a person or organization may begin with the stated intent of rescuing, rehabilitating, or providing sanctuary to animals, but over time accumulates animals in numbers exceeding the available resources, staffing, space, sanitation, and veterinary support necessary to provide lawful and humane care. When this occurs, the resulting conditions frequently include overcrowding, environmental contamination, untreated medical conditions, malnutrition, infectious disease risk, and the inability to provide adequate husbandry or

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

timely veterinary intervention. In my professional experience, such situations have repeatedly resulted in the removal of animals for their protection and welfare.

Based on my training, education, and experience, including the investigation of over 50 animal hoarding cases and my veterinary medical technician background, it is my professional conclusion that:

1) There are many animals on the property which are suffering from severe neglect

2) All of the cats in the catteries are suffering due to overcrowding, reflected in the cattery's structure and population. Individual cats that need medical care are being overlooked or ignored, likely due to the sheer quantity of cats in a small area.

3) Most of the horses suffer from lack of basic required husbandry which is likely contributing to their poor overall condition and lameness.

4) There are clear violations of California Penal Code that likely date back months, if not years, of 597.1 – failure to provide adequate care, 597(t) – inadequate space and confinement, and 597(b) – neglect and unnecessary suffering.

I believe that further sick and injured animals as well as other evidence of crimes will be located on the three parcels. Further, my training and experience indicates individuals who abuse and/or neglect one of their animals have a tendency to subject other animals under their possession, care, charge and/or custody, to the same treatment. Therefore, I desire to seize all animals that can be safely and humanely captured and transported. [People vs. Speegle (App. 3 Dist. 1997) 62 Cal.Rptr.2d 384, 53 Cal.App.4th 1405].

Therefore, based on my training, experience, and the above facts, which I believe to be true, I have substantial cause to believe the above-described properties or a portion thereof will be found in the residence described herein.

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

## ADDITIONAL REQUESTS, IF ANY

Based on the aforementioned information and investigation, I believe that grounds for the issuance of a search warrant exist as set forth in Penal Code 1524.

I, the affiant, hereby pray that a search warrant be issued for the seizure of said property, or any part thereof, from said premises, good cause being shown therefore, and that the same be brought before this magistrate or retained subject to the order of this Court.

I, **Jace Huggins** your affiant, swear under penalty of perjury to the truth of the contents of this affidavit and pursuant to P.C.1526(c)(1), hereby verify the same by my digital electronic signature typed in by me below.

Affiant Name: **Jace Huggins**

I.D. **001**

Signed and Sworn on 04/30/2026

This affidavit has been reviewed for legal sufficiency by Deputy District Attorney Eric Bodnar

Page **18** of **18** 2604301040-OTH-PHS-US-USW

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

**IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,**

**COUNTY OF SAN DIEGO**

**SEARCH WARRANT**

**No. 2604301040-OTH-PHS-US-USW**

The People of the State of California, to any peace officer in the County of San Diego:

Proof, by affidavit, having been this day made before me by Jace Huggins, a qualified affiant, that there is substantial probable cause pursuant to Penal Code section 1524 for the issuance of the search warrant, as set forth in the affidavit attached hereto and made a part hereof as is fully set forth herein, you are, therefore, commanded to make search at any time of the day.

**WARRANT REQUEST**

**LOCATION, PROPERTY, AND/OR PERSON[S] TO BE SEARCHED**

With the assistance San Diego Sheriff's Department, San Diego County Department of Animal Services, California Licensed Veterinarians including sheltering and private vets, field and staff teams from local shelters, the Large Animal Group CART (Community Animal Response Team), all individuals to be identified and listed in the investigative report.

A. The premises and all parts therein, including all rooms, attics, basements, cellars, crawl spaces, safes, mail receptacles, storage areas, refrigerators, freezers, containers, surrounding grounds, pastures, animal yards, trash containers, barns, garages and outbuildings assigned to, or part of the residence and property located at 4554 Boulder Creek Road, 0 Eagle Peak Rd. and 4430 Boulder Creek Rd., Julian, CA 92036 ("Villa Chardonnay Horses With Wings, INC.") dwelling and land currently occupied by Monika Kerber and Mercedes Flores. The property to be searched is three rural parcels consisting of approximately forty (40) acres, located in the County of San Diego, State of

