**Michael R. Totaro 102229**
**Totaro & Shanahan, LLP**
**P.O. Box 789**
**Pacific Palisades, CA 90272**
**(310) 804 2157**
**Ocbkatty@aol.com**

**Former Attorneys for Debtor in Possession**

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA, SAN DIEGO DIVISION**

| | |
|---|---|
| **In re**<br><br>**Villa Chardonnay Horses with Wings, Inc**<br><br>**Debtor in Possession.** | **Case No. 3:25-bk-04245-JBM11**<br><br>**Chapter 11**<br><br>**REPLY OF MICHAEL R. TOTARO, MAUREEN J. SHANAHAN AND TOTARO & SHANAHAN, LLP TO TRUSTEE'S OPPOSITION TO REVISED FIRST AND FINAL FEE APPLICATION**<br><br>**Date: November 3, 2026**<br>**Time: 1:30 p.m.**<br>**Ctrm: 2 Rm 118**<br>**325 W. F St.**<br>**San Diego, CA 92101**<br><br>**HON. J. BARRETT MARUM** |

**REPLY OF TOTARO & SHANAHAN, LLP TO TRUSTEE'S OPPOSITION TO REVISED FIRST AND FINAL FEE APPLICATION [DKT 299]**

Totaro & Shanahan, LLP (the "Firm"), former general insolvency counsel to the Debtor, submits this reply to the Trustee's Opposition [Dkt 299] to the Firm's Revised First and Final Fee Application [Dkt 288] (the "Revised Application"). The reply is supported by the concurrently filed Supplemental Declaration of Michael R. Totaro (the "Totaro Dec.") and its Exhibit "A."

# I. INTRODUCTION

The Trustee raises three objections: that the Revised Application was filed after the August 31, 2026 administrative claims bar date, that the time records were not revised, and that the Firm has not shown its services were reasonably likely to benefit the estate. None warrants denial.

The Firm's claim was on file before the bar date existed. The Firm filed its first application on July 12, 2026 [Dkt 220], ten days before the Court entered the Administrative bar date order on July 22, 2026 [Dkt. 241], and the Trustee opposed it on July 27. The Court did not reject the claim. It denied the application without prejudice so that the Firm could revise its time entries, and it set no deadline for doing so. The Revised Application is the revision the Court invited, not a new claim.

On the merits, the Court asked how the Firm's work benefited the estate. The supplemental declaration answers that question task by task. In the 3½ months before the Trustee was appointed, the Firm kept a case that had already been dismissed once in compliance with the Code and the U.S. Trustee's requirements. In doing so it preserved the 45-acre Property that the Trustee is now selling for creditors. The Firm also restored the Debtor's ability to accept donations to feed the animals, prepared every monthly operating report, analyzed the claims and roughly $6.6 million in recorded liens, and put in the record an appraisal valuing the Property at $3,625,000, more than $1 million above a creditor's figure. That is the benefit Section 330 requires.

# II. THE FIRM'S CLAIM WAS TIMELY ASSERTED AND RETAINS ADMINISTRATIVE PRIORITY

## A. The Claim Was on File Before the Bar Date, and the Court Invited Its Revision.

The bar date order requires a party who believes it holds an administrative claim to "file … a motion for approval" by August 31, 2026. [Dkt 241, ¶ 5.] The Firm had done exactly that six weeks earlier. The Trustee concedes that the July 12th application was her

"first notice" of the Firm's claim (Opp. 5:3-6) and that she opposed it before the bar date passed. The bar date order exists to identify unknown administrative claims so the estate can plan its distribution. This claim was not unknown. It had already been filed, opposed and quantified.

The Court's ruling of August 6th did not decide that the Firm had no claim. It said: "Instead of reducing fees, the Court will provide Applicant an opportunity to revise the time entries to eliminate lumping and to fully describe the work Applicant performed." [Dkt 261.] It denied the application "without prejudice to Applicant re-filing it with respect to fees incurred prior to the Chapter 11 Trustee's appointment" and set no deadline for re-filing. The order on the tentative was entered on August 7, 2026, only a short time before the bar date. The Firm re-filed on September 9, 2026.

The Trustee's only authority, *In re Reeves*, 127 B.R. 866 (Bankr. S.D. Cal. 1991), does not support her. *Reeves* was a dischargeability action. Sears filed its complaint but did not serve it within the 120 days required by former Fed. R. Civ. P. 4(j), and the court found "simple attorney neglect" with not good cause. *Id.* at 868. The court then held that Sears could not refile because the 60-day deadline of Fed. R. Bankr. P. 4007(c) had passed. Sears's filing could not have stopped the clock, because "[t]olling of the statute of limitations is conditional upon the timely completion of service of process," and "[s]ince there was no proper service in this case, there could be no tolling." *Id.* at 869. Only in that setting did the court say that a dismissal without prejudice leaves "the plaintiff" as if the action had never been filed. *Id.* (citing *U.S. ex rel. DeLoss v. Kenner General*, 764 F.2d 707, 710-11 (9th Cir. 1985)).