Page 1 of 7 2604301040-OTH-PHS-US-USW

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

California, and commonly accessed via Boulder Creek Road. Ownership of all three parcels has been confirmed as "Villa Chardonnay Horses With Wings, INC." via the county assessor website. The property is entered through a large gate situated along Boulder Creek Road, which provides primary access to the parcel. There are two additional gate access points, one approximately .25 miles south from the first main entrance and the other at the Northwest back end of the property which opens out to Eagle Peak Rd. The property contains a two-story, single-family residence of approximately 4,706 square feet, which serves as the main dwelling. In addition to the primary residence, the property includes multiple outbuildings, including but not limited to barns, storage structures, sheds, and other auxiliary buildings. The parcel consists of multiple fenced and unfenced pasture areas, corrals, and enclosures used for the housing and containment of animals. The property includes all structures, outbuildings, barns, sheds, trailers, vehicles, containers, and enclosures located within the boundaries of the parcel, as well as any open land, pastures, or areas where animals may be housed, kept, or concealed. This warrant authorizes the search of the entire property, including the main residence, all outbuildings, barns, structures, vehicles, and any areas under the control of the occupants where evidence or animals described in this warrant may be located.

## ITEMS TO BE SEIZED

For the following property, to wit:

Page **2** of **7 2604301040-OTH-PHS-US-USW**

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

1. Any ill, injured, unborn, or deceased animals that are found above ground or underground.

2. Any and all animals located on the property, including but not limited to horses, cats, dogs, livestock, poultry, and any other domestic or exotic animals.

3. Any animal exhibiting signs of neglect, malnutrition, dehydration, illness, injury, or lack of veterinary care.

4. Any deceased animals, carcasses, skeletal remains, or animal parts, whether buried, stored, or otherwise concealed.

5. Any structures, enclosures, cages, stalls, pens, or fencing used to confine animals that are unsafe, unsanitary, or inadequate.

6. Any accumulations of feces, urine, waste, trash, or hazardous debris impacting animal health and welfare.

7. Any food or water sources, including feed, hay, grain, supplements, feeding devices, or watering devices, that are spoiled, contaminated, insufficient, or otherwise inadequate.

8. Any animal feed, hay, grain, supplements, or other nutritional provisions, whether adequate or inadequate, as evidence of care or neglect.

9. Any veterinary medications, pharmaceuticals (prescription or non-prescription), syringes, needles, medical equipment, or treatment supplies.

10. Any records or evidence reflecting the administration or lack of administration of veterinary care or medical treatment.

11. Any veterinary records, treatment logs, vaccination records, or medical histories for animals located on the property.

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

12. Any breeding records, ownership documents, bills of sale, transfer records, or adoption paperwork.

13. Any financial records related to the care, acquisition, sale, or maintenance of animals.

14. Any logs, notes, journals, calendars, or written documentation reflecting animal care practices.

15. Any computers, tablets, cellular phones, digital storage devices, cameras, or surveillance equipment capable of storing electronic evidence.

16. Any digital files, including photographs, video recordings, emails, text messages, or social media content depicting animals, their condition, or their care.

17. Any equipment used in the care, restraint, transport, or handling of animals, including but not limited to halters, leads, cages, crates, trailers, or transport vehicles.

18. Any tools, implements, or instruments used to inflict harm on animals or facilitate neglect.

19. Any soil, water, feed, or environmental samples necessary to assess conditions affecting animal health and welfare.

20. Any hazardous materials, toxins, chemicals, or unsafe structural components impacting the safety and welfare of animals.

21. Any tags, microchips, branding equipment, or other animal identification tools.

22. Any documents or items establishing ownership, possession, custody, or control over the animals or property, including utility bills, leases, or correspondence.

Exhibit A
23 of 25

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

23.   Authority to photograph, video record, and otherwise document the condition of the animals and property, and to collect forensic evidence related thereto.

24.   All animals contained within the residence.

Having read and considered the sworn affidavit in support of this warrant, this warrant is approved including the court's orders on the request(s) as indicated below.  The warrant is hereby issued on 4/30/2026 | 12:42 PDT ·

If you find the items authorized to be seized, or any part thereof, you are ordered to bring it forthwith before me at the Superior Court of the State of California for the County of San Diego, or to any other court in which the offense in respect to which the property or things is triable.

Alternatively, you may retain such property in your custody, subject to the order of this Court, pursuant to section 1536 of the Penal Code, unless seized under state or federal asset forfeiture laws pursuant to Title 21 United States Code section 881, and to dispose of said property pursuant to law and the impounding agency's evidence disposal protocols when the property is no longer of evidentiary value.

Docusign Envelope ID: C8CCA194-2C37-85A4-8175-B46BF70CE9DB

DocuSigned by:

0E44C91C4023434

Polly Shamoon

Judge of the Superior Court

Exhibit A
25 of 25