Every element of *Reeves* is missing here. The Firm's first application was not dismissed for any default by the Firm. It was properly filed and served, and the Trustee answered it on the merits before the bar date passed. The Court denied it without prejudice for the stated purpose of giving the Firm "an opportunity to revise the time entries," and set no deadline for doing so. *Reeves* also turned on Rule 4(j), which the court stressed "is

part of an act of Congress," and on the fixed deadline of Rule 4007(c). *Id.* at 869. The August 31 date, by contrast, was set by this Court's own order on the Trustee's ex parte application. The Court has full discretion over that deadline, and Rule 9006(b)(1) permits it to be enlarged. Under *Reeves*'s own reasoning, a timely filing that was properly served and actually litigated is effective; it is the opposite of Sears's complaint.

**B. Alternatively, Any Delay Was Excusable Neglect.**

If the Court considers the September 9th filing late, it may extend the deadline after the fact on a showing of excusable neglect. Fed. R. Bankr. P. 9006(b)(1). The test is equitable and considers the danger of prejudice, the length of the delay and its effect on the proceedings, the reason for the delay, and good faith. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993); *Pincay v. Andrews*, 389 F.3d 853, 855 (9th Cir. 2004) (en banc). Each factor favors the Firm. The delay was nine days. The Trustee has known the amount and nature of the claim since July and identifies no prejudice. No distribution has been made and claim and interim application are still being filed and hearings held. The Firm used the time to revise the application as the Court directed, believing in good faith that it was continuing an application already before the Court. Finally, compensation allowed under Section 330(a) is by statute an administrative expense. 11 U.S.C. § 503(b)(2).

As a matter of fact, the Court is still adjudicating a number of administrative claims including that of the trustee.

**<u>III. THE FIRM'S SERVICES WERE REASONABLY LIKELY TO BENEFIT THE ESTATE AND DID BENEFIT IT</u>**

**A. Benefit Is Measured When the Services Were Rendered, Not in Hindsight.**

Bankruptcy Code section 330(a)(3)(C) asks whether services were "necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of," the case. Section 330(a)(4)(A)(ii) excludes only services that were not "reasonably likely to benefit the debtor's estate" or "necessary to the administration of the

case." The test is what a reasonable attorney would have done at the time, not whether the effort ultimately succeeded. *In re Mednet*, 251 B.R. 103, 108 (B.A.P. 9th Cir. 2000). Trustee agrees that counsel need not "guarantee any particular result." (Opp. 10:21-24.) The two disjunctive prongs also matter: services "necessary to the administration of the case" are compensable whether or not they produced a measurable return.

*In re Coastal Equities, Inc.*, 39 B.R. 304 (Bankr. S.D. Cal. 1984), does not help the Trustee. The fees reduced there were for a plan that was never accompanied by a disclosure statement and never put to a vote. The Firm seeks nothing for a plan.

**B. The Specific Benefits to the Estate.**

The supplemental declaration describes what each category of work accomplished. In summary:

*1. The Property was preserved for creditors.* The case was filed on October 14, 2025 to stop a foreclosure. The first case had been dismissed for failure to provide proof of insurance. In this case the Firm made certain insurance was obtained, the Office of the US Trustee listed on the policies and proof provide to the US Trustee. Counsel prepared the Debtor's principal for and attended the Initial Debtor Interview and the § 341(a) meeting, and attended every hearing, reducing its travel time. (Totaro Decl. ¶¶ 5-6.) As a result, the case survived and the automatic stay remained, and the Chapter 11 Trustee has sold the Property for the estate. A court-supervised sale of the principal estate asset, rather than a foreclosure, is the most basic benefit a chapter 11 case can give creditors.

*2. The case met its reporting obligations.* The Debtor's president did not prepare the monthly operating reports, and the Debtor had no accountant. The Firm collected and organized the receipts and prepared and filed at least four reports. (Totaro Decl. ¶ 7.) Those filings were mandatory, and failing to make them is cause for dismissal under 11 U.S.C. § 1112(b)(4)(F). The reports also created the first reliable record of the Debtor's actual income.

*3. The animals were fed without cost to the estate.* The Firm worked with the

California Attorney General to resolve the Debtor's charitable registration so the Debtor could lawfully accept donations to feed hundreds of animals. (Totaro Decl. ¶ 8.) Without that, caring for the animals would have become an immediate cost to the estate.

*4. Secured creditors were kept at bay.* The Firm dealt with counsel for the first deed of trust holder and the SBA regarding their claims. (Totaro Decl. ¶ 9.)

*5. Claims and liens were analyzed.* The Firm reviewed every proof of claim as it was filed and, with the title review, set out roughly $6.6 million in recorded liens and their priority. (Totaro Decl. ¶ 10.) That work bears directly on the distribution of the sale proceeds the Trustee will administer.

*6. The Motion to Value created a valuation record.* The Motion to Value was filed on January 26, 2026, before the Trustee's appointment. It was supported by an appraisal valuing the Property at $3,625,000, compared with the $2,500,000 a creditor asserted. (Totaro Decl. ¶ 11.) When it was prepared, the debtor in possession was pursuing a family-funded purchase, and the motion was the necessary first step toward that transaction. The Trustee withdrew the motion because she chose a different course; it was never denied on its merits. An appraisal-supported value more than $1 million above a creditor's figure remains in the record and protects the estate's position in the sale.

*7. Counsel investigated what the Debtor would not volunteer.* The Firm obtained missing tax returns, identified the gap between the $1.8 to $1.9 million in reported annual donations and actual receipts of no more than about $60,000 a month, and checked the represented family funding by email, by video conference, through a background check, and with Merrill Lynch. It reported what it learned to the Trustee. (Totaro Decl. ¶¶ 12-13.)

**C. The "Red Flags" Argument Is Hindsight.**

The Trustee argues that a reasonable attorney would have recognized the warning signs sooner. (Opp. 11:3-17.) But the Revised Application did not hide those signs. Counsel described them because he investigated each one. At the time, they pointed in innocent directions. The Debtor reported more income than it received, which taxpayers do not

normally do and which no practitioner counsel consulted could explain. Most of the tax returns bore filing stamps. A brokerage account had in fact been opened.

he represented benefactor proved to be a real and prominent professional. (Totaro Decl. ¶¶ 12-13.) Only after the Trustee's appointment did counsel learn that reporting gross revenue just under $2 million can keep a California charity out of the mandatory audit requirement. Counsel's diligence is what brought the discrepancies to light. Section 330 does not make the debtor's attorney the guarantor of the principal's honesty, and the law does not judge counsel by facts that came out later. *Mednet*, 251 B.R. at 108.

The Trustee also notes that the time records begin on October 15, 2025. (Opp. 11:18-25.) That is because the Firm wrote off its pre-filing work, $13,020.00 billed in the first case, by credit memo on October 13, 2025, and asserts no claim for any pre-petition services. (Totaro Decl. ¶ 4.) The Firm absorbed that cost; it did not pass it on to this estate.

## IV. THE TIME RECORDS NOW SHOW WHAT THE COURT ASKED FOR

The supplemental declaration and Exhibit "A" describe each task separately, identify the document, claim, creditor or hearing involved, and state the purpose of the work. The two "RV Loan docs" entries concerned different documents reviewed six weeks apart. (Totaro Decl. ¶ 16.) The Revised Application's statement that certain billing categories overlap was a candid description of how the U.S. Trustee's categories are defined. It is not an admission that any task was billed twice, and the Trustee identifies no entry that was. If the Court still finds particular entries insufficient, the remedy is to reduce those entries, not to deny compensation for 3½ months of necessary work.

## V. THERE WAS NO CONFLICT OF INTEREST

The Trustee suggests that Mr. Totaro sought a loan from Ms. Kerber's father "to fund Totaro's own finances." (Opp. 12:8-13 & n.3.) He did not. The offer was unsolicited, came from Ms. Kerber, and was refused every time it was raised. No terms were discussed, no documents were exchanged, and no money was ever received by Mr. Totaro or the Firm from any member of the family. Mr. Totaro disclosed the approaches to the Trustee

himself. (Totaro Decl. ¶ 19.) The time entries that mention the father concern the proposed purchase of the Property, which was a plan-funding source discussed openly. With no agreement and no payment, there was nothing to disclose under Fed. R. Bankr. P. 2016(b) and no interest adverse to the estate. As to the retainer questions the Trustee raises (Opp. 3:17-22, 4:14-18), the amounts, payors and application of every payment are set out in the declaration. (Totaro Decl. ¶¶ 17-18.) The Firm has received nothing for fees in this case.

## VI. CONCLUSION

The Firm asks the Court to allow compensation of $38.195.00 for services rendered from October 15, 2025 through January 29, 2026, as a chapter 11 administrative expense under 11 U.S.C. §§ 330(a) and 503(b)(2). In the alternative, if the Court concludes that priority is barred, the Firm asks that the fees be allowed as a general unsecured claim.

Dated: October 27, 2026

TOTARO & SHANAHAN, LLP

/s/ Michael R. Totaro
Michael R. Totaro
Prior Bankruptcy Cousnel for Debtor